**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE: CERNER/ORACLE DATA BREACH LITIGATION | Case No. 25-00259-CV-W-BP<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT CERNER CORPORATION'S SUGGESTIONS IN SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 2

ARGUMENT ..... 4

I. Plaintiffs Lack Standing ..... 4

A. Plaintiffs Lack Standing To Seek Prospective Relief ..... 4

B. Plaintiffs Lack Standing To Seek Retrospective Relief ..... 7

II. Plaintiffs Fail To State A Claim ..... 14

A. Choice Of Law ..... 15

B. Plaintiffs' Negligence Claims Fail ..... 17

C. Plaintiffs' Contract Claims Fail ..... 25

D. Plaintiffs' Miscellaneous Common-Law Claims Fail ..... 28

E. Plaintiffs' Invasion-Of-Privacy Claims Fail ..... 32

F. Plaintiffs' Consumer-Protection Claims Fail ..... 34

G. Plaintiffs' Request For A Declaratory Judgment Should Be Denied ..... 40

CONCLUSION ..... 40

## TABLE OF AUTHORITIES

## CASES

Page(s)

*A.G. Edwards & Sons, Inc. v. Drew*,
978 S.W.2d 386 (Mo. Ct. App. 1998)....31

*Allied Services, LLC v. Smash My Trash, LLC*,
153 F.4th 600 (8th Cir. 2025)....28, 40

*Amburgy v. Express Scripts, Inc.*,
671 F. Supp. 2d 1046 (E.D. Mo. 2009)....22

*American Eagle Waste Industries, LLC v. St. Louis County*,
379 S.W.3d 813 (Mo. 2012) (per curiam)....27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....14

*Auer v. Trans Union, LLC*,
902 F.3d 873 (8th Cir. 2018)....7, 9

*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*,
155 A.3d 445 (Md. 2017)....24

*Balke v. Ream*,
33 S.W.3d 589 (Mo. Ct. App. 2000)....32

*BancOklahoma Mortgage Corporation v. Capital Title Company*,
194 F.3d 1089 (10th Cir. 1999)....31

*Bass v. Bowmar Nutrition, LLC*,
2022 WL 4182203 (S.D. Iowa Aug. 30, 2022)....40

*Bassett v. Credit Bureau Services, Inc.*,
60 F.4th 1132 (8th Cir. 2023)....10

*BBX Capital Corporation v. Scottsdale Insurance Company*,
713 S.W.3d 590 (Mo. Ct. App. 2025)....16, 17

*Berry v. Crescent Community Health Center*,
2025 WL 1287909 (N.D. Iowa May 2, 2025)....21, 27

*Bourgeois v. Vanderbilt*,
639 F. Supp. 2d 958 (W.D. Ark. 2009), *aff'd*, 417 F. App'x 605 (8th Cir. 2011)
(per curiam)....17

*Brock v. Dunne*,
637 S.W.3d 22 (Mo. 2021) ....................17, 18, 21

*Brown v. Conagra Brands, Inc.*,
131 F.4th 624 (8th Cir. 2025) ....................2

*Brown v. Schnuck Markets, Inc.*,
973 S.W.2d 530 (Mo. Ct. App. 1998) (per curiam)....................20

*Calderon v. Sixt Rent a Car, LLC*,
114 F.4th 1190 (11th Cir. 2024) ....................35

*Campbell v. Honey Science, LLC*,
797 F. Supp. 3d 1080 (N.D. Cal. 2025) ....................34

*Carter v. Ludwick*,
139 F.4th 982 (8th Cir. 2025) ....................3

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)....................4

*Clay v. Bank of America, N.A.*,
2025 WL 3013000 (E.D. Mo. Oct. 28, 2025) ....................29

*Crowe v. Managed Care of North America*,
2024 WL 6863341 (S.D. Fla. Aug. 16, 2024)....................21

*DeCastro v. Hot Springs Neurology Clinic, P.A.*,
107 F.4th 813 (8th Cir. 2024) ....................15, 19, 39

*Denmon v. Kansas Counselors, Inc.*,
149 F.4th 1010 (8th Cir. 2025) ....................8, 9, 10

*Devine v. Horizontal Integration, Inc.*,
2025 WL 3687972 (D. Minn. Dec. 19, 2025)....................13

*DiSalvo Properties, LLC v. Hall*,
616 S.W.3d 502 (Mo. Ct. App. 2020)....................27

*Dodd v. Jones*,
623 F.3d 563 (8th Cir. 2010) ....................25

*Domagala v. Rolland*,
805 N.W.2d 14 (Minn. 2011)....................18

*Duty Free Americas, Inc. v. Legg Mason Wood Walker, Inc.*,
2005 WL 914395 (Md. Cir. Ct. Jan. 13, 2005)....................29

*Earley v. Dunn*,
670 S.W.3d 47 (Mo. Ct. App. 2023) .... 18

*Ellis v. Nissan North America Inc.*,
2020 WL 3105097 (W.D. Mo. June 11, 2020) .... 40

*Elmore v. Owens-Illinois, Inc.*,
673 S.W.2d 434 (Mo. 1984) .... 16

*Emerick v. Mutual Benefit Life Insurance Company*,
756 S.W.2d 513 (Mo. 1988) .... 30, 31

*Estate of Peterson ex rel. Peterson v. Koelsch Senior Communities, LLC*,
2025 WL 953709 (D. Mont. Feb. 21, 2025), *report and recommendation adopted*, 2025 WL 914401 (D. Mont. Mar. 26, 2025) .... 36

*Exxon Mobil Corporation v. Albright*,
71 A.3d 30 (Md. 2013) .... 22

*Faheen ex rel. Hebron v. City Parking Corporation*,
734 S.W.2d 270 (Mo. Ct. App. 1987) .... 18

*Faltermeier v. FCA US LLC*,
899 F.3d 617 (8th Cir. 2018) .... 35

*Farmer v. Humana, Inc.*,
582 F. Supp. 3d 1176 (M.D. Fla. 2022) .... 39

*Fenrich v. Blake School*,
920 N.W.2d 195 (Minn. 2018) .... 18

*Ford v. Bluegreen Vacations Unlimited, Inc.*,
2022 WL 1125276 (W.D. Mo. Apr. 14, 2022) .... 26

*Frost v. Sioux City*,
920 F.3d 1158 (8th Cir. 2019) .... 6, 7

*FTC v. Johnson*,
800 F.3d 448 (8th Cir. 2015) .... 25

*Gilbreath v. First State Bank of Joplin*,
859 S.W.2d 237 (Mo. Ct. App. 1993) .... 31

*Goguen v. NYP Holdings, Inc.*,
544 P.3d 868 (Mont. 2024) .... 16

*Gourdine v. Crews*,
955 A.2d 769 (Md. 2008) .... 18

*Grossman v. GEICO Casualty Company*,
2022 WL 1656593 (2d Cir. May 25, 2022) ....................35

*Hale v. Emerson Electric Company*,
942 F.3d 401 (8th Cir. 2019) (per curiam)....................17, 34

*Hall v. Centerspace, LP*,
2023 WL 3435100 (D. Minn. May 12, 2023)....................4, 6

*Hawaiian Airlines, Inc. v. AAR Aircraft Services, Inc.*,
167 F. Supp. 3d 1311 (S.D. Fla. 2016) ....................34

*Healthcare Living for Families, Inc. v. Optum, Inc.*,
2025 WL 2300720 (D. Md. Aug. 8, 2025) ....................32

*Hekel v. Hunter Warfield, Inc.*,
118 F.4th 938 (8th Cir. 2024) ....................7, 9, 10, 12

*Hennessey v. Gap, Inc.*,
86 F.4th 823 (8th Cir. 2023) ....................34

*Hiscox Insurance Company v. Warden Grier, LLP*,
474 F. Supp. 3d 1004 (W.D. Mo. 2020) ....................27

*Holden Farms, Inc. v. Hog Slat, Inc.*,
347 F.3d 1055 (8th Cir. 2003) ....................25

*Holmes v. Elephant Insurance Company*,
156 F.4th 413 (4th Cir. 2025) ....................6

*Howard v. Frost National Bank*,
458 S.W.3d 849 (Mo. Ct. App. 2015)....................33

*Howland v. Truman Medical Center, Inc.*,
719 S.W.3d 98 (Mo. Ct. App. 2025)....................24, 25

*In re American Medical Collection Agency, Inc. Customer Data Security Breach Litigation*,
2023 WL 8540911 (D.N.J. May 5, 2023)....................30

*In re Arthur J. Gallagher Data Breach Litigation*,
631 F. Supp. 3d 573 (N.D. Ill. 2022) ....................28

*In re Change Healthcare, Inc. Customer Data Security Breach Litigation*,
2025 WL 3693201 (D. Minn. Dec. 19, 2025)....................6, 18, 21, 29

*In re Folgers Coffee Marketing*,
159 F.4th 1151 (8th Cir. 2025) ....................35

*In re Fortra File Transfer Software Data Security Breach Litigation*,
749 F. Supp. 3d 1240 (S.D. Fla. 2024) ....................................................................39

*In re MCG Health Data Security Issue Litigation*,
2023 WL 3057428 (W.D. Wash. Mar. 27, 2023), *report and recommendation adopted*, 2023 WL 4131746 (W.D. Wash. June 22, 2023)........28, 33, 37

*In re NCB Managment Services, Inc. Data Breach Litigation*,
748 F. Supp. 3d 262 (E.D. Pa. 2024) ..............................................................28, 40

*In re Pawn America Consumer Data Breach Litigation*,
2022 WL 3159874 (D. Minn. Aug. 8, 2022) .........................................................6

*In re Samsung Data Security Breach Litigation*,
761 F. Supp. 3d 781 (D.N.J. 2025) ....................................................................12

*In re St. Jude Medical, Inc., Silzone Heart Valve Products Liability Litigation*,
425 F.3d 1116 (8th Cir. 2005) ...........................................................................15

*In re SuperValu, Inc., Customer Data Seccurity Breach Litigation*,
870 F.3d 763 (8th Cir. 2017) ...................................................4, 5, 7, 11, 12, 22

*In re SuperValu, Inc., Customer Data Secruity Breach Litigation*,
925 F.3d 955 (8th Cir. 2019) .................................................12, 14, 19, 22, 23

*In re U.S. Vision Data Breach Litigation*,
2025 WL 615366 (D.N.J. Feb. 26, 2025) ...........................................................36

*In re Unite Here Data Security Incident Litigation*,
740 F. Supp. 3d 364 (S.D.N.Y. 2024)..................................................................36

*In re Waste Managment Data Breach Litigation*,
2022 WL 561734 (S.D.N.Y. Feb. 24, 2022).........................................................21

*J.J. ex rel. C.W. v. Poplar Bluff Regional Medical Center, L.L.C.*,
675 S.W.3d 259 (Mo. Ct. App. 2023)...................................................................25

*Johnson v. Cornerstone National Insurance Company*,
2024 WL 5265372 (W.D. Mo. Apr. 29, 2024) ...................................................5, 6

*Jones v. Bloomingdales.com, LLC*,
124 F.4th 535 (8th Cir. 2024) ..............................................................................8

*JTL Consulting, L.L.C. v. Shanahan*,
190 S.W.3d 389 (Mo. Ct. App. 2006)...................................................................26

*Karn v. PTS of America, LLC*,
590 F. Supp. 3d 780 (D. Md. 2022) ....................................................................17

*Kearns v. Ford Motor Company*,
567 F.3d 1120 (9th Cir. 2009) ....................................................................................34

*Kingman v. Dillard's, Inc.*,
643 F.3d 607 (8th Cir. 2011) ....................................................................15, 20, 30, 31

*Klaxon Company v. Stentor Electric Manufacturing Company*,
313 U.S. 487 (1941)....................................................................................................15

*Knockerball MidMo, LLC v. McGowan & Company*,
667 S.W.3d 640 (Mo. Ct. App. 2023)..........................................................................23

*Kostelecky v. Peas in a Pod LLC*,
518 P.3d 840 (Mont. 2022)..........................................................................................35

*Kuhns v. Scottrade, Inc.*,
868 F.3d 711 (8th Cir. 2017) ...........................................................................20, 21, 37

*L.A.C. ex rel. D.C. v. Ward Parkway Shopping Center Company*,
75 S.W.3d 247 (Mo. 2002) ...........................................................................................26

*Lawson v. DoorDash, Inc.*,
658 F. Supp. 3d 707 (W.D. Mo. 2023) ...........................................................................4

*Lawton v. Hyundai Motor America, Inc.*,
734 F. Supp. 3d 904 (W.D. Mo. 2024) .........................................................................19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
739 F.3d 45 (2d Cir. 2013) (per curiam).......................................................................16

*Lindenmuth v. McCreer*,
165 A.3d 544 (Md. Ct. Spec. App. 2017)......................................................................32

*M.B. v. Live Nation Worldwide, Inc.*,
661 S.W.3d 342 (Mo. Ct. App. 2022)..........................................................................18

*Mackey v. Belden, Inc.*,
2021 WL 3363174 (E.D. Mo. Aug. 3, 2021)..........................................16, 19, 29, 31, 40

*McAllister v. St. Louis Rams, LLC*,
2018 WL 1299710 (E.D. Mo. Mar. 13, 2018) ..............................................................31

*McCann v. Foster Wheeler LLC*,
225 P.3d 516 (Cal. 2010).............................................................................................16

*McNeil v. Best Buy Company*,
2014 WL 1316935 (E.D. Mo. Apr. 2, 2014)..................................................................33

*Merritt v. Wilson*,
697 S.W.3d 814 (Mo. Ct. App. 2024)....................27

*Meyer v. City of Walnut Grove*,
505 S.W.3d 331 (Mo. Ct. App. 2016)....................24

*Miller v. NextGen Healthcare, Inc.*,
742 F. Supp. 3d 1304 (N.D. Ga. 2024)....................28

*Mohsen v. Veridian Credit Union*,
733 F. Supp. 3d 754 (N.D. Iowa 2024)....................30

*Morales v. Conifer Revenue Cycle Solutions, LLC*,
2025 WL 1096396 (C.D. Cal. Mar. 31, 2025)....................38

*Mullinix v. US Fertility, LLC*,
2021 WL 4935975 (C.D. Cal. Apr. 21, 2021)....................38

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020)....................29

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................6

*Negron v. Ascension Health*,
2025 WL 2710014 (E.D. Mo. Sept. 23, 2025)....................10, 13, 19, 25, 29, 33

*New Life Treatment Center, Inc. v. Sanford Health Plan*,
2024 WL 5186986 (D.S.D. Dec. 20, 2024)....................40

*Ojogwu v. Rodenburg Law Firm*,
26 F.4th 457 (8th Cir. 2022)....................14

*Parnell v. FanDuel, Inc.*,
591 S.W.3d 315 (Ark. 2019)....................35

*Plank v. Cherneski*,
231 A.3d 436 (Md. 2020)....................30, 31, 32

*Polkowski v. Jack Doheny Companies*,
2025 WL 3079358 (E.D. Mich. Nov. 4, 2025)....................21

*Pop v. LuliFama.com LLC*,
145 F.4th 1285 (11th Cir. 2025)....................34

*Prestby v. A&A Services, LLC*,
2026 WL 26128 (D. Neb. Jan. 5, 2026)....................4, 6, 10

*Pulliam v. West Technology Group, LLC*,
2024 WL 356777 (D. Neb. Jan. 19, 2024) .......... 9

*Regents of University of California v. Superior Court*,
163 Cal. Rptr. 3d 205 (Ct. App. 2013) .......... 38

*Robinson v. Langenbach*,
599 S.W.3d 167 (Mo. 2020) .......... 30

*S&H Farm Supply, Inc. v. Bad Boy, Inc.*,
25 F.4th 541 (8th Cir. 2022) .......... 27

*Smits ex rel. Short v. Park Nicollet Health Services*,
979 N.W.2d 436 (Minn. 2022) .......... 18

*Soybean Merchandising Council v. AgBorn Genetics, LLC*,
534 S.W.3d 822 (Mo. Ct. App. 2017) .......... 26

*Speaks Family Legacy Chapels, Inc. v. National Heritage Enterprises, Inc.*,
2009 WL 2391769 (W.D. Mo. Aug. 3, 2009) .......... 31

*Spiel Associates, Inc. v. Gateway Bookbinding Systems, Ltd.*,
2010 WL 546746 (E.D.N.Y. Feb. 16, 2010) .......... 36

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 13

*State Farm Mutual Automobile Insurance Company v. Roach*,
945 So.2d 1160 (Fla. 2006) .......... 16

*Stuart v. Kyocera AVX Components Corporation*,
769 F. Supp. 3d 476 (D.S.C. 2025) .......... 13

*Stutman v. Chemical Bank*,
731 N.E.2d 608 (N.Y. 2000) .......... 35

*Sutter Health v. Superior Court*,
174 Cal. Rptr. 3d 653 (Ct. App. 2014) .......... 38

*T.R. v. Clay-Platte Family Medicine, P.C.*,
2025 WL 3143638 (W.D. Mo. Nov. 3, 2025) .......... 10, 19, 25, 32

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 4, 7, 8, 10, 11, 12

*Trex Company v. CPG International LLC*,
2017 WL 3272013 (W.D. Va. Aug. 1, 2017) .......... 36

*Tsao v. Captiva MVP Restaurant Partners, LLC*,
986 F.3d 1332 (11th Cir. 2021) ....................................................................4, 5, 6

*Van Dusen v. Barrack*,
376 U.S. 612 (1964).......................................................................................15

*Verni v. Cleveland Chiropractic College*,
212 S.W.3d 150 (Mo. 2007) ...........................................................................26

*Vigil v. Muir Medical Group IPA, Inc.*,
300 Cal. Rptr. 3d 32 (Ct. App. 2022) ..........................................................38

*Walton v. Premier Soccer Club, Inc.*,
334 A.3d 784 (Md. 2025) ........................................................................18, 25

*Warr v. JMGM Group, LLC*,
70 A.3d 347 (Md. 2013) .................................................................................18

*Watts v. Medicis Pharmaceutical Corporation*,
365 P.3d 944 (Ariz. 2016)...............................................................................35

*Webb v. Injured Workers Pharmacy, LLC*,
72 F.4th 365 (1st Cir. 2023)..............................................................................7

*Whalen v. Michael Stores Inc.*,
153 F. Supp. 3d 577 (E.D.N.Y. 2015), *aff'd*, 689 F. App'x 89 (2d Cir. 2017).................23

*Wieland v. Owner-Operator Services, Inc.*,
540 S.W.3d 845 (Mo. 2018) .....................................................................18, 20

*Williams v. Gyrus ACMI, Inc.*,
790 F. Supp. 2d 410 (D. Md. 2011) ..............................................................17

*Wilson v. J.B. Hunt Transportation, Inc.*,
2022 WL 20273042 (W.D. Ark. Oct. 6, 2022) ...............................................10

*Wright v. Catalent Pharma Solutions, LLC*,
2020 WL 1276104 (W.D. Mo. Mar. 17, 2020)...............................................33

*Young v. Grand Canyon University, Inc.*,
57 F.4th 861 (11th Cir. 2023) .........................................................................34

*Zean v. Fairview Health Services*,
858 F.3d 520 (8th Cir. 2017) ............................................................................3

**STATUTES, RULES, AND REGULATIONS**

Cal. Civ. Code § 1798.81.5.........................................................................................37

Cal. Civ. Code § 1798.146 .......... 38

Fed. R. Civ. P. 12 .......... 1, 2

Mont. Code Ann. § 30-14-1704 .......... 39

Mont. Code Ann. § 50-16-504 .......... 39

Mont. Code Ann. § 50-16-505 .......... 39

**OTHER AUTHORITIES**

Restatement (Second) of Conflict of Laws § 145 (A.L.I. 1971) .......... 16

Restatement (Second) of Torts § 652D (A.L.I. 1977) .......... 9

## INTRODUCTION

In early 2025, a criminal hacker gained unauthorized access to certain Cerner Corporation legacy data-migration servers. The information on the servers included names, birth dates, Social Security numbers, driver-license numbers, treating-physician names, dates of service, medical-insurance information, and diagnostic and treatment information. The criminal hacker copied some of this data to a nonpublic external location. There is no well-pleaded allegation that anyone has viewed any of the stolen data. Upon discovery of the unauthorized access by the criminal hacker, Cerner immediately contacted law enforcement and engaged external cybersecurity experts to remediate the criminal hacker's activity. Law enforcement requested that Cerner delay notification to its customers (specifically, the healthcare providers who use Cerner's healthcare-technology solutions) for a period of time to facilitate the investigation. After the requested delay ended, Cerner started notifying its healthcare-provider clients of the data theft.

After the fact of the theft became public, lawsuits began. Not by Cerner's healthcare-provider customers, however, but by *their* customers—patients who received healthcare from the providers and therefore allege that their personal and healthcare information was stolen from Cerner. Complaints by plaintiffs across the country in courts across the country were consolidated here, with twenty-three Plaintiffs filing a consolidated amended complaint (the "CAC").

That complaint should now be dismissed. At the threshold, each Plaintiff lacks standing to sue Cerner and so the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1). Plaintiffs' uniform, boilerplate allegations of the risk of future harm do not show the imminent, impending threat required to pursue prospective injunctive relief. And no Plaintiff alleges a sufficiently concrete injury, traceable to the theft, to seek monetary damages.

Even if some or all Plaintiffs are found to have standing, the complaint should be dismissed for failure to state a claim under Rule 12(b)(6). Plaintiffs bring claims under virtually every

conceivable theory of liability, including tort, contract, unjust enrichment, and various statutes. Alongside claim-specific shortcomings, most of these claims fail because there is no relationship between Plaintiffs and Cerner on which liability could be based. Cerner and Plaintiffs are not contractual counterparties, Plaintiffs are not Cerner's customers, and Cerner is not Plaintiffs' fiduciary. At minimum, the Court should narrow the action to the negligence claim.

While negligence is arguably the correct theory of liability here, Plaintiffs' factual allegations fail to state a plausible claim for it. *First*, Plaintiffs allege no facts giving rise to a duty that Cerner owed them to prevent the theft that Cerner experienced; on the contrary, it is well established that there is no general duty to protect someone from the crimes of someone else, and Plaintiffs plead no applicable exception. *Second*, Plaintiffs fail to plead a breach of any duty; their sole relevant allegation is the information theft, but the mere fact that a criminal illegally gained access to information does not plausibly indicate that Cerner was negligent with that information. Without more, they do not allege breach. *Third*, Plaintiffs fail to allege facts plausibly showing proximate causation or actual damages. The complaint should therefore be dismissed altogether.

## BACKGROUND[1]

Cerner is a Missouri-based provider of products and services relating to electronic health records for healthcare providers across the country, including the Healthcare Provider Defendants. CAC ¶¶ 1, 328-329, 345, 363. Cerner's healthcare-provider customers can create, store, and manage electronic health records using Cerner's software and data-storage platform. *Id.* ¶¶ 345-346. Those records' contents vary by healthcare provider and, for any provider, from patient to

---

[1] Cerner accepts the well-pleaded allegations in the CAC as true solely for purposes of the motion to dismiss. *See Brown v. Conagra Brands, Inc.*, 131 F.4th 624, 627 (8th Cir. 2025). For all quotes, except where noted, all alterations have been adopted, and all further quotation marks and citations are omitted. Citations to "Ex." are to exhibits attached to the Declaration of Alan Schoenfeld.

patient. Cerner's relationships with healthcare providers are governed by customer-specific agreements, which include business-associate agreements ("BAAs") to which only Cerner and the respective healthcare providers are parties. *Id.* ¶¶ 329, 509; Exs. A-I.[2] Cerner's only customers are the healthcare providers. Cerner does not provide products or services to individuals, and it has no relationship with the healthcare providers' patients.

Plaintiffs allege that on January 22, 2025, a criminal hacker gained unauthorized access to certain Cerner legacy data-migration servers and copied information from those servers to a nonpublic external location, and that Cerner discovered the theft around February 20, 2025. CAC ¶¶ 2, 369-370. Law enforcement requested that Cerner delay notifying its customers to facilitate an investigation. After the delay expired, Cerner began notifying its customers (the healthcare providers). *Id.* ¶¶ 372-374. In turn, the healthcare providers began notifying their customers (the patients). *Id.* ¶¶ 376-384.

In the CAC, twenty-three Plaintiffs assert twenty-three claims under the common law and state statutes. They seek "monetary relief, including actual damages, statutory damages, nominal damages, equitable relief, restitution, disgorgement, and statutory costs." CAC at 156. They also seek "injunctive and other equitable relief," including "[i]nstructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance" and "[r]equiring Defendants to implement enhanced data security measures." *Id.* at 156-157.

---

[2] "Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Carter v. Ludwick*, 139 F.4th 982, 989 (8th Cir. 2025). The BAAs are "incorporated by reference" in the CAC and "integral to the claim" for breach of contract, so the Court may properly consider them. *Id.*; *see Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss. This is true even if contract documents not attached to the complaint refute a breach-of-contract claim, or a claim that [the] defendant breached a statutory or common law duty.").

## ARGUMENT

### I. Plaintiffs Lack Standing

The Court should dismiss the case for lack of standing. "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 431. Here, Plaintiffs lack standing for either injunctive relief (or any other prospective relief) or damages (or any other retrospective relief).

#### A. Plaintiffs Lack Standing To Seek Prospective Relief

To seek prospective relief, Plaintiffs must plead a sufficient risk of future harm. That is because "an injunction will not remedy past or completed injuries." *Lawson v. DoorDash, Inc.*, 658 F. Supp. 3d 707, 711 (W.D. Mo. 2023) (Phillips, C.J.). For a future harm to support standing, "the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re SuperValu, Inc., Customer Data Sec. Breach Litig.*, 870 F.3d 763, 769 (8th Cir. 2017) ("*SuperValu I*"). Mere "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). For this reason, "conclusory allegations of an elevated risk of identity theft … are simply not enough to confer standing." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1343 (11th Cir. 2021); *see, e.g.*, *SuperValu I*, 870 F.3d at 769-770 (no standing for prospective relief because plaintiffs did not "plausibly demonstrate that the risk" of "future identity theft is substantial"); *Prestby v. A&A Servs., LLC*, 2026 WL 26128, at *14-17 (D. Neb. Jan. 5, 2026) (same); *Hall v. Centerspace, LP*, 2023 WL 3435100, at *3-5 (D. Minn. May 12, 2023) (same).

Each Plaintiff identically alleges that his or her information "will be used for criminal, fraudulent purposes," presenting "a lifetime risk of identity theft." *E.g.*, CAC ¶¶ 15, 20. Plaintiffs also assert that their information "remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff[s] to the imminent prospect of additional harm." *E.g.*, *id.* ¶ 21. From this, Plaintiffs further claim that they "will be forced to expend considerable time and effort including to monitor [their] accounts and credit files" and are "experiencing emotional distress" over the supposed risk of future harm. *E.g.*, *id.* ¶¶ 16, 18. Plaintiffs thus seek injunctive relief requiring Cerner to "strengthen [its] data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs." *Id.* ¶ 493; *see also id.* ¶¶ 586, 592, 625. These allegations are inadequate to confer standing.

To start, Plaintiffs fail to allege that future identity theft using information stolen by the criminal hacker is "certainly impending" or at a "substantial risk" of occurring, *SuperValu I*, 870 F.3d at 769, as needed to support their request for lifetime credit monitoring and identify-theft insurance. As discussed below (*infra* § II.B.3), no Plaintiff plausibly alleges any past instances of identity theft that are traceable to the criminal hacker's theft. True, there is no *per se* requirement that a plaintiff show past actual misuse to establish a substantial risk of future identity theft. *See Johnson v. Cornerstone Nat'l Ins. Co.*, 2024 WL 5265372, at *3 (W.D. Mo. Apr. 29, 2024) (Phillips, C.J.). But "without specific evidence of *some* misuse of class members' data, a named plaintiff's burden to plausibly plead factual allegations sufficient to show that the threatened harm of future identity theft was 'certainly impending'—or that there was a 'substantial risk' of such harm—will be difficult to meet," *Tsao*, 986 F.3d at 1344. In turn, the CAC lacks facts indicating that—despite the non-occurrence of any identity theft to date—there is nevertheless "a substantial

risk" of identity theft "in the near future." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). If anything, the (already low) probability of identity theft will only decrease as the alleged breach "fade[s] further into the past." *Prestby*, 2026 WL 26128, at *16. So even if (as some decisions have held) "allegations that some of the stolen data has already been misused [can] indicate[] that all stolen data is at risk of misuse," *In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, 2025 WL 3693201, at *6 (D. Minn. Dec. 19, 2025); *see also Johnson*, 2024 WL 5265372, at *3, there are no such plausible allegations here—meaning that "the risk of future harm involving identity theft … is not substantial and is, at best, speculative," *Tsao*, 986 F.3d at 1344.

Nor do Plaintiffs adequately allege standing based on the risk of another, future theft of information from Cerner, as might support their request for court-ordered strengthening and auditing of Cerner's systems. A plaintiff "seek[ing] prospective relief against future conduct of defendants who caused injury in the past … must show that she faces a real and immediate threat that she would again suffer similar injury in the future." *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019). While it may be possible that Cerner could suffer a second breach in the future and that Plaintiffs could be harmed if such a breach occurred, "the law requires not just possibility but *imminence*." *In re Pawn Am. Consumer Data Breach Litig.*, 2022 WL 3159874, at *3 (D. Minn. Aug. 8, 2022). "[T]here are no facts in the [CAC] that indicate a second data breach is certainly impending, or even that there is a substantial risk one will occur." *Hall*, 2023 WL 3435100, at *4. "There is, for example, no suggestion that [Cerner] is currently being targeted by hackers, or that something about their operations makes them uniquely vulnerable to incursions." *Id.* "Nor do [Plaintiffs] give any reason to think another data breach at [Cerner] would compromise their information, specifically, as opposed to information belonging to others." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 433 (4th Cir. 2025). Because the CAC's allegations do not

suggest that Cerner will soon suffer another theft, or that (even if it does) Plaintiffs' information will be stolen, the hypothetical risk of such an incident is too speculative to support standing. *See Webb v. Injured Workers Pharm., LLC*, 72 F.4th 365, 378 (1st Cir. 2023) (no standing for injunctive relief where the "only allegation in the complaint that injunctive relief is necessary is that plaintiffs' 'PII is still maintained by [the defendant] with its inadequate cybersecurity system and policies,'" and complaint did not "allege that any such future breach will occur").

As for Plaintiffs' alleged ongoing and future time and effort monitoring their accounts and ongoing emotional harm, it rises and falls—and here falls—with the underlying alleged future risks. Concern over purely conjectural future harm does not confer standing. *See Frost*, 920 F.3d at 1161. "Because plaintiffs have not alleged a substantial risk of future identity theft" or further information theft, "the time they spent protecting themselves against this speculative threat cannot create an injury." *SuperValu I*, 870 F.3d at 771. That is because "plaintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018).

### B. Plaintiffs Lack Standing To Seek Retrospective Relief

Even if Plaintiffs could seek prospective relief, "a plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages." *TransUnion*, 594 U.S. at 436; *see also Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 942-943 (8th Cir. 2024) ("Nor can the risk of future harm support a backwards-looking claim for damages."). To have standing for past injuries, Plaintiffs must have suffered concrete harms. *TransUnion*, 594 U.S. at 417. To be concrete, the asserted harm must have "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *Id.*

Here, too, Plaintiffs come up short. For intangible harms, they claim "the unauthorized disclosure of the Private Information itself," "time and effort including to monitor [their] accounts and credit files," "worry and feelings of anxiety and emotional distress," an "increase in spam," and fraud attempts. *E.g.*, CAC ¶¶ 15-16, 18-19, 101. None opens the doors to federal court. As for tangible monetary harms, Plaintiffs allege "diminution in the value of [their] Private Information" that is not sufficiently close to a traditionally recognized harm. *E.g.*, *id.* ¶ 17. Only three Plaintiffs—Morgan, Sheward, and King—assert monetary damages at all, but these damages are neither sufficiently pleaded (because Plaintiffs do not plausibly allege that they actually lost money) nor fairly traceable to the alleged data breach. All Plaintiffs thus lack standing to seek damages.

### 1. Plaintiffs' alleged intangible harms are insufficient.

"Various intangible harms can … be concrete" if they have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. None of Plaintiffs' alleged intangible harms is sufficiently concrete to confer standing.

*First*, "the unauthorized disclosure of the Private Information itself" is not enough. *E.g.*, CAC ¶ 15. While "disclosure of private information" can constitute a concrete harm, *TransUnion*, 594 U.S. at 425, "that doesn't mean that every plaintiff who comes to court alleging such a harm gets in the courthouse door," *Jones v. Bloomingdales.com, LLC*, 124 F.4th 535, 539 (8th Cir. 2024). Rather, such "an intangible injury" must meet the "traditional elements of [an] invasion-of-privacy tort." *Denmon v. Kan. Couns., Inc.*, 149 F.4th 1010, 1016 (8th Cir. 2025). There are four such torts: (1) intrusion upon seclusion; (2) misappropriation of another's name or likeness; (3) false light; and (4) public disclosure of private facts. Plaintiffs allege nothing like the first three torts, leaving only public disclosure of private facts—but Plaintiffs' allegations do not meet the "main elements" of the tort. *Id.* at 1017. Fundamentally, there is no "publicity," which requires

"that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a (A.L.I. 1977). Plaintiffs allege that a single bad actor stole their private facts from Cerner, not that Cerner publicized their private facts. In other words, Cerner did not purposely disclose or communicate anything about Plaintiffs; at most, someone else stole that information from Cerner. Without intentional publicity to many people *by Cerner*, "there is no tort" and therefore no standing. *Denmon*, 149 F.4th at 1017.

*Second*, Plaintiffs' alleged "time and effort including to monitor [their] accounts and credit files" is as insufficient for damages as for an injunction. *E.g.*, CAC ¶ 16; *see supra* § I.A. Plaintiffs cannot seek damages for time spent monitoring for speculative harms. The Eighth Circuit has rejected standing based on "lost time" like this, explaining that if a plaintiff does "not establish that the [defendant is] likely to violate the [plaintiff's rights] on future occasions," the plaintiff does "not suffer an injury in fact by dedicating her time to this cause." *Auer*, 902 F.3d at 878. "In other words, this allegation is not in itself an injury in fact unless there is also a substantial risk of future injury in fact," which is absent here. *Pulliam v. W. Tech. Grp., LLC*, 2024 WL 356777, at *8 (D. Neb. Jan. 19, 2024).

*Third*, Plaintiffs' alleged "worry and feelings of anxiety and emotional distress" do not confer standing in this Circuit. *E.g.*, CAC ¶ 18. "Alleging emotional injuries like confusion, worry, and sleeplessness … falls short": "nervousness, restlessness, irritability, amongst other negative emotions," are not themselves a concrete injury, and "none gives rise to standing." *Hekel*, 118 F.4th at 943; *see also Denmon*, 149 F.4th at 1013 ("In general, allegations of intangible injury such as distress and alarm fall short of cognizable injury as a matter of general tort law."). "Moreover, even if emotional injuries counted," Plaintiffs' "conclusory allegations would not."

*Hekel*, 118 F.4th at 943. "They are naked assertions of emotional harm, devoid of further factual enhancement," that "fall short of plausibly establishing injury." *Id.*

*Fourth*, all Plaintiffs allege an "increase in spam" emails, text, or calls, *e.g.*, CAC ¶ 19, and some also allege other unsolicited communications, including inquiries, notices, letters, alerts, and notifications, *e.g.*, *id.* ¶¶ 45, 143. But merely receiving unwanted communications is not close to any "harm traditionally recognized as providing a basis for a lawsuit in American courts." *Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1136 (8th Cir. 2023); *see id.* at 1137 (mere receipt of letter is not injury); *Denmon*, 149 F.4th at 1016 (same); *Prestby*, 2026 WL 26128, at *9 ("Receiving unsolicited spam emails, messages, and calls does not constitute a cognizable injury, and a spike in unsolicited marketing and cyber ploys received by phone, email, and messaging applications is not an actual harm sufficient to confer standing.").[3] Even if it were, Plaintiffs' allegations do not carry their burden to show traceability at this stage. "Phone numbers and email addresses" are "basic contact information [that] can be obtained from any number of sources," *Negron v. Ascension Health*, 2025 WL 2710014, at *6 (E.D. Mo. Sept. 23, 2025), and no Plaintiff alleges "facts that would tend to show that his phone number [or email address] was stolen from [Cerner's servers], as opposed to some other source," *Wilson v. J.B. Hunt Transp., Inc.*, 2022 WL 20273042, at *6 (W.D. Ark. Oct. 6, 2022).

*Fifth*, alleged fraud attempts that did not cause a monetary loss do not constitute an actionable intangible harm. Of the twenty-three Plaintiffs, a full fourteen of them (R. Tripp, L. Tripp, Lewis, Holcomb, Sanders, Smith, Wright, Greeno, Woolard, Walker, Melvin, Magliozzi,

---

[3] Courts that have found an injury in fact based on an alleged increase in spam calls and texts (*e.g.*, *T.R. v. Clay-Platte Fam. Med., P.C.*, 2025 WL 3143638, at *4 (W.D. Mo. Nov. 3, 2025)) have often done so without considering whether—let alone explaining why—those calls and texts have "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 440.

Fox, Rangel) do not allege even attempted fraud. Six others allege fraud attempts but no resulting monetary loss. Bell alleges "two fraudulent attempts to open accounts in her name as well as fraudulent charges made on her debit card, which required her to request and receive a new card." CAC ¶ 45. Evans alleges "two fraudulent attempts to use his card, requiring him to report the charges as fraudulent and be issued a new card." *Id.* ¶ 101. Taylor alleges "four fraudulent attempts" to open accounts and two fraudulent attempts to make debit-card purchases. *Id.* ¶ 171. Delaney allegedly was notified "of fraud on her debit card" by her bank and "had to replace it several times." *Id.* ¶ 241. Even more generally, Adams allegedly received a letter that she was turned down for a mortgage for which she did not apply, *id.* ¶ 129, and Carnahan allegedly had her credit report accessed for loans for which she did not apply, *id.* ¶ 143. None of these Plaintiffs alleges that an attempted fraud resulted in a tangible harm, i.e., losing money. So for these incidents to confer standing, it must be due to some actionable *intangible* harm—but there is none. Fraud attempts that cause no actual, tangible monetary harm have no "close historical or common-law analogue," *TransUnion*, 594 U.S. at 424, so they do not confer standing.[4]

*SuperValu I* is not to the contrary. That pre-*TransUnion* decision held that one named plaintiff out of sixteen had standing in a data-breach case because he had allegedly "suffered a fraudulent charge on the credit card he previously used to make a purchase at one of defendants' stores affected by the data breaches." 870 F.3d at 772. The Eighth Circuit reached this conclusion because the defendants did "not contest that identity theft constitutes an actual, concrete, and

[4] Morgan (CAC ¶ 73), King (*id.* ¶ 199), and Sheward (*id.* ¶ 213) allege similar attempts at fraud, which fail to confer standing for these same reasons; they also attempt to allege tangible monetary harms, which are addressed below. Morgan also allegedly "experienced a four-point drop in her credit score." *Id.* ¶ 73. Without more, this is neither a tangible monetary harm (she does not allege that she paid more for a loan as a result) nor an actionable intangible reputational harm (she does not allege that her decreased credit score was published to others, among other things). So this bare allegation is insufficient to confer standing on her.

particularized injury." *Id.* The defendants challenged only "the sufficiency of [the plaintiff's] allegations," not "the nature of [his] injury." *Id.* Cerner does not make that concession. Quite the opposite, it is clear after *TransUnion* that the nature of the injury is determinative, and identity theft confers standing *only* if it causes an intangible harm with a close historical analogue (or a monetary harm). These six Plaintiffs do not even attempt to allege a monetary harm, and the unfulfilled fraud that they allege has no historical analogue.[5]

### 2. Plaintiffs' alleged tangible harms are insufficient.

Plaintiffs also allege two supposed tangible harms, both involving financial injury. First, all Plaintiffs allege the diminution in the value of their personal information from its unauthorized copying alone, regardless of any further disclosure or misuse by the criminal hacker. Second, three Plaintiffs—Morgan (CAC ¶ 73), King (*id.* ¶ 199), and Sheward (*id.* ¶ 213)—attempt to allege actual tangible monetary losses. These efforts fail too.

*First*, Plaintiffs' uniform and conclusory allegation that the information theft tangibly diminished the value of their intangible personal information does not confer standing. *E.g.*, CAC ¶ 17. For this to be a tangible monetary harm, Plaintiffs must allege enough facts to demonstrate it. "Monetary harms readily qualify as concrete injuries, but the complaint [must explain] *how* [Cerner's] actions financially harmed" the value of their information. *Hekel*, 118 F.4th at 943. "Courts have routinely rejected the proposition that an individual's personal identifying information has an independent monetary value." *In re Samsung Data Sec. Breach Litig.*, 761 F.

[5] As discussed more below, when *SuperValu* returned to the Eighth Circuit on appeal from another motion to dismiss, the court fulfilled its prediction in *SuperValu I* that questions like whether the plaintiff's supposed fraudulent "charge was unreimbursed" were resolvable on a motion to dismiss rather than standing and *affirmed* dismissal of the plaintiff's complaint including for lack of pecuniary loss. *In re SuperValu, Inc., Customer Data Sec. Breach Litig.*, 925 F.3d 955, 961, 965 (8th Cir. 2019) ("*SuperValu II*") ("[The plaintiff] is in the best position to know whether he was ever obligated to pay this unauthorized charge.").

Supp. 3d 781, 799 (D.N.J. 2025). And "even if the [CAC] included allegations to plausibly plead that [Plaintiffs'] specific PII/PHI was disclosed and that it had monetary value, the [CAC] does not contain any factual allegations explaining how the monetary value was reduced or diminished as a result of the Data Breach." *Devine v. Horizontal Integration, Inc.*, 2025 WL 3687972, at *6 (D. Minn. Dec. 19, 2025). "For example, there are no allegations that [any Plaintiff] tried to sell his PII/PHI and was forced to accept less as a result of the Data Breach." *Id.*; *see Stuart v. Kyocera AVX Components Corp.*, 769 F. Supp. 3d 476, 488 (D.S.C. 2025) (collecting cases denying standing for "fail[ure] to allege any facts explaining how Plaintiffs actually lost value because of the disclosure of their PII"). Plaintiffs therefore fail to allege a concrete, tangible monetary injury based on the supposedly diminished value of their personal information.[6]

*Second*, the three Plaintiffs who attempt to allege a tangible monetary harm still do not allege facts sufficient to show that they actually suffered a concrete injury.

Two Plaintiffs, Morgan and Sheward, try to allege fraudulent transactions. Morgan claims that "someone was able to fraudulently withdraw approximately $50 from her account." CAC ¶ 73. Sheward allegedly "experienced a fraudulent transaction in the amount of $800 made at Home Depot." *Id.* ¶ 213. Losing $50 or $800 is a tangible monetary harm, of course. But neither Plaintiff alleges that she actually lost the money. As the Eighth Circuit has observed, when there is a fraudulent credit-card or debit-card charge, "federal law and card-issuer contracts ordinarily

---

[6] Other courts' contrary holdings are unpersuasive. For example, *Negron* found "the practical value of personal information" to be "significant" because people sometimes use personal information "to purchase goods and services remotely and electronically," so a breach could "impede[] plaintiffs' ability to participate in the economy." 2025 WL 2710014, at *7-8. But it is doubtful that having personal information stolen seriously impairs one's ability to "purchase goods and services remotely and electronically" or "participate in the economy" (*id.*) in a manner that is "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). The CAC certainly does not allege that Plaintiffs have been or are likely to be so affected.

absolve the consumer from any obligation to pay the fraudulent charge." *SuperValu II*, 925 F.3d at 965. Neither Plaintiff alleges that she lost the fraudulently charged amount in the end. Indeed, Morgan specifically alleges that because of this fraudulent withdrawal, she "had to close her debit card and get a new one," CAC ¶ 73, which suggests that Morgan "reported the suspicious charge and was issued a new credit card," *SuperValu II*, 925 F.3d at 965. Sheward and Morgan are "in the best position to know whether [they were] ever obligated to pay this unauthorized charge," *id.*, but they do not allege they were. While *SuperValu I* did not require this allegation to find that one plaintiff had standing, it was analyzing standing based only on a pre-*TransUnion* "identity theft" injury. That is not an actionable intangible harm under *TransUnion* for the reasons above. But in any event, to invoke standing based on a *tangible* monetary harm (rather than an *intangible* harm), Morgan and Sheward must allege that they actually lost money. They do not.

Turning to King, she alleges that she is out $10—not because it was stolen from her, but because after she closed certain accounts, she "incurred a $10 late fee as a result of failed automatic payments tied to her compromised accounts." CAC ¶ 199. Cerner did not cause King to lose this $10. Rather, it was King who caused this loss to herself, by failing to update her automatic payments after changing her accounts. This injury therefore "falls squarely on [King] because [she] chose not to" update her automatic payments. *Ojogwu v. Rodenburg L. Firm*, 26 F.4th 457, 463 (8th Cir. 2022). It does not confer standing on King to sue Cerner.

## II. Plaintiffs Fail To State A Claim

Even if the Court concludes that any Plaintiff has standing to bring any claims, all of Plaintiffs' claims lack "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual matter does not include labels or a formulaic recitation of the elements of a cause of action, naked assertions of

claims, or legal conclusions couched as facts." *DeCastro v. Hot Springs Neurology Clinic, P.A.*, 107 F.4th 813, 816 (8th Cir. 2024).

Plaintiffs assert many claims sounding in various forms of liability. At bottom, however, this is—at most—a negligence action. It is the common law of negligence, not anything else, that governs the relationship between two parties with no contract or other special relationship. And none of the statutes that Plaintiffs invoke properly applies here. Plaintiffs' negligence claim, however, lacks sufficient allegations. Plaintiffs do not plausibly allege that Cerner owed them a duty to protect against the illegal acts of a third-party hacker, nor that Cerner breached any such duty, nor that they suffered any actual damages as an actual and proximate result of it. Accordingly, the complaint should be dismissed in its entirety.

**A. Choice Of Law**

All of Plaintiffs' claims arise under state law. "[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *Kingman v. Dillard's, Inc.*, 643 F.3d 607, 615 (8th Cir. 2011). When "faced with opposing plausible interpretations of state law," federal courts should "generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability." *Id.* at 617.

"[A]n individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action." *In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*, 425 F.3d 1116, 1120 (8th Cir. 2005). For the ten Plaintiffs who filed suit in Missouri (Adams, Carnahan, Delaney, Evans, Holcomb, Melvin, Sanders, Smith, Taylor, Woolard), Missouri's choice-of-law rules govern. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For the thirteen Plaintiffs who originally filed elsewhere—Arkansas (L. Tripp, R. Tripp), California (Fox, Magliozzi, Rangel), Florida (Bell, Lewis, Sheward), Maryland (Wright), Montana (Walker), and New York (Greeno, King, Morgan)—those States' choice-of-law rules apply. *See Van Dusen v.*

*Barrack*, 376 U.S. 612, 639 (1964). If there is no conflict between Missouri law and another State's law on a particular issue, the Court is free to apply Missouri law. *See BBX Cap. Corp. v. Scottsdale Ins. Co.*, 713 S.W.3d 590, 602 (Mo. Ct. App. 2025).

Based on the allegations in the CAC, in the event of a conflict, Missouri law governs the tort claims of everyone except Wright (Maryland). For tort-related choice-of-law issues, Missouri, Montana, and Florida apply the most-significant-relationship test under the Restatement (Second) of Conflict of Laws § 145 (A.L.I. 1971). *See Elmore v. Owens-Ill., Inc.*, 673 S.W.2d 434, 436 (Mo. 1984); *Goguen v. NYP Holdings, Inc.*, 544 P.3d 868, 879 (Mont. 2024); *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006). Missouri has the most significant relationship to this case because it is "where the conduct [allegedly] causing the injury occurred" and where Cerner maintains its principal "place of business." Restatement (Second) of Conflict of Laws § 145(2); *see Mackey v. Belden, Inc.*, 2021 WL 3363174, at *2-3 (E.D. Mo. Aug. 3, 2021) (Missouri had most significant relationship because defendant was "headquartered in Missouri; the Data Breach occurred in Missouri; [and] the allegedly negligent actions by [defendant] resulting in the Data Breach occurred in Missouri"). New York's interest-analysis approach also points to Missouri because Cerner's "exercise of due care is in issue, [so] the jurisdiction in which the allegedly wrongful conduct occurred" (i.e., Missouri) has "a predominant, if not exclusive, concern." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50 (2d Cir. 2013) (per curiam). Under California's governmental-interest analysis, Missouri "has the predominant interest in regulating conduct that occurs within its borders, and in being able to assure individuals and commercial entities operating within [Missouri] that applicable limitations on liability set forth in [Missouri's] law will be available to those individuals and businesses in the event they are faced with litigation in the future." *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010).

And since Missouri law applies to so many other Plaintiffs' claims, applying Missouri law to the tort claims of Plaintiffs who filed in Arkansas would lead to more "predictab[le] … results" overall and would "simplif[y] … the judicial task." *Bourgeois v. Vanderbilt*, 639 F. Supp. 2d 958, 963 (W.D. Ark. 2009), *aff'd*, 417 F. App'x 605 (8th Cir. 2011) (per curiam).

Separately, based on the allegations in the CAC, Maryland law governs Wright's tort claims. Wright sued in Maryland, which "adheres to the *lex loci delicti* rule to determine the applicable law in tort actions." *Williams v. Gyrus ACMI, Inc.*, 790 F. Supp. 2d 410, 414 (D. Md. 2011). Where, as here, the alleged "events giving rise to a tort action occur in more than one State," Maryland applies the law of the State "where the plaintiff first suffers harm." *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 797 n.6 (D. Md. 2022). Given her claimed residence in Maryland (CAC ¶ 176), Wright likely first suffered any purported injury in Maryland.

Different choice-of-law principles govern Plaintiffs' non-tort common-law claims. *See, e.g.*, *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 404 (8th Cir. 2019) (per curiam) ("Missouri applies the 'most significant relationship' test to all claims, but considers different factors for claims sounding in tort … , contract … , and unjust enrichment."). As pleaded, Plaintiffs' non-tort common-law claims fail on similar grounds under any State's law, so the Court is free to apply Missouri law to them at this stage—although Cerner reserves all rights and objections with respect to choice of law for any claims that survive the pleading stage. *See BBX Cap.*, 713 S.W.3d at 602.

**B. Plaintiffs' Negligence Claims Fail**

Plaintiffs' and Cerner's duties to one another (if any) are governed by the common law of negligence. But Plaintiffs fail to plead each element of a claim: "(1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty; (3) a proximate cause between the conduct and the resulting injury; and

(4) actual damages to the claimant's person or property." *Brock v. Dunne*, 637 S.W.3d 22, 29 n.8 (Mo. 2021); *accord Walton v. Premier Soccer Club, Inc.*, 334 A.3d 784, 792 (Md. 2025).

**1. Plaintiffs do not adequately plead that Cerner owed them a duty.**

"[T]he general rule is that there is no duty to protect against the criminal acts of third parties." *Earley v. Dunn*, 670 S.W.3d 47, 50 (Mo. Ct. App. 2023); *accord Gourdine v. Crews*, 955 A.2d 769, 783-784 (Md. 2008); *see Faheen ex rel. Hebron v. City Parking Corp.*, 734 S.W.2d 270, 272 (Mo. Ct. App. 1987) (listing policy reasons supporting rule). This rule applies squarely here: Plaintiffs claim that Cerner failed to protect their information from being copied illegally by a criminal. CAC ¶ 484. There are two exceptions to this general rule under Missouri law: (1) if the parties are in a "special relationship"; or (2) if other "special facts and circumstances" exist. *Earley*, 670 S.W.3d at 50; *M.B. v. Live Nation Worldwide, Inc.*, 661 S.W.3d 342, 350 (Mo. Ct. App. 2022). Similarly, under Maryland law, "in the absence of [(1)] control or [(2)] a special relationship, there can be no duty to an injured person for harm caused by a third party." *Warr v. JMGM Grp., LLC*, 70 A.3d 347, 358 (Md. 2013). There is of course no suggestion that Cerner controls the criminal hacker. And neither of the other exceptions is pleaded here.[7]

[7] *Change Healthcare*, decided under Minnesota law, does not require a different conclusion. That decision based the existence of a duty on the principle that "a duty to exercise reasonable care to protect that data arises if a defendant's own conduct creates a foreseeable risk of data exposure." 2025 WL 3693201, at *13. Indeed, in Minnesota, "[t]he traditional rule that a party is not liable for the actions of another" is subject to "[t]he 'own conduct' exception." *Smits ex rel. Short v. Park Nicollet Health Servs.*, 979 N.W.2d 436, 458 (Minn. 2022). This exception applies "when 'the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff.'" *Fenrich v. Blake Sch.*, 920 N.W.2d 195, 202 (Minn. 2018) (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011)); *see Change Healthcare*, 2025 WL 3693201, at *13 (citing District of Minnesota cases relying on *Domagala* and *Fenrich*). No such exception exists under Missouri or Maryland law. *See Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848-849 (Mo. 2018) (recognizing only "two exceptions to the 'no duty' rule"); *Warr*, 70 A.3d at 358 (same).

***Special Relationship.*** "A special relationship giving rise to [a duty to protect against criminal acts] exists when a party entrusts himself to the protection of another and relies upon that person to provide a place of safety." *Lawton v. Hyundai Motor Am., Inc.*, 734 F. Supp. 3d 904, 910 (W.D. Mo. 2024) (Phillips, C.J.). Possessing information about someone with whom you have no other relationship, by itself, does not create a special relationship with that person; for this reason, "no court applying Missouri law appears to have recognized a general, common law duty to safeguard information from a criminal cyberattack." *Mackey*, 2021 WL 3363174, at *6. Rather, there must be an independent basis for finding a special relationship *before* imposing a duty to safeguard. For example, *Mackey* "predict[ed] … that the Missouri Supreme Court would recognize that [the defendant] had a duty to protect [the plaintiff's] PII because of their special relationship as employer and employee." *Id.* More recently, two federal courts in Missouri have found a duty to safeguard data in "the patient-provider relationship," which "is even more sacred" than the employer-employee relationship in *Mackey* "and is clearly recognized as special under Missouri law." *T.R.*, 2025 WL 3143638, at *5; *Negron*, 2025 WL 2710014, at *9.

The CAC, properly shorn of "legal conclusions couched as facts," *DeCastro*, 107 F.4th at 816, does not adequately allege that Plaintiffs were in a special relationship with Cerner (or even any relationship at all) giving rise to a duty to prevent the criminal theft of their information. Cerner indisputably did not provide medical care to Plaintiffs. Indeed, the CAC never alleges that any Plaintiffs ever interacted directly with Cerner in any capacity before filing suit. Plaintiffs instead allege that they gave information to the Healthcare Provider Defendants, and that the Healthcare Provider Defendants then contracted with Cerner for certain records-related services. *E.g.*, CAC ¶¶ 22, 329. That does not plausibly give rise to a special relationship between Plaintiffs and Cerner. *See, e.g.*, *SuperValu II*, 925 F.3d at 963 (affirming dismissal of negligence claim in

data-breach action under Illinois law, under which "generally there is no affirmative duty to protect another from a criminal attack" without a special relationship, which direct retailer lacked).

***Special Facts and Circumstances.*** "The 'special facts and circumstances' exception encompasses two possible theories of liability: (1) an intentional infliction of injury by known and identifiable third parties and (2) numerous and recent incidents of violent crime against persons on the premises by unknown assailants." *Brown v. Schnuck Mkts., Inc.*, 973 S.W.2d 530, 532-533 (Mo. Ct. App. 1998) (per curiam); *accord Wieland*, 540 S.W.3d at 848-849. This exception does not apply here. First, as the quoted language indicates, this exception applies only to premises-liability cases. To the best of Cerner's knowledge, no Missouri state-court decision has applied it to the distinct context of data breaches. Since federal courts do not expand state law when applying it, *see Kingman*, 643 F.3d at 615, 617, this Court should not be the first to apply this exception beyond how Missouri courts do. Second, even if this exception could be generalized beyond premises liability, it would not be met here under either theory. The first theory of liability requires knowledge about "a specific third person," *Wieland*, 540 S.W.3d at 849, but Plaintiffs do not allege that the criminal hacker was "known [by] and identifiable" to Cerner prior to the theft, *Brown*, 973 S.W.2d at 532. The second theory fails because it is specific to "violent crime[s]," which the alleged data breach was not. *Id.*

**2. Plaintiffs do not adequately plead that Cerner breached a duty.**

Plaintiffs also have not alleged facts sufficient to establish the breach of any duty. The only well-pleaded factual allegation is that a criminal hacker illegally accessed Cerner's servers and stole information. Without more, Plaintiffs have failed to allege a breach of any duty of care.

The Eighth Circuit has held that "[t]he implied premise that because data was hacked [a defendant's] protections must have been inadequate is a naked assertion[] devoid of further factual enhancement that cannot survive a motion to dismiss." *Kuhns v. Scottrade, Inc.*, 868 F.3d 711,

717 (8th Cir. 2017).[8] That makes sense because "[c]ompanies may employ the most state-of-the-art practices and standards and yet hackers are still able to breach the protective measures. Simply because a breach occurred does not mean that it necessarily follows that [the] defendant did anything wrong." *Berry v. Crescent Cmty. Health Ctr.*, 2025 WL 1287909, at *6 (N.D. Iowa May 2, 2025). And because "the law does not impose strict liability for harms arising out of the storage of personal information," Plaintiffs cannot "seek[] to hold [Cerner] liable for the fact of the data breach alone": they must "plausibly allege not only that there was a data breach, but that the breach was caused by [Cerner's] unreasonable conduct." *In re Waste Mgmt. Data Breach Litig.*, 2022 WL 561734, at *4-5 (S.D.N.Y. Feb. 24, 2022). "[W]ithout more" alleged than the fact of a data breach itself, "the Court cannot plausibly conclude that [Cerner] breached its duty to [any] Plaintiff." *Polkowski v. Jack Doheny Cos.*, 2025 WL 3079358, at *9 (E.D. Mich. Nov. 4, 2025) (dismissing negligence claim); *Crowe v. Managed Care of N. Am.*, 2024 WL 6863341, at *6-7 (S.D. Fla. Aug. 16, 2024) (same); *Waste Mgmt.*, 2022 WL 561734, at *4 (same); *cf. Change Healthcare*, 2025 WL 3693201, at *3, *13-14 (extensive and specific allegations of deficient security measures allowed complaint to survive motion to dismiss).

**3. Plaintiffs do not adequately plead that Cerner proximately caused any actionable actual damages to their person or property.**

Plaintiffs also do not allege "a proximate cause between the conduct and the resulting injury" or "actual damages to the claimant's person or property." *Brock*, 637 S.W.3d at 29 n.8.

---

[8] *Kuhns* was assessing a contract claim, not a negligence claim, but the holding applies equally whether the basis for alleged inadequacy arises in contract or tort. "The allegation that '[the defendant] did not maintain sufficient security measures and procedures to prevent unauthorized access' does not assert more than the mere possibility of misconduct," and so does not cross the plausibility threshold needed to state a claim, whether in contract or tort. 868 F.3d at 717.

Starting with the latter requirement, no Plaintiffs claim any actual damages to person, i.e., physical injury. And most Plaintiffs do not even attempt to claim actual damage to property: none of unauthorized disclosure, diminution in value, monitoring time and effort, emotional distress, or increased spam even arguably constitutes actual damages to property.[9] Nor can a negligence claim rest on a supposed *future* injury: negligence is a claim at law to compensate for past actual damages, not an equitable claim to prospective relief to prevent imminent future harm. *See Amburgy*, 671 F. Supp. 2d at 1055 ("Damages cannot reasonably be assessed for a hypothetical harm which may (or may not) come to plaintiff in the future."). These allegations fail to show an injury in fact conferring standing (*see supra* § I) and so fall well short of "the higher hurdles of Rules 8(a) and 12(b)(6)." *SuperValu I*, 870 F.3d at 773.

The nine Plaintiffs (Bell, Morgan, Evans, Adams, Carnahan, Taylor, King, Sheward, Delaney) who allege something more than mere increased spam to show that their allegedly copied information was misused—namely, through attempted or actual fraudulent activity—also fall well short of plausible actual damages. *SuperValu II* is instructive. While the Eighth Circuit affirmed dismissal of the negligence claim for lack of duty, it also affirmed dismissal of Illinois consumer-protection claims for lack of actual damages. It held that the single remaining plaintiff's "alleged injuries—the expenditure of time monitoring his account, the single fraudulent charge to his credit card, and the effort expended replacing his card—do not constitute actual damage." 925 F.3d at 964. In particular, the Court observed that the plaintiff "does not directly allege that the fraudulent

[9] Under Missouri law, a plaintiff cannot recover damages for emotional distress in negligence without a "medically diagnosed condition that resulted from [the] defendant's negligent act." *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1055 (E.D. Mo. 2009). Similarly, Maryland law provides that "the emotional distress due to the tortious conduct" must be "manifested objectively." *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 59 (Md. 2013).

charge to his credit card resulted in any pecuniary loss" and that an inference "that he was required to pay the fraudulent charge" was "not a reasonable one." *Id.*

*SuperValu II* shows that these nine Plaintiffs' allegations also fall short of plausible actual damages. None alleges actually losing money. Bell, Morgan, Holcomb, Taylor, King, and Delaney allege attempted fraudulent charges, including requiring them to replace cards. Like the *SuperValu II* plaintiff, none alleges that they were "ever obligated to pay this unauthorized charge," even though they are "in the best position to know." 925 F.3d at 965; *see also, e.g.*, *Whalen v. Michael Stores Inc.*, 153 F. Supp. 3d 577, 581 (E.D.N.Y. 2015) ("[E]ven if the … charges were accepted by the bank, [plaintiff] would not have suffered any liability given the zero-fraud-liability policy of every major card issuer in the country."), *aff'd*, 689 F. App'x 89 (2d Cir. 2017). That goes for Morgan and Sheward too, as discussed: Morgan alleges $50 was withdrawn from her account (CAC ¶ 73) and Sheward alleges an $800 fraudulent transaction at Home Depot (*id.* ¶ 213), but neither alleges that they actually lost this money. Bell and Taylor also allege fraudulent attempts to open accounts; Bell, Morgan, Adams, and Carnahan also allege receiving notices about unsolicited credit inquiries (including for Morgan allegedly affecting her credit score by four points); and Carnahan and Taylor allege being notified that certain information was "on the dark web." But none of them alleges that these circumstances cost them even a dollar of actual damages. *See Knockerball MidMo, LLC v. McGowan & Co.*, 667 S.W.3d 640, 645-646 (Mo. Ct. App. 2023) ("Damages are an essential element of [a negligence claim].").

Separately, Plaintiffs do not plead facts showing that Cerner's alleged conduct proximately caused any actual damages. Plaintiffs' allegations above all concern unsolicited or fraudulently attempted financial activity. But unlike in *SuperValu I*, where one plaintiff's payment-card information was disclosed, Plaintiffs do not allege that the theft implicated their financial-payment

information. Rather, they allege that it involved "names, dates of birth, Social Security numbers, medical records, treatment information, insurance data, and other personally identifiable information … and protected health information." CAC ¶ 2; *see also id.* ¶ 369.[10] Moreover, Plaintiffs allege that the theft was in January 2025 but allege no consequences from it until many months later in summer 2025. Altogether, Plaintiffs' allegations "connecting the injury to the negligence amount[] to mere conjecture and speculation" and do not plausibly suggest that what they experienced was proximately caused by Cerner's alleged negligence. *Meyer v. City of Walnut Grove*, 505 S.W.3d 331, 336 (Mo. Ct. App. 2016).

Finally, Maryland's economic-loss doctrine forecloses Wright's negligence claim. This doctrine bars an action for negligence "when the parties are not in privity with one another or the alleged negligent conduct did not result in physical injury or risk of severe physical injury or death." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 452 (Md. 2017). Cerner is not in privity with Wright, and Wright does not allege that Cerner's "alleged negligent conduct … result[ed] in physical injury or risk of severe physical injury or death." *Id.* Accordingly, her claim is independently barred.

**4. Plaintiffs' negligence *per se* claims also fail.**

Plaintiffs' claims for negligence *per se*, premised on purported violations of the Health Insurance Portability and Accountability Act ("HIPAA") and the Federal Trade Commission Act (the "FTC Act"), are also deficient. *See* CAC ¶¶ 494-506. Under Missouri law, "only those statutes which create a private right of action can form the basis for a negligence *per se* claim." *Howland v. Truman Med. Ctr., Inc.*, 719 S.W.3d 98, 109 (Mo. Ct. App. 2025). Similarly, "[t]he

[10] King alleges she incurred "a $10 late fee as a result of failed automatic payments." CAC ¶ 199. The actual and proximate cause of her paying this fee was her failure to update her automatic payments after changing accounts, which is not plausibly attributed to Cerner, but only to herself.

settled rule in Maryland is that a statutory violation … does not constitute negligence *per se*, unless a statute expressly makes it so." *Walton*, 334 A.3d at 794 n.14. But "HIPAA does not create a private right of action." *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010). Neither does the FTC Act. *FTC v. Johnson*, 800 F.3d 448, 452 (8th Cir. 2015). And neither statute expressly provides that a violation is negligence *per se*. So neither statute supports a claim for negligence *per se* under applicable law. *See, e.g.*, *Howland*, 719 S.W.3d at 109 (negligence *per se* claim failed because HIPAA lacks private right of action).[11]

### C. Plaintiffs' Contract Claims Fail

Plaintiffs assert two contract-based theories of liability; both fail on the pleadings. *First*, Plaintiffs claim that Cerner breached the BAAs between Cerner and the Healthcare Provider Defendants. But Plaintiffs are not third-party beneficiaries of the BAAs, so they cannot assert claims for breach. *Second*, Plaintiffs allege that they entered an implied-in-fact contract with Cerner and the Healthcare Provider Defendants based on the parties' collective conduct. Yet Plaintiffs fail to plead the mutual assent necessary for contract formation.

#### 1. Plaintiffs are not third-party beneficiaries of the BAAs.

Plaintiffs allege that the data breach resulted from Cerner's breach of contractual obligations owed to the Healthcare Provider Defendants under the respective BAAs. CAC ¶ 514. But Plaintiffs cannot enforce the BAAs.

---

[11] *Negron*, 2025 WL 2710014, at *10, and *T.R.*, 2025 WL 3143638, at *6, declined to dismiss negligence *per se* claims based on purported HIPAA violations. Both relied on *J.J. ex rel. C.W. v. Poplar Bluff Regional Medical Center, L.L.C.*, 675 S.W.3d 259 (Mo. Ct. App. 2023). As *Howland* explains, however, *J.J.*'s discussion of negligence *per se* was dicta. *See* 719 S.W.3d at 110 n.11. Thus, *Howland*—not *J.J.*, *T.R.*, or *Negron*—properly reflects Missouri law on negligence *per se*. *See also Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1066 (8th Cir. 2003) ("[A]n intermediate state appellate court's decision … is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

A breach-of-contract claim usually requires "a valid and enforceable contract *between the parties*." *Soybean Merch. Council v. AgBorn Genetics, LLC*, 534 S.W.3d 822, 833 (Mo. Ct. App. 2017) (emphasis added). Plaintiffs are not parties to the BAAs; those contracts are between Cerner and the Healthcare Provider Defendants. *See* CAC ¶ 509; Exs. A-I. Therefore, to assert claims for breaches of the BAAs, Plaintiffs must be third-party beneficiaries of the BAAs. They are not. To be a third-party beneficiary, "the contract terms must clearly express that the contracting parties intended the third party to have the right to maintain an action on the contract." *JTL Consulting, L.L.C. v. Shanahan*, 190 S.W.3d 389, 400 (Mo. Ct. App. 2006). "In cases where the contract lacks an express declaration of that intent, there is a strong presumption that the third party is not a beneficiary and that the parties contracted to benefit only themselves." *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. 2007).

None of the BAAs clearly expresses an intent by the contracting parties (Cerner and the Healthcare Provider Defendants) to allow Plaintiffs to enforce the agreement. On the contrary, many expressly *disclaim* third-party beneficiaries. *E.g.*, Ex. A § 20; Ex. B § 5.7; Ex. C § 27; *see L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co.*, 75 S.W.3d 247, 260 (Mo. 2002) ("The intention of the parties is to be gleaned from the four corners of the contract."). Although Plaintiffs insist that the BAAs "were made expressly for the benefit of Plaintiffs" (CAC ¶ 510) and that Plaintiffs are "intended third-party beneficiaries of these contracts" (*id.* ¶ 512), the contract language dispositively disproves these assertions. *See Ford v. Bluegreen Vacations Unlimited, Inc.*, 2022 WL 1125276, at *2 (W.D. Mo. Apr. 14, 2022) ("If the contents of the contract contradict an allegation in the complaint, the contract and not the allegation controls.").

**2. Plaintiffs' claims for breach of implied contract fail.**

Perhaps recognizing that they cannot assert a claim for breach of an express contract, Plaintiffs also plead that they entered into an implied-in-fact contract with Cerner whereby Cerner

promised to take appropriate measures to safeguard Plaintiffs' personal information, and that Cerner's breach of this contract resulted in the data breach. CAC ¶¶ 518-527.[12] This claim is deficient because, at a minimum, Plaintiffs fail to plead the existence of an implied-in-fact contract.

A claim for breach of contract necessarily requires the existence of a valid contract. "A valid contract requires a mutuality of assent by the parties to the terms of the contract, i.e., a meeting of the minds." *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 547 (8th Cir. 2022). "To determine whether a meeting of the minds occurred and an agreement has been reached, the court looks to the intention of the parties as expressed or manifested in their words or acts." *Merritt v. Wilson*, 697 S.W.3d 814, 821 (Mo. Ct. App. 2024). Acts (instead of words) may express mutual assent "where the parties' conduct reflects a tacit understanding," even if not reduced to writing. *Hiscox Ins. Co. v. Warden Grier, LLP*, 474 F. Supp. 3d 1004, 1009 (W.D. Mo. 2020).

Plaintiffs' allegations do not plausibly establish mutual assent. The CAC asserts that Plaintiffs entered into implied contracts with Cerner because they "entrusted their Private Information to Defendants." CAC ¶ 525. But Plaintiffs had no direct relationship with Cerner, and they allege no facts suggesting that they and Cerner had a meeting of the minds, or that they and Cerner engaged in conduct reflecting a shared and sufficiently specific understanding. *See DiSalvo Props., LLC v. Hall*, 616 S.W.3d 502, 510 (Mo. Ct. App. 2020) ("An enforceable contract is not formed when terms are too uncertain."); *Berry*, 2025 WL 1287909, at *8-9 (purported "implicit promise to protect the data from unauthorized use or to comply with data security laws" was not "sufficiently definite for the court to determine the duty of each party and the conditions

[12] Plaintiffs do not allege that Cerner breached an implied-in-law contract (sometimes called a "quasi-contract") and instead assert only an implied-in-fact theory. *See Am. Eagle Waste Indus., LLC v. St. Louis County*, 379 S.W.3d 813, 828-829 (Mo. 2012) (per curiam) (distinguishing between implied-in-fact contracts and implied-in-law contracts).

of performance"). Instead, Cerner entered BAAs with the Healthcare Provider Defendants, through which Cerner indirectly acquired Plaintiffs' information. CAC ¶ 345. Plaintiffs purport to identify "*Defendants'* implied promises" (*id.* ¶ 524 (emphasis added)), but Plaintiffs do not identify a single act *by Cerner* that would (or even could) have conveyed such promises to Plaintiffs who never dealt directly with Cerner. Nor do Plaintiffs allege facts supporting a meeting of the minds. Simply put, "Plaintiffs had no direct dealings with [Cerner] and were unaware of [Cerner's] existence until … the Data Breach. They thus could not have reached any implied understanding with [Cerner]" sufficient to give rise to an implied-in-fact contract. *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 591 (N.D. Ill. 2022); *accord In re NCB Mgmt. Servs., Inc. Data Breach Litig.*, 748 F. Supp. 3d 262, 274-275 (E.D. Pa. 2024).

### D. Plaintiffs' Miscellaneous Common-Law Claims Fail

Continuing their kitchen-sink approach, Plaintiffs assert three common-law causes of action—unjust enrichment, breach of confidence, and breach of fiduciary duty—all of which fail.

#### 1. Plaintiffs' unjust-enrichment claims fail.

To establish a claim for unjust enrichment, a plaintiff must show that "(1) it directly conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Allied Servs., LLC v. Smash My Trash, LLC*, 153 F.4th 600, 612 (8th Cir. 2025). Plaintiffs' unjust-enrichment claims fail for two reasons. *First*, "Plaintiffs do not allege that they directly conferred any benefit to [Cerner]. Instead, they allege that they conferred a benefit to their healthcare providers and those providers conferred a benefit to [Cerner]. This is insufficient to allege a claim for unjust enrichment." *Miller v. NextGen Healthcare, Inc.*, 742 F. Supp. 3d 1304, 1315 (N.D. Ga. 2024) (dismissing claim in data-breach case); *see In re MCG Health Data Sec. Issue Litig.*, 2023 WL 3057428, at *6 (W.D. Wash. Mar. 27, 2023) (same reasoning and outcome), *R&R adopted*,

2023 WL 4131746 (W.D. Wash. June 22, 2023); *see also Negron*, 2025 WL 2710014, at *12-13 ("defendant didn't receive a benefit [from plaintiff] in exchange for data security because no portion of payment was attributable to that service," so unjust-enrichment claim failed). *Second*, the CAC lacks facts suggesting that Cerner accepted and retained a benefit inequitably or unjustly. "Plaintiff[s'] allegations focus primarily on the personal hardships [they] claim[] to have suffered due to [Cerner's] conduct. Such allegations, without showing inequity or injustice in the retention of the [benefit], are insufficient to state a claim for unjust enrichment." *Clay v. Bank of Am., N.A.*, 2025 WL 3013000, at *4 (E.D. Mo. Oct. 28, 2025); *accord Change Healthcare*, 2025 WL 3693201, at *17.

**2. Plaintiffs' breach-of-confidence claims fail.**

Plaintiffs assert breach-of-confidence claims based on Cerner's alleged failure to safeguard Plaintiffs' personal information. CAC ¶¶ 553-564. Generally, a claim for breach of confidence "involves the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc). Besides Wright, Plaintiffs' breach-of-confidence claims fail because, under Missouri law, "breach of confidence claims are clearly limited to disclosure or communication of trade secrets or other confidential business information." *Mackey*, 2021 WL 3363174, at *9. "There is no indication that a cause of action for breach of confidence extends to the theft of [individuals'] PII by third-party hackers." *Id.* Wright's claim fails because Maryland has not clearly recognized breach of confidence as a standalone tort in *any* context, let alone this one. *Cf. Duty Free Ams., Inc. v. Legg Mason Wood Walker, Inc.*, 2005 WL 914395, at *4 (Md. Cir. Ct. Jan. 13, 2005) (assuming without deciding "whether the tort of breach of a confidential relationship exists in Maryland, there [we]re no facts alleged that could support a breach"). Even if it were to recognize the tort of breach of confidence,

Maryland (like Missouri and numerous other jurisdictions) likely would decline to extend the tort to the data-breach context. *See Mohsen v. Veridian Credit Union*, 733 F. Supp. 3d 754, 769 (N.D. Iowa 2024) (collecting cases where "courts addressing data breach cases dismissed breach of confidence claims"). Nor should this Court stretch Missouri and Maryland law beyond existing limits, as "it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *Kingman*, 643 F.3d at 615; *see id.* at 617 ("Federal court is not the place to press innovative theories of state law.").

Even if Missouri and Maryland recognized a cognizable and applicable tort of breach of confidence, Plaintiffs' claims are lacking. Breach of confidence requires the defendant to have taken an "affirmative action" to disclose the information. *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2023 WL 8540911, at *5 (D.N.J. May 5, 2023). But Plaintiffs "do not allege that [Cerner] affirmatively disclosed their information to the [criminal hacker]." *Id.* at *6. This deficiency requires dismissal. *See id.*; *Mohsen*, 733 F. Supp. 3d at 769 ("[The plaintiff] alleges that [the defendant's] inadequate safeguards allowed a third party to steal his PII. This falls short of stating a plausible breach of confidence claim.").

**3. Plaintiffs' breach-of-fiduciary-duty claims fail.**

To establish a claim for breach of fiduciary duty, a plaintiff must show the existence of a fiduciary duty, a breach of that duty, and causation of damage. *Robinson v. Langenbach*, 599 S.W.3d 167, 178 (Mo. 2020); *Plank v. Cherneski*, 231 A.3d 436, 442 (Md. 2020). These claims fail because the CAC insufficiently alleges that Cerner owed Plaintiffs any fiduciary duties.

To establish a fiduciary relationship under Missouri law, a plaintiff must show:

> (1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by

> the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

*Emerick v. Mut. Ben. Life Ins. Co.*, 756 S.W.2d 513, 526-527 (Mo. 1988). Courts usually decline to find a fiduciary relationship if any factor is absent. *See, e.g.*, *Gilbreath v. First State Bank of Joplin*, 859 S.W.2d 237, 239 (Mo. Ct. App. 1993) (rejecting fiduciary-duty claim based on failure to satisfy first element); *Mackey*, 2021 WL 3363174, at *11 (same); *McAllister v. St. Louis Rams, LLC*, 2018 WL 1299710, at *5 (E.D. Mo. Mar. 13, 2018) (same based on failure to satisfy third element). Here, the CAC lacks allegations supporting (at a minimum) the first and third elements.

To be sure, there are select "instances in which a fiduciary relationship exists absent [all five] elements." *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 394 (Mo. Ct. App. 1998). "Such instances include the attorney-client relationship, the physician-patient relationship, and the principal-agent relationship, none of which exist in this case." *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1106 n.12 (10th Cir. 1999). "The common thread elevating each of these relationships to the level of a fiduciary relationship is the special circumstances of the parties['] relationship where one places trust in another so that the latter gains superiority and influence over the former." *Speaks Fam. Legacy Chapels, Inc. v. Nat'l Heritage Enters., Inc.*, 2009 WL 2391769, at *3 (W.D. Mo. Aug. 3, 2009). Even if it would be proper for the Court to recognize a new exception to the rule (*but see Kingman*, 643 F.3d at 615, 617), "there are no factual allegations in the [CAC] that plausibly establish a direct relationship of any sort between [Cerner] and Plaintiffs, let alone a relationship in which Plaintiffs placed any special confidence in [Cerner]." *Speaks*, 2009 WL 2391769, at *3. Indeed, Plaintiffs do not purport even to have known that Cerner existed before the data breach alleged in the CAC.



Case 4:25-cv-00259-BP Document 161 Filed 01/16/26 Page 43 of 53

Wright likewise fails to establish the existence of a fiduciary relationship between her and Cerner under Maryland law. In Maryland, a fiduciary relationship "can be created by common law, by statute, or by contract, and can have different characteristics." *Plank*, 231 A.3d at 465. Cerner's indirect relationship with Wright does not correspond to any "[w]ell-known examples of habitual or categorical fiduciary relationships" recognized under Maryland common law. *Id.* (listing examples). The CAC's sole (and, even then, conclusory) allegation in this regard is: "As healthcare service providers, Defendants have a fiduciary relationship to their clients." CAC ¶ 568. But Cerner does not provide healthcare services to Wright and Wright is not Cerner's client; rather, LifeBridge Health, Inc., is Wright's healthcare provider and Cerner's client. *See id.* ¶ 176. The CAC also does not identify any statute imposing a fiduciary relationship, and (as discussed *supra* § II.C) Cerner and Wright never entered a contract, let alone one giving rise to fiduciary duties. Absent a fiduciary relationship, dismissal is warranted. *See, e.g.*, *Healthcare Living for Fams., Inc. v. Optum, Inc.*, 2025 WL 2300720, at *8 (D. Md. Aug. 8, 2025).

**E. Plaintiffs' Invasion-Of-Privacy Claims Fail**

Although Plaintiffs broadly label Count VIII as asserting claims for "Invasion of Privacy," they appear to assert only public disclosure of private facts. This tort requires "1) publication or publicity, 2) absent any waiver or privilege, 3) of private matters in which the public has no legitimate interests, 4) so as to bring shame or humiliation to a person of ordinary sensibilities." *Balke v. Ream*, 33 S.W.3d 589, 594 (Mo. Ct. App. 2000); *accord Lindenmuth v. McCreer*, 165 A.3d 544, 556-557 (Md. Ct. Spec. App. 2017). Plaintiffs' claims fail for two reasons.

*First*, Plaintiffs have not alleged that Cerner published anything—only, at most, that the criminal hacker stole data. CAC ¶¶ 143, 171, 225, 369; *see also id.* ¶ 581 (asserting, in passive voice, that "publicity was given"). Even if Plaintiffs had plausibly alleged that the criminal hacker then posted some of this data online (*but see supra* § II.B.3), such allegations might support a

claim against the criminal hacker, but not against Cerner. *See T.R.*, 2025 WL 3143638, at *6 (public-disclosure claim failed because complaint "allege[d] that Plaintiffs' Private Information was stolen from Defendants, not that Defendants disseminated it to unauthorized third parties"); *Negron*, 2025 WL 2710014, at *13 (same); *MCG Health*, 2023 WL 3057428, at *6 (same).

*Second*, even if a public-disclosure claim could be brought against Cerner based on the criminal hacker's independent actions (though it cannot), Plaintiffs have not plausibly alleged that the criminal hacker has published information that would bring shame or humiliation to an ordinary person. In this context, "[p]ublication means communication to the public in general or to a large number of persons, as distinguished from one individual or a few." *Wright v. Catalent Pharma Sols., LLC*, 2020 WL 1276104, at *24 (W.D. Mo. Mar. 17, 2020). While the CAC alleges that the criminal hacker stole information including medication and diagnostic and treatment information (*e.g.*, CAC ¶ 369), no Plaintiff alleges such information was "published." Even if the Court credits Carnahan's and Greeno's bald and dubious assertion that all data of theirs on the dark web came from the criminal hacker's theft, the data in question is not of the type that satisfies the elements of a public-disclosure claim. Carnahan alleges that her Social Security number is on the dark web (*id.* ¶ 143) and Greeno alleges that his "credit card number, name, and address" (*id.* ¶ 225) are on the dark web. The release of this sort of information plainly would not bring shame or humiliation to a person of ordinary sensibilities. *See Howard v. Frost Nat'l Bank*, 458 S.W.3d 849, 855 (Mo. Ct. App. 2015) (affirming dismissal of claim based on disclosure that plaintiffs "had over $3 million in assets available to them in their investment accounts" because plaintiffs could "no[t] … reasonably" "allege that such disclosure would bring shame or humiliation to a person of ordinary sensibilities"). No other Plaintiff alleges that any information allegedly copied by the criminal hacker has been published. Because "[t]he alleged threat of some future publication is

too speculative to state a claim," Plaintiffs' privacy claims should be dismissed. *McNeil v. Best Buy Co.*, 2014 WL 1316935, at *4 (E.D. Mo. Apr. 2, 2014).

### F. Plaintiffs' Consumer-Protection Claims Fail

Plaintiffs' statutory consumer-protection claims should all be dismissed.[13]

#### 1. The general consumer-protection claims fail for fundamental reasons.

Plaintiffs' claims under eight States' general consumer-protection statutes (the ACFA, the ADTPA, the FDUTPA, the IDCSA, the MMPA, the GBL, the MCPA, and the UCL) differ in various important respects. But they all fail here for common reasons. Plaintiffs' deception-based theory of liability should be dismissed because Plaintiffs are not consumers or customers of Cerner, so they were not plausibly exposed to or affected by any alleged representation or omission by Cerner. Plaintiffs' unfairness-based theory (cognizable only under some of the statutes at issue) fails because Plaintiffs do not plausibly allege that Cerner engaged in unfair conduct.

Start with Plaintiffs' deception-based theory, which "sound[s] in fraud" and therefore is "subject to Rule 9(b)'s heightened pleading standard." *E.g.*, *Hennessey v. Gap, Inc.*, 86 F.4th 823,

---

[13] Plaintiffs invoke the Arizona Consumer Fraud Act (the "ACFA"), the Arkansas Deceptive Trade Practices Act (the "ADTPA"), the California Consumer Privacy Act (the "CCPA"), the California Confidentiality of Medical Information Act (the "CMIA"), the California Customer Records Act (the "CCRA"), the California Unfair Competition Law (the "UCL"), the California Privacy Rights Act (the "CPRA"), the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), the Indiana Deceptive Consumer Sales Act (the "IDCSA"), the Missouri Merchandising Practices Act (the "MMPA"), the New York General Business Law (the "GBL"), the Montana Data Breach Notification Law (the "MDBNL"), the Montana Consumer Protection Act (the "MCPA"), and the Montana Uniform Health Care Information Act (the "MUHCIA"). Generally, only Plaintiffs who allege that they engaged in a transaction in a State can bring claims under that State's consumer-protection statutes. *See, e.g.*, *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1323 (S.D. Fla. 2016) (FDUTPA); *Hale*, 942 F.3d at 404 (MMPA); *Campbell v. Honey Sci., LLC*, 797 F. Supp. 3d 1080, 1091 (N.D. Cal. 2025) (UCL).

827 (8th Cir. 2023) (MMPA);[14] *see* CAC ¶¶ 603, 616, 676, 694, 744 (alleging that Cerner "intended to mislead Plaintiffs … and to induce them to rely on its misrepresentations"); *id.* ¶¶ 656, 714, 723 (alleging "misrepresentations," "concealment, suppression and/or omission of material facts," and misleading "representations"). Generally, to bring a deception-based consumer-protection claim, a plaintiff must plead a "causal connection" between the purportedly deceptive act and the alleged harm. *E.g.*, *In re Folgers Coffee Mktg.*, 159 F.4th 1151, 1156 (8th Cir. 2025) (MMPA).[15] To do so, a plaintiff must plausibly allege that she was exposed to or otherwise "aware of the misrepresentation." *Faltermeier v. FCA US LLC*, 899 F.3d 617, 622 (8th Cir. 2018) (MMPA). This is because "if the plaintiff did not see any of [the] statements, they could not have been the cause of his injury, there being no connection between the deceptive act and the plaintiff's injury." *Grossman v. GEICO Cas. Co.*, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022) (GBL).

Plaintiffs—who are not Cerner's customers and do not claim to have chosen their healthcare providers based on the electronic-health-records platform used by their doctors—do not plausibly allege that Cerner made any misrepresentations or that Plaintiffs were exposed to any such misrepresentations. On the former point, the only cited statements by Cerner are that (1) Cerner is "'an industry leader in securely storing' data," and (2) Cerner "'has implemented and will maintain technical and organizational measures designed to prevent accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Services Private Information … [and] which are generally aligned with the ISO/IEC 27001:2013 standard.'" CAC ¶ 349. But

[14] *See also, e.g.*, *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875 (11th Cir. 2023) (ACFA); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (UCL); *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1293 (11th Cir. 2025) (FDUTPA).

[15] *See also, e.g.*, *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016) (ACFA); *Parnell v. FanDuel, Inc.*, 591 S.W.3d 315, 318 (Ark. 2019) (ADTPA); *Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1209 (11th Cir. 2024) (FDUTPA); *Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 861 (Mont. 2022) (MCPA); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) (GBL).

Plaintiffs do not claim they were ever exposed to any of these purportedly deceptive misrepresentations. Not a single Plaintiff alleges that he or she saw (let alone relied on, as some of the consumer-protection statutes require) the statement that Cerner is an industry leader in securely storing data, or the statement that Cerner would implement technical and organizational measures under ISO/IEC 27001:2013 standards. This is unsurprising since, as noted, Plaintiffs are not Cerner customers and so likely had no exposure whatsoever to *any* statement (or omission) by Cerner. All the deception-based claims should be dismissed for this reason. *See, e.g.*, *In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 387 (S.D.N.Y. 2024) (GBL claim failed where plaintiffs did not see statements); *In re U.S. Vision Data Breach Litig.*, 2025 WL 615366, at *7 (D.N.J. Feb. 26, 2025) (same for ACFA claim); *Est. of Peterson ex rel. Peterson v. Koelsch Senior Cmtys., LLC*, 2025 WL 953709, at *14 (D. Mont. Feb. 21, 2025) (same for MCPA claim), *R&R adopted*, 2025 WL 914401 (D. Mont. Mar. 26, 2025).

Even if Plaintiffs were exposed to these statements, all their deception-based claims premised on the statements still fail. The first statement—that Cerner was an industry leader—is nonactionable puffery. *See Trex Co. v. CPG Int'l LLC*, 2017 WL 3272013, at *8 (W.D. Va. Aug. 1, 2017) (collecting "ample authority holding that statements that a company is 'the leader' are generally puffery"); *Spiel Assocs., Inc. v. Gateway Bookbinding Sys., Ltd.*, 2010 WL 546746, at *11 (E.D.N.Y. Feb. 16, 2010) ("[B]road, vague claims to be an industry leader … are inherently subjective puffery."). And Plaintiffs do not allege facts suggesting that the second statement—about implementing technical and organizational measures under ISO/IEC 27001:2013 standards—was untrue. The mere allegation that a criminal hacker was able to access Cerner's servers does not plausibly establish that technical and organizational measures designed to prevent that result were not implemented (and certainly not with the specificity that Rule 9(b) requires).

Plaintiffs also fail to plead a viable unfairness-based theory. Although the relevant statutes do not uniformly define what makes a practice "unfair" (and some do not impose unfairness-based liability at all), Plaintiffs' claims under all these statutes fall short because the CAC does not allege that Cerner was more than (at most) negligent. Cerner disputes that it was negligent, and that Plaintiffs plead a plausible negligence claim. But in any event, it cannot be true that every negligent act (including negligence in ensuring data security) amounts to an unfair trade practice. And "Plaintiffs' conclusory allegations that, because of the data breach, [Cerner] did not implement and maintain adequate data security" are "insufficient to show [Cerner's alleged] conduct meets the level necessary" to state an unfairness claim. *MCG Health*, 2023 WL 3057428, at *14; *see also Kuhns*, 868 F.3d at 719 (affirming dismissal of MMPA claim because complaint "fail[ed] to plausibly allege how failing to discover and notify customers of the data breach qualifies as an unfair or deceptive trade practice"). That is particularly true given that Plaintiffs are not Cerner's consumers and do not claim to have ever interacted with Cerner.

**2. The other consumer-protection claims fail for statute-specific reasons.**

**CCRA, CCPA, and CPRA.** Plaintiffs' allegations are not covered by the CCRA or the CCPA (or the CPRA, which merely amended the CCPA and does not merit separate treatment). The CCRA's disclosure obligations "do not apply to" an entity "regulated by the [CMIA]" or "governed by the medical privacy and security rules issued by the federal Department of Health and Human Services … established pursuant to [HIPAA]." Cal. Civ. Code § 1798.81.5(e)(1), (3). Plaintiffs' claims against Cerner for violations of the CMIA (CAC ¶¶ 629-637) and their allegations that Cerner failed to comply with HIPAA requirements (*id.* ¶¶ 399-406) make clear that, for purposes of Plaintiffs' claims, Cerner is not subject to the CCRA's disclosure obligations.

Plaintiffs likewise fail to state a claim for violation of the CCPA against Cerner for two reasons. First, like the CCRA, the CCPA does not apply either to "[m]edical information governed

by the [CMIA]," or to "protected health information that is collected by … [a] business associate governed by the privacy, security, and breach notification rules" promulgated under HIPAA. Cal. Civ. Code § 1798.146(a)(1). Plaintiffs' "Private Information," which was provided "in connection with [Cerner's] services contracted by [their] healthcare provider" (*e.g.*, CAC ¶¶ 9, 23), is medical/protected health information not covered by the CCPA. *See Morales v. Conifer Revenue Cycle Sols., LLC*, 2025 WL 1096396, at *9 (C.D. Cal. Mar. 31, 2025). Second, and relatedly, the CCPA does not apply to Cerner because Cerner is a "business associate of a covered entity governed by [HIPAA]" that "maintains, uses, and discloses patient information in the same manner as medical information or protected health information." Cal. Civ. Code § 1798.146(a)(3). Protected health information, as defined by the statute, "includes Social Security numbers and other nonmedical information which was provided in relation to an individual's healthcare." *Mullinix v. US Fertility, LLC*, 2021 WL 4935975, at *5 (C.D. Cal. Apr. 21, 2021).

**CMIA.** A claim for disclosure of confidential medical information under the CMIA "requires a showing that an unauthorized party viewed the confidential information." *Vigil v. Muir Med. Grp. IPA, Inc.*, 300 Cal. Rptr. 3d 32, 42 (Ct. App. 2022). The CAC contains no concrete allegations that an unauthorized party *viewed* any confidential medical information (much less the named Plaintiffs' confidential information), only that such information was copied to either "a remote server" (CAC ¶ 2) or "an external hard drive" (*id.* ¶ 369). This is insufficient. *See Regents of Univ. of Cal. v. Super. Ct.*, 163 Cal. Rptr. 3d 205, 221 (Ct. App. 2013) (although thief stole hard drive containing medical records, plaintiff did not allege that "her medical records were, in fact, viewed by an unauthorized individual"); *Sutter Health v. Super. Ct.*, 174 Cal. Rptr. 3d 653, 659 (Ct. App. 2014) (same). To be sure, Plaintiffs broadly assert that "[a]s a result of Defendants' negligence, an unauthorized third-party viewed and obtained Plaintiffs' medical information"

(CAC ¶ 636; *see also id.* ¶ 403), but the Court need not credit this "formulaic recitation of the elements of a cause of action." *DeCastro*, 107 F.4th at 816.

**FDUPTA.** In addition to the reasons stated above (*supra* § II.F.1), Plaintiffs' FDUTPA damages claims fail because Plaintiffs do not allege "actual damages" under the statute. "Florida courts consider actual damages, in the FDUTPA context, to be a term of art." *In re Fortra File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1270 (S.D. Fla. 2024). "Importantly, FDUTPA entitles a consumer to recover damages attributable to the diminished value of the goods or services received, but does not authorize recovery of consequential damages to other property attributable to the consumer's use of such goods or services." *Id.* at 1270-1271. Here, Plaintiffs "fail to plausibly allege that the healthcare services they received diminished in value as a result of the [alleged data b]reach." *Id.* at 1271. Instead, they allege (at most) mere consequential damages, which are "insufficient to state a claim." *Id.*; *accord Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1191 (M.D. Fla. 2022).

**MDBNL.** Plaintiffs fail to state claims under the MDBNL because they do not plausibly allege that Cerner "owns or licenses" the data at issue, or that Cerner's disclosures to the hospitals were "unreasonabl[y] delay[ed]" in view of "the legitimate needs of law enforcement." Mont. Code Ann. § 30-14-1704(1); *see also id.* § 30-14-1704(3) ("The notification … may be delayed if a law enforcement agency determines that the notification will impede a criminal investigation and requests a delay in notification."). Indeed, on the latter point, Plaintiffs tacitly acknowledge that "law enforcement investigations" resulted in delay. CAC ¶ 374.

**MUHCIA.** Plaintiffs fail to state a claim under the MUHCIA because the statute "appl[ies] only to a health care provider." Mont. Code Ann. § 50-16-505. But Cerner is not a "health care provider" for purposes of the MUHCIA. *See id.* § 50-16-504(7) ("'Health care provider' means a

person who is licensed, certified, or otherwise authorized by the laws of this state to provide health care in the ordinary course of business or practice of a profession.").

**UCL**. Plaintiffs' UCL claims fail for two reasons in addition to those stated above (*supra* § II.F.1). First, in "data breach cases," the UCL applies "only when the liability-causing conduct emanated from California." *NCB Mgmt. Servs.*, 748 F. Supp. 3d at 283. Here, Plaintiffs "allege that [Cerner] engaged in liability-creating conduct when it failed to implement reasonable security and privacy measures to protect their PII." *Id.* at 284. "All of this alleged conduct took place at [Cerner's] headquarters in [Missouri]," so "the UCL does not apply." *Id.* Second, Plaintiffs have not plausibly alleged that their remedies at law are inadequate, as required to obtain equitable relief in federal court—yet "[t]he UCL provides only for equitable remedies" for private plaintiffs. *New Life Treatment Ctr., Inc. v. Sanford Health Plan*, 2024 WL 5186986, at *9 (D.S.D. Dec. 20, 2024); *see id.* at *9-11 (dismissing UCL claim for failure to plead inadequate remedy at law); *Bass v. Bowmar Nutrition, LLC*, 2022 WL 4182203, at *2-4 (S.D. Iowa Aug. 30, 2022) (same).

### G. Plaintiffs' Request For A Declaratory Judgment Should Be Denied

Plaintiffs should be denied relief under the Declaratory Judgment Act, which creates "a remedy for a viable underlying cause of action" but does not provide "a separate cause of action." *Smash My Trash*, 153 F.4th at 610. Plaintiffs lack a viable underlying cause of action, so they cannot get a declaratory judgment. *See Ellis v. Nissan N. Am. Inc.*, 2020 WL 3105097, at *5 (W.D. Mo. June 11, 2020). Even if any Plaintiff stated an underlying claim, dismissal of the request for a declaratory judgment would be proper because Plaintiffs' requests for declaratory relief duplicate their other claims. *See Mackey*, 2021 WL 3363174, at *12.

## CONCLUSION

The CAC should be dismissed without leave to amend.

Dated: January 16, 2026

Respectfully submitted,


*/s/ Alan Schoenfeld*
Alan Schoenfeld (*pro hac vice*)
Thomas Oates (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Alan.Schoenfeld@wilmerhale.com
Tom.Oates@wilmerhale.com

Siddharth Velamoor (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Siddharth.Velamoor@wilmerhale.com

Katherine Mackey (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Katherine.Mackey@wilmerhale.com

Patrick Fanning (MO Bar No. 47615)
LATHROP GPM LLP
2345 Grant Blvd., Suite 2200
Kansas City, MO 6418-2618
Telephone: (816) 460-5416
Patrick.Fanning@lathropgpm.com

*Attorneys for Defendant Cerner Corporation*