**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| IN RE: CERNER/ORACLE DATA BREACH LITIGATION | ) ) ) ) ) | Case No. 25-00259-CV-W-BP<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION
TO DEFENDANT CERNER CORPORATION'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 2

LEGAL STANDARD .......... 3

ARGUMENT .......... 4

I. ALL PLAINTIFFS HAVE ARTICLE III STANDING. .......... 4

A. INJURY IN FACT .......... 4

B. TRACEABILITY .......... 10

II. PLAINTIFFS PLAUSIBLY ALLEGE COMMON LAW AND STATUTORY CLAIMS. .......... 11

A. CHOICE OF LAW .......... 11

B. PLAINTIFFS PLEAD A CLAIM FOR NEGLIGENCE. .......... 12

C. CERNER OWED PLAINTIFFS A DUTY TO SAFEGUARD THEIR PRIVATE INFORMATION. .......... 12

1. Special facts and circumstances establish Cerner owes a duty. .......... 13

2. A duty arises from the special relationship between Plaintiffs and Cerner. .......... 14

D. CERNER BREACHED ITS DUTY TO SAFEGUARD PLAINTIFFS' PRIVATE INFORMATION. .......... 15

E. PLAINTIFFS SUFFERED COGNIZABLE INJURIES FROM THE DATA BREACH. .......... 16

F. CERNER CAUSED PLAINTIFFS' INJURIES. .......... 19

G. PLAINTIFFS ADEQUATELY PLEAD A CLAIM FOR NEGLIGENCE *PER SE*. .......... 20

H. PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR CONTRACT-BASED CLAIMS .......... 21

1. Plaintiffs are third-party beneficiaries of the business associate agreements. .......... 21

2. Plaintiffs have stated a valid breach of implied contract claim. .......... 24

I. PLAINTIFFS ADEQUATELY ALLEGED THEIR UNJUST ENRICHMENT CLAIM .......... 27

J. PLAINTIFFS PLAUSIBLY PLEAD BREACH OF FIDUCIARY DUTY .......... 28

K. PLAINTIFFS SUFFICIENTLY STATE A CLAIM FOR INVASION OF PRIVACY. .......... 29

L. PLAINTIFFS PROPERLY ALLEGE THEIR STATUTORY CONSUMER PROTECTION CLAIMS. .......... 31

M. CERNER'S STATUTE-SPECIFIC OBJECTIONS .......... 37

CONCLUSION .......... 40

## TABLE OF AUTHORITIES

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
125 F. Supp. 3d 945 (N.D. Cal. 2015) ........ 40

*Allergan Inc. v. Athena Cosmetics, Inc.*,
2013 WL 12142655 (C.D. Cal. Mar. 6, 2013) ........ 40

*Amburgy v. Express Scripts, Inc.*,
671 F. Supp. 2d 1046 (E.D. Mo. 2009) ........ 18

*Angus v. Flagstar Bank, FSB*,
2025 WL 937760 (E.D. Mich. Mar. 27, 2025) ........ 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 3

*Bailey v. St. Louis*,
196 So. 3d 375 (Fla. 2d DCA 2016) ........ 32, 38

*Baldwin v. Nat'l W. Life Ins. Co.*,
2021 WL 4206736 (W.D. Mo. Sep. 15, 2021) ........ 9, 17, 18

*Barber v. Time, Inc.*,
159 S.W.2d 291 (Mo. 1942) ........ 31

*Barletti v. Connexin Software, Inc.*,
2023 WL 6065884 (E.D. Pa. Aug. 17, 2023) ........ 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 3, 4

*Bohnak v. Marsh & McLennan Cos.*,
79 F.4th 276 (2d Cir. 2023) ........ 7

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ........ 34, 35

*Burnett v. Nat'l Ass'n of Realtors*,
75 F.4th 975 (8th Cir. 2023) ........ 21

*Campbell v. Pub. Hous. Auth. ex rel. City of Minneapolis*,
168 F.3d 1069 (8th Cir. 1999) ........ 4

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*,
169 So. 3d 164 (Fla. 4th DCA 2015) ........ 38

*Carlsen v. GameStop, Inc.*,
833 F.3d 903 (8th Cir. 2016) ........ 3, 4, 26

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ........ 32

*Castillo v. Seagate Tech., LLC*,
2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) ........ 25

*Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*,
2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) .......... 40

*Chen v. Target Corp.*,
2022 WL 1597417 (D. Minn. May 19, 2022) .......... 12

*Childs v. Williams*,
825 S.W.2d 4 (Mo. Ct. App. 1992) .......... 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 6, 9

*Clayton v. PruittHealth, Inc.*,
2025 WL 1643485 (N.D. Ga. June 9, 2025) .......... 9

*Clemens v. ExecuPharm Inc.*,
48 F.4th 146 (3d Cir. 2022) .......... 7

*CMR Constr. & Roofing, LLC v. UCMS, LLC*,
2022 WL 3012298 (11th Cir. July 29, 2022) .......... 38

*Coffey v. OK Foods Inc.*,
2022 WL 738072 (W.D. Ark. Mar. 10, 2022) .......... 8

*Collyer v. Catalina Snacks Inc.*,
712 F. Supp. 3d 1276 (N.D. Cal. 2024) .......... 40

*Drobnak v. Andersen Corp.*,
561 F.3d 778 (8th Cir. 2009) .......... 36

*Emerick v. Mut. Benefit Life Ins. Co.*,
756 S.W. 2d 513 (Mo. 1988) .......... 28

*F.T.C. v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) .......... 36

*Farmers Edge Inc. v. Farmobile, LLC*,
970 F.3d 1027 (8th Cir. 2020) .......... 24, 26

*Feliciano v. Dep't of Transp.*,
605 U.S. 38 (2025) .......... 24

*Flores-Mendez v. Zoosk, Inc.*
2021 WL 308543 (N.D. Cal. Jan. 30, 2021) .......... 34

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
344 F.3d 1263 (11th Cir. 2003) .......... 11

*Galaria v. Nationwide Mut. Ins. Co.*,
663 Fed. App'x. 384 (6th Cir. 2016) .......... 8

*Gen. Am. Life Ins. Co. v. Barrett*,
847 S.W.2d 125 (Mo. Ct. App. 1993) .......... 23

*Gibbons v. J. Nuckolls, Inc.*,
216 S.W.3d 667 (Mo. 2007) .......... 32

*Hall v. Centerspace, LP*,
2023 WL 3435100 (D. Minn. May 12, 2023) .......... 10, 16

*Hargis v. JLB Corp.*,
357 S.W.3d 574 (Mo. 2011) .......... 27

*Harris v. Mercy Health Network, Inc.*,
2024 WL 5055556 (S.D. Iowa June 26, 2024) .......... 26

*Henry v. Farmers Ins. Co.*,
444 S.W.3d 471 (Mo. Ct. App. 2014) .......... 28

*Howland v. Truman Med. Ctr.*,
719 S.W.3d 98 (Mo. Ct. App. 2025) .......... 5, 21

*Huntair, Inc. v. Gladstone*,
774 F. Supp. 2d 1035 (N.D. Cal. 2011) .......... 40

*In re Actiq Sales & Mktg. Pracs. Litig.*,
790 F. Supp. 2d 313 (E.D. Penn. 2011) .......... 32

*In re Ambry Genetics Data Breach Litig.*,
567 F. Supp. 3d 1130 (C.D. Cal. 1130) .......... 5, 6

*In re Arthur J. Gallagher Data Breach Litig.*,
631 F. Supp. 3d 573 (N.D. Ill. 2022) .......... 16, 25, 26

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
2021 WL 3568394 (D.S.C. Aug. 12, 2021) .......... 32

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
567 F. Supp. 3d 667 (D.S.C. 2021) .......... 14

*In re Cap. One Consumer Data Sec. Breach Litig.*,
488 F. Supp. 3d 374 (E.D. Va. 2020) .......... 35

*In re Change Healthcare, Inc.*,
2025 WL 3687895 (D. Minn. Dec. 19, 2025) .......... 22

*In re Change Healthcare, Inc.*,
2025 WL 3693201 (D. Minn. Dec. 19, 2025) .......... 9, 17, 27

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
999 F.3d 1247 (11th Cir. 2021) .......... 8

*In re Grp. Health Plan Litig.*,
709 F. Supp. 3d 707 (D. Minn. 2023) .......... 27

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
440 F. Supp. 3d 447 (D. Md. 2020) .......... 35, 37

*In re Mednax Servs., Inc. Customer Data Sec. Breach Litig.*,
603 F. Supp. 3d 1183 (S.D. Fla. 2022) .......... 5, 38

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
198 F. Supp. 3d 1183 (D. Or. 2016) .......... 27

*In re Shields Health Care Grp., Inc. Data Breach Litig.*,
721 F. Supp. 3d 152 (D. Mass. 2024) .......... 5

*In re Snowflake, Inc.*,
2025 WL 3012889 (D. Mont. Oct. 28, 2025) .......... 32

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017) .......... 4, 7, 11

*In re SuperValu, II*,
925 F.3d 955 (8th Cir. 2019) .......... 18

*In re Univ. Urology Data Sec. Incident Litig.*,
2025 WL 1002355 (S.D.N.Y. Mar. 31, 2025) .......... 34

*In re: Cmty. Health Sys., Inc.*,
2016 WL 4732630 (N.D. Ala. Sept. 12, 2016) .......... 27

*Indiana ex rel. Rokita v. Jackson Cnty. Schneck Mem'l Hosp.*,
2023 WL 7485516 (S.D. Ind. Nov. 13, 2023) .......... 36

*J.J. ex rel. C.W. v. Poplar Bluff Reg'l Med. Ctr., L.L.C.*,
675 S.W.3d 259 (Mo. Ct. App. 2023) .......... 20

*J.J.'s Bar & Grill, Inc. v. Time Warner Cable Midwest, LLC*,
539 S.W.3d 849 (Mo. Ct. App. 2017) .......... 20

*Jackson v. Health Ctr. Partners of S. Cal.*,
2024 WL 3708867 (S.D. Cal. Aug. 7, 2024) .......... 37

*Jerseyville Mall, L.L.C. v. Shop 'N Save Warehouse Foods, Inc.*,
633 S.W.3d 523 (Mo. Ct. App. 2021) .......... 23, 24

*Johnson v. Cornerstone Nat'l Ins. Co.*,
2024 WL 5265372 (W.D. Mo. Apr. 29, 2024) .......... 7, 8, 9, 11

*JTL Consulting, L.L.C. v. Shanahan*,
190 S.W.3d 389 (Mo. Ct. App. 2006) .......... 23

*Klenc v. John Beal, Inc.*,
484 S.W.3d 351 (Mo. Ct. App. 2015) .......... 22

*Krueger v. Wyeth, Inc.*,
2019 WL 4785862 (S.D. Cal. Oct. 1, 2019) .......... 32

*Kuhns v. Scottrade, Inc.*,
868 F.3d 711 (8th Cir. 2017) .......... 16

*L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*,
75 S.W.3d 247 (Mo. 2002) .......... 13

*Laclede Inv. Corp. v. Kaiser*,
596 S.W.2d 36 (Mo. Ct. App. 1980) .......... 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 4, 10

*Luong v. Subaru of Am., Inc.*,
2018 WL 2047646 (N.D. Cal. May 2, 2018) .......... 40

*McKenzie v. Allconnect, Inc.*,
369 F. Supp. 3d 810 (E.D. Ky. 2019) .......... 29

*Meardon v. Register*,
994 F.3d 927 (8th Cir. 2021) .......... 4

*Miller v. NextGen Healthcare, Inc.*,
742 F. Supp. 3d 1304 (N.D. Ga. 2024) .......... 15

*Mohsen v Veridian Credit Union*,
733 F. Supp. 3d 754 (N.D. Iowa 2024) .......... 28

*Negron v. Ascension Health*,
2025 WL 2710014 (E.D. Mo. Sept. 23, 2025) .......... passim

*Nemani v. St. Louis Univ.*,
33 S.W.3d 184 (Mo. 2000) .......... 29

*New York v. Feldman*,
210 F. Supp. 2d 294 (S.D.N.Y. 2002) .......... 35

*Nickel v. Stephens Coll.*,
480 S.W.3d 390 (Mo. Ct. App. 2015) .......... 24

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) .......... 5

*Norwest Mortg., Inc. v. Superior Ct.*,
72 Cal. App. 4th 214 (Cal. Ct. App. 1999) .......... 40

*Ohio Telecom Ass'n v. Fed. Trade Commc'ns Comm'n*,
150 F.4th 694 (6th Cir. 2025) .......... 36

*Oracle v. SAP AG*,
734 F. Supp. 2d 956 (N.D. Cal. 2010) .......... 40

*Orthman v. Premiere Pediatrics, PLLC*,
545 P.3d 124 (Okla. Ct. App. 2024) .......... 5

*Osborn v. United States*,
918 F.2d 724 (8th Cir. 1990) .......... 3

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
647 N.E.2d 741 (N.Y. 1995) .......... 32

*Perry v. Bay & Bay Transp. Servs., Inc.*,
650 F. Supp. 3d 743 (D. Minn. 2023) .......... 8

*Plubell v. Merck & Co.*,
289 S.W.3d 707 (Mo. Ct. App. 2009) .......... 32

*Prestby v. A&A Servs., LLC*,
2026 WL 26128 (D. Neb. Jan. 5, 2026) .......... 10

*Purdy v. Burlington N. & Santa Fe. Ry. Co.*,
2000 WL 34251818 (D. Minn. 2000) .......... 31

*Ramirez v. Paradis Shops, LLC*,
69 F.4th 1213 (11th Cir. 2023) .......... 34

*Rardon v. Falcon Safety Prods., Inc.*,
2021 WL 2008923 (W.D. Mo. May 4, 2021) .......... 12, 13, 14

*Remijas v. Neiman Marcus Grp., LLC*,
794 F.3d 688 (7th Cir. 2015) .......... 9

*Robinson v. Mo. State Highway & Transp. Comm'n*,
24 S.W.3d 67 (Mo. Ct. App. 2000) .......... 19

*Rodriguez v. Mena Hosp. Comm'n*,
2023 WL 7198441 (W.D. Ark. Nov. 1, 2023) .......... 17

*Roma v. Prospect Med. Holdings, Inc.*,
2024 WL 3678984 (E.D. Pa. Aug. 6, 2024) .......... 38

*Spiel Assocs., Inc. v. Gateway Bookbinding Sys., Ltd.*,
2010 WL 546746 (E.D.N.Y. Feb. 16, 2010) .......... 33

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 4, 5, 6

*Stasi v. Inmediata Health Grp. Corp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) .......... 38

*T.R. v. Clay-Platte Fam. Med., P.C.*,
2025 WL 3143638 (W.D. Mo. Nov. 3, 2025) .......... passim

*Tabata v. Charleston Area Med. Ctr., Inc.*,
759 S.E.2d 459 (W. Va. 2014) .......... 5

*TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy*,
238 S.W.3d 140 (Mo. 2007) .......... 23

*Teague v. AGC Am., Inc.*,
2025 WL 1527738 (N.D. Ga. Jan. 6, 2025) .......... 9

*Tehan v. MTC Holsters, LLC*,
2023 WL 12216384 (W.D. Mo. July 27, 2023) .......... 16, 17

*Tracy v. Elekta, Inc.*,
667 F. Supp. 3d 1276 (N.D. Ga. 2023) .......... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 4, 5, 6

*Trex Co. v. CPG Int'l LLC*,
2017 WL 3272013 (W.D. Va. Aug. 1, 2017) .......... 33

*Tsao v. Captiva MVP Rest. Partners, LLC*,
986 F.3d 1332 (11th Cir. 2021) .......... 10

*Verni v. Cleveland Chiropractic Coll.*,
212 S.W.3d 150 (Mo. 2007) .......... 21

*Watts v. Medicis Pharm. Corp.*,
365 P.3d 944 (Ariz. 2016).......... 32

*Webb v. Injured Workers Pharmacy, LLC*,
72 F.4th 365 (1st Cir. 2023).......... 7, 8

*Weisenberger v. Ameritas Mut. Holding Co.*,
597 F. Supp. 3d 1351 (D. Neb. 2022).......... 10

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019) .......... 11

*Yu v. Signet Bank/Virginia*,
69 Cal. App. 4th 1377 (Cal. Ct. App. 1999) .......... 40

Statutes

15 U.S.C. § 45.......... 36

Ariz. Rev. Stat. § 44-1522 (C) .......... 35

Cal. Bus. & Prof. Code § 17205 .......... 40

Cal. Civ. Code § 1798.81.......... 37

Cal. Civ. Code §§ 56.10(a), 56.101(a), 56.36(b) .......... 38

Fla. Stat. § 501.204(2).......... 35

Fla. Stat. § 501.211(2).......... 38

Mont. Code Ann. § 30-14-104(1) .......... 35

Mont. Code Ann. § 70-1-101.......... 39

Mont. Code Ann. §§ 70-1-301–70-1-304 .......... 39

Regulations

15 Mo. Code of State Regs. § 60-8.020.......... 35

45 C.F.R. § 164.308(b) .......... 22

Other Authorities

13 Williston on Contracts § 37:10 (4th ed.) ..... 22
17A Am. Jur. 2d Contracts § 14 (2015) ..... 24
Restatement (Second) of Conflict of Laws § 145 (1971) ..... 12
Restatement (Second) of Contracts § 302 ..... 22
Restatement (Second) of Torts § 302B ..... 13
Restatement (Second) of Torts § 8A ..... 29
Restatement (Second) of Torts § 919(1) (1979) ..... 9

## INTRODUCTION

Plaintiffs are victims of one of the largest healthcare data breaches in United States history. Oracle Health, formerly Cerner Corporation ("Cerner"), is the second-largest electronic health record ("EHR") vendor in the United States. Consolidated Class Action Complaint, Doc. 93 ("CAC") ¶ 1.[1] Cerner learned in February 2025 that a hacker gained access to and obtained extensive data from the company's servers. The data stolen included patient medical records, which contained highly private, statutorily protected personal health information ("PHI") including medical diagnosis and treatment records, dates of birth, and Social Security numbers. ¶ 2. Cerner moves to dismiss, arguing that Plaintiffs lack standing and have failed to state a claim. Cerner's arguments lack merit and its motion should be denied.

All Plaintiffs have Article III standing. Plaintiffs allege a common, concrete injury: the loss of their legally protected privacy interests in their highly personalized, uniquely identifiable, and statutorily confidential PHI, as well as other sensitive personal information including Social Security numbers. That alone is a sufficiently concrete injury for Article III standing for all Plaintiffs under established Supreme Court, Eighth Circuit, and other relevant precedents. Plaintiffs also allege sufficient facts to show a substantial risk of future harm due to misuse of Plaintiffs' Private Information following the Cerner data breach. Cerner's standing arguments are all based on cases that are easily distinguishable. None of the cases Cerner cites in arguing for a lack of standing involved a breach with individuals' PHI and Social Security numbers in the hands of criminals. Cerner's Rule 12(b)(1) motion should be denied.

Cerner's Rule 12(b)(6) motion is equally unavailing on nearly all counts.[2] Plaintiffs have

---

[1] "¶__" refers to the designated paragraph(s) of the CAC.

[2] Plaintiffs are no longer pursuing the breach of confidence claim, the claims under the Montana Uniform Health Care Information Act, the California Consumer Privacy Act, and the Arkansas Deceptive Trade Practices Act. Plaintiffs are pursuing the pending third-party beneficiary claims

sufficiently stated claims for negligence, negligence *per se*, breach of contract, unjust enrichment, breach of fiduciary duty, invasion of privacy, declaratory judgment, and claims under state consumer protection laws and other applicable state statutes.

## BACKGROUND

As an EHR vendor, Cerner provides software and a data-storage platform to healthcare providers. Doctors and hospitals use Cerner's platform to create, store, organize, and manage patients' health records, including names, addresses, dates of birth, and Social Security numbers, as well as health insurance information, billing information, and comprehensive medical history, including treatment records, lab results, diagnoses, medications, and more. ¶¶ 345-46.

Although Cerner acknowledges that it is "trusted with some of the world's most sensitive and regulated data," ¶ 1, it allowed a massive data breach in January 2025, ¶¶ 1-2. According to Cerner, a hacker stole and copied patient data for an untold number of patients—including medical records, treatment information, and health insurance information, as well as names, dates of birth, Social Security numbers and other personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information"). ¶ 2.

Plaintiffs are 20 individuals from eight states,[3] all of whom are or were patients of

---

against Cerner for Plaintiffs that received Data Breach notices from Heartland Regional Medical Center d/b/a Mosaic Life Care ("Mosaic") and Tallahassee Memorial Healthcare ("Tallahassee Memorial"), but concede the remaining third-party beneficiary claims to the extent discussed in Section I.D.1 below.

[3] Ronald and Laura Tripp (Arkansas Heart Hospital, LLC); Machelle Bell and Alyson Brooke Lewis (Baptist Health South Florida, Inc.); Karen Anne Morgan, Heidi Holcomb, and Dillon Greeno (Glens Falls Hospital in the Albany Med Health System in New York); Jason Phillip Evans and Kim Delaney (Mosaic in Missouri); Karen Sue Adams, Jill Renee Carnahan, Shannon Smith, James Taylor, Gerri Woolard, and Lois Melvin (Union Health System, Inc. in Indiana); Paula Sheward (Tallahassee Memorial in Florida); Jerry Walker (Sapphire Community Health, Inc. in Montana); Christian Magliozzi (Huntington Hospital ("Huntington") in California); Rebecca D. Fox (Huntington in New York); and German Rangel (Huntington in Arizona). Plaintiffs Marlene King (Doc. 197), Kelly Michele Sanders (Doc. 198), and Tracy Wright (Doc. 215), voluntarily dismissed their claims without prejudice. Tracy Wright was the only named Plaintiff with an action

healthcare providers that currently or previously used Cerner as their EHR vendor. ¶¶ 8-327, 345. Plaintiffs allege that Cerner is culpable for the theft of their Private Information. ¶¶ 13, 27, 41, 55, 69, 83, 97, 125, 139, 153, 167, 209, 223, 237, 251, 265, 279, 293, 307, 319. As detailed below, Plaintiffs plead they have suffered harms because of the Data Breach.

## LEGAL STANDARD

Cerner contends Plaintiffs lack standing under Rule 12(b)(1) and have failed to state a claim under Rule 12(b)(6). "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack' on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). Cerner's Rule 12(b)(1) arguments are a "facial attack." Doc. 161 ("Def. Br.") at 4-14. Cerner does not rely on any factual evidence outside the pleadings in support of its Rule 12(b)(1) challenge and confirms that it accepts the well-pleaded allegations in the CAC as true. *Id.* at 2 n.1. When considering a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen*, 833 F.3d at 908.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim survives even if it is "improbable" a plaintiff will be able to prove those facts or the odds of recovery are "remote and unlikely." *Twombly*, 550 U.S. at 556. The Court must

---

naming LifeBridge Health Inc. Thus, LifeBridge has been dismissed from the Complaint.

"accept the well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor," *Meardon v. Register*, 994 F.3d 927, 934 (8th Cir. 2021) (citation omitted), and "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When, taken as true, the facts "raise a reasonable expectation that discovery will reveal evidence" to support a plaintiff's claim, the court should deny a motion to dismiss. *Twombly*, 550 U.S. at 556; *T.R. v. Clay-Platte Fam. Med., P.C.*, 2025 WL 3143638, at *2 (W.D. Mo. Nov. 3, 2025).

Finally, in considering motions under both Rule 12(b)(1) and 12(b)(6), "[i]t is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." *Carlsen*, 833 F.3d at 909 (citations omitted). "[S]tanding in no way depends on the merits of the plaintiff's claim[.]" *In re SuperValu, Inc.*, 870 F.3d 763, 773-74 (8th Cir. 2017); *see also Campbell v. Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069, 1074 (8th Cir. 1999) ("We repeat the fundamental principle that the ultimate merits of the case have no bearing on the threshold question of standing.").

## ARGUMENT

### I. ALL PLAINTIFFS HAVE ARTICLE III STANDING.

To have Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, as required in addressing Cerner's facial attack, Plaintiffs readily satisfy those requirements here.

#### A. INJURY IN FACT

To establish standing, an injury in fact must be concrete, particularized, and actual or imminent. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs meet these

requirements. Cerner's arguments are all based on easily distinguishable cases.

To be "concrete," an actual or imminent injury must be "real, and not abstract." *Id.* at 424 (quoting *Spokeo*, 578 U.S. at 340). One way courts assess "concreteness" is to consider whether the alleged injury "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.*; *Spokeo*, 578 U.S. at 340-41. Traditionally recognized tangible harms include physical and monetary harms, but "[v]arious intangible harms can also be concrete," particularly ones that have traditionally supported lawsuits in American courts such as "reputational harms, *disclosure of private information*, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425 (emphasis added).

As the Supreme Court recognized, disclosure of private information—and especially private medical information—is a type of intangible harm traditionally recognized in American courts as supporting a potential right to recover. Many courts have found standing and permitted claims for injury based on the unauthorized disclosure or release of private medical information under various theories, including for example: (a) breach of fiduciary duty (*e.g., In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152 (D. Mass. 2024); *Howland v. Truman Med. Ctr.*, 719 S.W.3d 98 (Mo. Ct. App. 2025); *Orthman v. Premiere Pediatrics, PLLC*, 545 P.3d 124 (Okla. Ct. App. 2024)); (b) breach of a duty of confidentiality (*e.g.*, *Tabata v. Charleston Area Med. Ctr., Inc.*, 759 S.E.2d 459 (W. Va. 2014); (c) negligence (*e.g.*, *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072 (W.D. Wash. 2024); *In re Mednax Servs., Inc. Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1222-24 (S.D. Fla. 2022); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1141-42 (C.D. Cal. 1130)); (d) invasion of privacy (*e.g.*, *In re Ambry Genetics*, 567 F. Supp. 3d at 1143 (noting "[c]ourts have refused to dismiss invasion of privacy claims at the motion to dismiss stage where, as here, a data breach

involved medical information, because the disclosure of such information is more likely to constitute an 'egregious breach of the social norms' that is 'highly offensive'")); (f) breach of contract (*e.g.*, *id.* at 1143-44); and (g) statutory liability (*e.g., id.* at 1148-49). This Court should have no difficulty concluding that Plaintiffs allege an injury in fact that is sufficiently concrete to support Article III standing.

Likewise, Plaintiffs' injuries are particularized. To be particularized, the injury must have been suffered directly by the individual plaintiff, and it must be distinct from the more general type of objection that members of the public at large might have to a defendant's unlawful conduct. *See Spokeo*, 578 U.S. at 339. Plaintiffs suffered direct injury. Every Plaintiff alleges that his or her own, personal private health information and other private information was compromised and stolen by a criminal hacker and removed to a remote server controlled by the criminal.[4]

Plaintiffs also allege actual and present harm. They have already suffered a loss of privacy in the details of their personal and medical health histories. Plaintiffs had a reasonable expectation that such information would remain private given federal and state statutory protections applicable to that information as well as Cerner's and their health care providers' representations that such information would be kept secure and private as required by law. *Id.* ¶¶ 349-358.

In addition, standing may also be "based on a 'substantial risk that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013); *see also TransUnion*, 594 U.S. at 435-36;

[4] Plaintiffs received notice of the data breach from a healthcare provider who used Cerner's products advising that cybercriminals accessed and copied their Private Information, including name, phone number, email address, date of birth, and Social Security numbers, as well as medical information, ¶¶ 83-84, 125-126, 139-140, 153-154, 167-168, including, medical treatments, diagnosis information, prescription information, provider or physician names, dates of services, and/or medical record and patient identification numbers," ¶¶ 13-14, 27-28, 41-42, 55-56, 69-70, 97-98, 209-210, 223-224, 237-238, 251-252, 265-266, 279-280, 293-294, 307-308, 319-320.

*SuperValu*, 870 F.3d at 769; *Johnson v. Cornerstone Nat'l Ins. Co.*, 2024 WL 5265372, at *2 (W.D. Mo. Apr. 29, 2024) (Phillips, C.J.). In determining standing based on the risk of future harm, courts typically consider: (1) whether the thieves specifically targeted plaintiffs' data; (2) whether at least some of the data has been misused since the data breach; and (3) whether the type of data taken is sensitive, such that there is a risk of identity theft or fraud. *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 374-75 (1st Cir. 2023); *see also, e.g.*, *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 286 (2d Cir. 2023) (Article III satisfied where risk of future harm caused a separate concrete harm, such as lost time or expenses); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 156 (3d Cir. 2022) (same regarding emotional distress or spending money on mitigation measures).

Each factor favors Plaintiffs. Plaintiffs allege that criminal actors targeted Plaintiffs' and Class members' Private Information when they hacked into Cerner's servers, ¶¶ 348, 367, 387; *see Johnson*, 2024 WL 5265372, at *3 ("[t]his factor is relevant because a targeted attack suggests the hacker/thief intends to use the stolen data for malicious purposes"); that some of the data stolen has been misused since the data breach, n. 5, and that because of the sensitivity of the stolen data, there is a heightened risk of identity theft and fraud that every Plaintiff now faces, *id.*

Plaintiffs allege that certain data has already been misused.[5] And as Defendants

[5] For example, Plaintiff Bell experienced fraudulent attempts to open accounts, fraudulent charges on her debit card requiring her to get a new card, and credit inquiries that she did not make. ¶ 45. Plaintiff Morgan had to replace her debit card after a fraudulent withdrawal; she received notice from Equifax of attempts to access her credit; she has experienced a drop in her credit score; and she has been receiving approximately 100 scam emails a day since the Data Breach. ¶ 73. Plaintiff Holcomb has experienced a significant increase in spam texts using her Private Information from scammers pretending to be the DMV and EZ-Pass. ¶ 87. Plaintiff Adams received a notice that she had been rejected for a mortgage that she never applied for, from a bank she had never heard of. ¶ 129. Plaintiff Carnahan received notices from Experian that her SSN was found on the dark web, and her credit report was accessed related to credit applications or vehicle financing she never applied for. ¶ 143. Plaintiff Taylor received multiple alerts and notifications from LifeLock that his information is on the dark web and of four fraudulent attempts to open bank or credit accounts in his name, as well as two attempted fraudulent purchases with his debit card. ¶ 171. Plaintiff

acknowledge, there is no *per se* requirement that a plaintiff show past actual misuse to establish a substantial risk of future identity theft. *See Johnson*, 2024 WL 5265372, at *3. Circuit courts and many district courts, including in this Circuit, have found standing based on the risk of future harm where particularly sensitive (and immutable or static) data such as SSNs, dates of birth, and PHI was compromised. *See Webb*, 72 F.4th at 376 ("the risk of future misuse may be heightened where the compromised data is particularly sensitive") (collecting cases); *Negron v. Ascension Health*, 2025 WL 2710014, at *5 (E.D. Mo. Sept. 23, 2025) ("this Court and others in the Eighth Circuit recognize a substantial risk of future injury when a data breach involves SSNs and birth dates") (citing cases); *Perry v. Bay & Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 751 (D. Minn. 2023) (the type of information stolen can be important in determining standing in a data breach case); *Coffey v. OK Foods Inc.*, 2022 WL 738072, at *3 (W.D. Ark. Mar. 10, 2022) (the complaint pleaded stolen SSNs, which create a higher risk of identity theft, and, therefore, plaintiff had a substantial risk of identity theft); *see also In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir. 2021) ("Given the colossal amount of sensitive data stolen, including Social Security numbers, names, and dates of birth, and the unequivocal damage that can be done with this type of data, we have no hesitation in holding that Plaintiffs adequately alleged that they face a 'material' and 'substantial' risk of identity theft.").

Courts also recognize that a substantial risk of future harm exists where—like here—criminals have stolen personal data and continue to possess it. *Galaria v. Nationwide Mut. Ins. Co.*, 663 Fed. App'x. 384, 388 (6th Cir. 2016) (reasoning that speculation about the possibility of future injury was unnecessary when the data had already been stolen and was in the possession

Sheward experienced an $800 fraudulent transaction made at Home Depot. ¶ 213. Plaintiff Delaney had to replace her debit card several times in 2025 due to fraud on her account. ¶ 241.

of criminals); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) ("Why else would hackers break into a store's database and steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities."); *Tracy v. Elekta, Inc.*, 667 F. Supp. 3d 1276, 1283 (N.D. Ga. 2023) ("While they have not alleged that their data is actually for sale on the dark web or elsewhere, they have alleged that it is in the hands of criminals."); *Teague v. AGC Am., Inc.*, 2025 WL 1527738, at *4 (N.D. Ga. Jan. 6, 2025) (alleged data was "in the hands of criminals"); *Clayton v. PruittHealth, Inc.*, 2025 WL 1643485, at *3 (N.D. Ga. June 9, 2025) (allegations of substantial and imminent risk of theft and fraud sufficient where hackers stole and "made copies of files with sensitive data such as full names, addresses, birth dates, social security numbers, and banking information").

Finally, where there is a substantial risk of future harm, as here, the time and energy spent guarding against that risk constitutes an injury as well. *In re Change Healthcare, Inc.*, 2025 WL 3693201, at *6 (D. Minn. Dec. 19, 2025) ("Mitigation costs qualify as concrete injuries sufficient for standing for purposes of monetary relief when there is a substantial risk of future harm."); *Johnson*, 2024 WL 5265372, at *3; *Baldwin*, 2021 WL 4206736, at *3 ("this Court finds that purported time and effort monitoring accounts can qualify as an injury to support Plaintiffs' claims"); *see also* Restatement (Second) of Torts § 919(1) (1979) ("One whose legally protected interests have been endangered by the tortious conduct of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert the harm threatened"); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (rejecting recovery for costs incurred as a "reasonable reaction" to a risk of harm because the harm the plaintiffs seek to avoid was not sufficiently imminent). Plaintiffs allege that they have spent time and energy

guarding against the heightened risk of identity theft they now face as a result of the Data Breach. ¶¶ 16, 30, 44, 58, 72, 86, 100, 128, 142, 156, 170, 212, 226, 240, 254, 268, 282, 296, 310, 322.

None of the cases on which Cerner relies support a different conclusion, and all are distinguishable. In *In re SuperValu, Inc.*, the stolen information "d[id] not include any personally identifying information, such as social security numbers, birth dates, or driver's license numbers" —the hackers stole only plaintiffs' bank card information. *Contrast* 870 F.3d at 76971 (risk of future harm wasn't substantial or imminent because bank card information alone isn't enough to open unauthorized new accounts), *and Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1343 (11th Cir. 2021) (same), *and Prestby v. A&A Servs., LLC*, 2026 WL 26128, at *2, 15 (D. Neb. Jan. 5, 2026) (data acquired from defendant's computer network was destroyed and was not further disseminated), *and Hall v. Centerspace, LP*, 2023 WL 3435100, at *4 (D. Minn. May 12, 2023) (finding no imminent or substantial risk of future harm where plaintiffs did not allege that defendant is currently being targeted by hackers, or that something about its operations makes it uniquely vulnerable to incursions), *with Weisenberger v. Ameritas Mut. Holding Co.*, 597 F. Supp. 3d 1351, 1359 (D. Neb. 2022) (holding that the sensitive nature of the PII compromised, and the allegations that the plaintiff's PII will be made available on the dark web, makes substantial risk of future harm reasonably plausible).

For these reasons, Plaintiffs have alleged concrete injury sufficient to establish Article III standing for each Plaintiff to pursue both retrospective and prospective relief.

### B. TRACEABILITY

Plaintiffs also adequately allege traceability, a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Article III standing does not require that defendants be the most immediate cause, or even a proximate cause, of plaintiffs' injuries; it requires only that those injuries be fairly traceable to defendants. *See Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)). The plaintiff's burden is "relatively modest" on traceability at the pleading stage. *SuperValu*, 870 F.3d at 772; *Johnson*, 2024 WL 5265372, at *4.

It is clear from Plaintiffs' allegations that they are claiming injuries—including a risk of future identity theft and/or misuse of medical information and Social Security numbers—as a result of Cerner failing to adequately protect their Private Information. Plaintiffs' Private Information was on Cerner's servers and was exfiltrated by hackers. Since then, Plaintiffs have experienced fraudulent activities tied to their identities. While the temporal connection between various fraudulent activities alleged by Plaintiffs and the data breach support traceability, "there is no need for Plaintiffs to allege—at this stage of the proceedings—specific proof establishing a connection between the unauthorized transactions and the Defendants' conduct." *Johnson*, 2024 WL 5265372, at *4; *see also SuperValu*, 870 F.3d at 772. Plaintiffs have adequately alleged that their injuries are traceable to Cerner's conduct.

For these reasons, Plaintiffs adequately allege Article III standing and Cerner's motion under Rule 12(b)(1) should be denied.

## II. PLAINTIFFS PLAUSIBLY ALLEGE COMMON LAW AND STATUTORY CLAIMS.

### A. CHOICE OF LAW

Cerner concludes that Missouri law governs most Plaintiffs' tort claims. Def. Br. at 27-29. Plaintiffs do not dispute that Missouri law governs the tort claims for purposes of this motion. Under Missouri's choice-of-law rules, Missouri has the most significant relationship to this dispute

because Cerner is headquartered in Missouri and the allegedly deficient security practices occurred in Missouri. *See* Restatement (Second) of Conflict of Laws § 145 (1971); ¶¶ 328-29; Def. Br. at 28 ("Missouri has the most significant relationship to this case because it is 'where the conduct [allegedly] causing the injury occurred' and where Cerner maintains its principal 'place of business.'").

Cerner's choice-of-law argument is ultimately beside the point, however, because Plaintiffs' claims are well-pleaded under Missouri law and any other potentially applicable state's law. Missouri law recognizes a duty to exercise reasonable care when storing sensitive Private Information. Missouri law also allows contract claims based on third-party beneficiary status and implied contracts. And Missouri's consumer protection statute—the Merchandising Practices Act—provides robust remedies for deceptive and unfair practices.[6]

### B. PLAINTIFFS PLEAD A CLAIM FOR NEGLIGENCE.

"In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." *Rardon v. Falcon Safety Prods., Inc.*, 2021 WL 2008923, at *3 (W.D. Mo. May 4, 2021) (internal citation omitted).[7] Cerner's challenge to each element fails.

### C. CERNER OWED PLAINTIFFS A DUTY TO SAFEGUARD THEIR PRIVATE INFORMATION.

Cerner's argument that Missouri law does not recognize a duty to secure Private

[6] In addition, the Court need not resolve choice-of-law issues at this stage. "[T]he Court will engage in any necessary analysis to determine the appropriate choice of law" after discovery. *Chen v. Target Corp.*, No. CV 21-1247, 2022 WL 1597417, at *7 (D. Minn. May 19, 2022). Because Plaintiffs' claims are viable under Missouri law and any other applicable law, Cerner's motion should be denied.

[7] Although Cerner asserts Maryland law applies to Tracy Wright, Cerner does not meaningfully address Maryland law and argues predominately under Missouri law. Tracy Wright has also voluntarily dismissed her claims and is no longer part of this action. Doc. 215.

Information is baseless. In Missouri, "[t]he touchstone for the creation of a duty is foreseeability." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 257 (Mo. 2002). "A duty of care arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *Id.* While parties typically lack a duty to protect others from intentional criminal acts of third parties, Missouri courts recognize a duty when the criminal acts of third parties are foreseeable. *Rardon*, 2021 WL 2008923, at *3. Third party criminal acts are foreseeable when (1) there is a special relationship between the parties; or (2) there are special facts and circumstances. *Id.* at *4. As discussed below, and as alleged, given Cerner's core business involves collection and storage of highly sensitive and valuable Private Information, Cerner should have reasonably anticipated the risk of the Data Breach, the compromise of Plaintiffs' Private Information stored on its computer systems, and the resulting harm to patients.

**1. Special facts and circumstances establish Cerner owes a duty.**

Under Missouri law, "knowledge of facts demonstrating a risk to others can create a duty, even if that risk involves criminal conduct of third parties." *Rardon*, 2021 WL 2008923, at *5. Missouri courts have found the Restatement (Second) of Torts § 302B instructive on this principle. *Id.* at *4-5 (collecting cases). Under § 302B, a duty exists "if the actor realizes or should realize that [its action or omission] involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." *Id.* For example, there are "situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others," such as when "the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." *Id.* cmt. e. As such, this doctrine is not cabined to premises liability or knowledge about a specific

third person as Cerner contends. *See Rardon*, 2021 WL 2008923, at *5 (applying general negligence principles to hold manufacturer of "Dust-Off" owed a duty to prevent foreseeable harm where manufacturer knew the product was inhaled by people while driving in order to get high).

Cerner's affirmative conduct created a foreseeable risk of harm to Plaintiffs, and therefore Cerner owed a duty to exercise reasonable care in its handling of Private Information. Cerner provides an EHR platform to healthcare providers across the country, and in turn, collects, stores, and manages patients' Private Information. ¶¶ 344-46. The Private Information is highly valuable to cybercriminals who frequently target companies in the healthcare sector, including EHR providers like Cerner. ¶¶ 347, 387-94, 423-41. Cerner itself recognizes the importance of securing Private Information in its possession from unauthorized access while acknowledging that that health data is among "the most targeted in security breaches" and that "[p]atient privacy and the security of health data, when left unaddressed, threaten what the exchange of health information is solely meant to protect: patient safety." ¶ 348. Given Cerner's affirmative risk-creating conduct and recognition that Private Information stored on its computer systems would be targeted by cybercriminals, Defendant owed Plaintiffs a duty to prevent foreseeable harm. *See, e.g.*, *Rardon*, 2021 WL 2008923, at *5; *In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 682 (D.S.C. 2021) (holding defendant owed a duty to protect plaintiffs' private information from criminal conduct where defendant was aware of the risks of cyberattacks).

**2. A duty arises from the special relationship between Plaintiffs and Cerner.**

Missouri courts recognize a special relationship exists between patients and their healthcare providers resulting in a duty to safeguard patients' sensitive information from unauthorized access. *Ascension Health*, 2025 WL 2710014, at *9 ("Given the highly sensitive nature of PHI shared in the health care context, the patient-provider relationship is even more sacred and is clearly

recognized as special under Missouri law."); *T.R. v. Clay-Platte Fam. Med., P.C.*, 2025 WL 3143638, at *5 (W.D. Mo. Nov. 3, 2025) (similar). Importantly, this special relationship and duty of care do not apply to only individual doctors, but also to "the entity maintaining treatment records." *Ascension Health*, 2025 WL 2710014, at *9. Courts recognize that the duty extends to such entities because "the level of trust inherent in the patient-provider relationship and corresponding duty of confidentiality codified by HIPAA necessarily extends to regulated providers and warrants fiduciary treatment." *Id.*

As an EHR provider, Cerner is the entity that maintained Plaintiffs' Private Information. ¶¶ 346, 359, 363-65. Cerner is a business associate of Plaintiffs' healthcare providers and is subject to the requirements of HIPAA. ¶ 400. Plaintiffs allege how they were justified in entrusting their Private Information to their healthcare providers and ultimately Cerner in order to receive healthcare services. *See, e.g.*, ¶¶ 9-12, 365. Among other things, Plaintiffs allege that Cerner marketed the security of its EHR Platform, ¶ 349; represented that its platform facilitated the treatment of Plaintiffs, ¶¶ 345-46; knew of the heightened cybersecurity risks posed by the retention of PHI it collected during the provision of healthcare, ¶ 348; and promised to use safeguards to prevent improper access or disclosure of Private Information, ¶ 349. Given Cerner's receipt and storage of Plaintiffs' Private Information under these circumstances, Plaintiffs sufficiently allege a special relationship with Cerner. *See Miller v. NextGen Healthcare, Inc.*, 742 F. Supp. 3d 1304, 1318 (N.D. Ga. 2024) (recognizing that "the retention of private information while seeking medical care" can create a fiduciary duty).

### D. CERNER BREACHED ITS DUTY TO SAFEGUARD PLAINTIFFS' PRIVATE INFORMATION.

Cerner's argument that Plaintiffs fail to plead that Defendant breached its duty to safeguard Plaintiffs' Private Information is similarly unavailing. Plaintiffs specifically allege that Cerner

breached its duties by failing to encrypt Plaintiffs' Private Information and failing to delete Private Information that was no longer needed. ¶¶ 366-68. Plaintiffs further allege that Cerner violated HIPAA-mandated security guidelines, FTC guidance around data security, and industry standards around data security by, *inter alia*: failing to use an intrusion detection system; failing to implement firewalls, anti-virus and anti-malware software, encryption, and multi-factor authentication; failing to implement policies and procedures to limit access rights to Plaintiffs' Private Information; failing to sufficiently train employees regarding the proper handling of Private Information; failing to require complex passwords across its networks; failing to monitor for large data transmissions from its system; and failing to implement an adequate response plan in the event of a data breach. ¶¶ 405, 408-411, 413-17, 418-21.

In short, Plaintiffs set forth detailed allegations of how Cerner breached its duties, going far beyond the vague, "naked assertion" of breach before the court in *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 717 (8th Cir. 2017). *See Tehan v. MTC Holsters, LLC*, 2023 WL 12216384, at *3 (W.D. Mo. July 27, 2023) (finding that plaintiff pleaded breach of duty where complaint alleged that defendant failed to adequately protect and safeguard the personal information "by knowingly disregarding standard information security principles, despite obvious risks").[8]

**E. PLAINTIFFS SUFFERED COGNIZABLE INJURIES FROM THE DATA BREACH.**

Each Plaintiff received a notification, that unauthorized persons had compromised their Private Information during the Data Breach. ¶¶ 14, 28, 42, 56, 70, 84, 98, 126, 140, 154, 168, 210,

---

[8] *See also Hall v. Centerspace, LP*, 2023 WL 3435100, at *6 (D. Minn. May 12, 2023) (rejecting applicability of *Kuhns* where plaintiff had "specifically assert[ed] how [the defendant] failed to comply with industry standards, failed to adequately train its employees on reasonable cybersecurity practices, failed to follow several FTC guidelines like those applicable to encryption of data, and delayed providing prompt notice upon discovery of the data breach"); *In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 586 (N.D. Ill. 2022) (distinguishing *Kuhns* and finding plaintiff pleaded breach where they alleged that defendant had failed to take one or more specific data security measures recommended by federal government).

224, 238, 252, 266, 280, 294, 308, 320. Plaintiffs allege injuries proximately caused by Cerner's negligence that led to the Data Breach including: a substantial and imminent risk of identity theft, ¶ 489; the loss of time and money they reasonably incurred to protect themselves against identity theft and fraud, ¶ 488; the lost value of their Private Information, *see, e.g.*, ¶¶ 17, 31; and actual or attempted fraud, *see infra*. n. 5. Courts in this district have repeatedly held that similar allegations are cognizable injuries caused by a data breach. *See, e.g.*, *Baldwin v. Nat'l W. Life Ins. Co.*, 2021 WL 4206736, at *3 (W.D. Mo. Sep. 15, 2021) (finding Plaintiffs pled injury for negligence purposes because "their PII was publicly disclosed online, which requires them to monitor their accounts"); *Id.* at *4 (also cognizable were "injury to PII, prophylactic measures undertaken by Class Members . . . and risks of a future . . . security incident."); *MTC Holster*, 2023 WL 12216384, at *3 (diminished value of PII, increased risk of fraud and identity theft, and time spent mitigating were cognizable injuries); *Clay-Platte*, 2025 WL 3143638, at *5 ("district courts have generally concluded that 'lost time' allegations may satisfy the injury requirement for data breach negligence claims").[9] Cerner's assertion—without citation—that none of these injuries "even arguably constitutes" an injury fails as a matter of law.

Further, instead of meaningfully addressing Missouri law, Cerner relies heavily on *In re SuperValu II* (a case addressing Illinois law), to argue that Plaintiffs have not suffered "actual damages." In making this argument, Cerner misstates the Eighth Circuit's holding in *SuperValu II*, which sustained the dismissal of a plaintiff's claim under the Illinois Consumer Fraud and

[9] These cases are not outliers within the Eighth Circuit, where courts have found that allegations substantially similar to Plaintiffs' allegations suffice for common-law negligence claims. *See, e.g.*, *In re Change Healthcare, Inc.*, 2025 WL 3693201 (D. Minn. Dec. 19, 2025) (lost time and effort to mitigate risk of identity theft and fraud); *Rodriguez v. Mena Hosp. Comm'n*, 2023 WL 7198441 (W.D. Ark. Nov. 1, 2023) (lost time, risk of identity theft, diminution of value, and actual fraud sufficient for negligence claim).

Deceptive Business Practices Act ("ICFA") for failure to allege "actual damages." 925 F.3d 955, 964 (8th Cir. 2019). Importantly, a claim under the ICFA requires a plaintiff to have suffered "*actual pecuniary loss*," *i.e.*, "a real and measurable out-of-pocket loss." *Id.* (emphasis added) (citations omitted). The Eighth Circuit in turn found that the plaintiff's alleged injuries—time spent protecting himself against the risk of identity theft and fraud stemming from a data breach—were not out-of-pocket losses for purposes of his ICFA claim. Given that *SuperValu II* was addressing "actual damage" in the context of a claim under the ICFA, it has no relevance to Plaintiffs' injury under Missouri law.

Cerner further misconstrues the law in arguing that Plaintiffs' allegations of increased spam and fraudulent activity, such as unsolicited credit inquiries and fraudulent payment card activity, are not cognizable harms. At the outset, increased spam phone calls "can qualify as an injury to support Plaintiffs' claims," particularly where Plaintiffs allege they were "not receiving anywhere near the same amount of spam phone calls and emails until after the Data Breach occurred." *Baldwin*, 2021 WL 4206736, at *4. Just like the *Baldwin* plaintiffs, several Plaintiffs here have experienced a significant increase in spam phone calls and texts since the Data Breach. *See* ¶¶ 19, 33, 45, 59, 73, 87, 115, 129, 143, 157, 171, 213, 229, 241, 257, 271, 285, 299, 323. But even if increased spam calls were not injuries on their own (as Cerner asserts without citation), they *also* serve as evidence that Plaintiffs' Private Information is presently in the hands of bad actors. The multiple attempts of fraud and identity theft documented in the Complaint only further demonstrate that cybercriminals have acquired Plaintiffs' Private Information and are using it. Plaintiffs' allegations of harm and injury are, accordingly, actual and imminent, rather than speculative and hypothetical. *Contrast with Amburgy v. Express Scripts, Inc*., 671 F. Supp. 2d 1046, 1052 (E.D. Mo. 2009) (finding the plaintiff lacked standing because "he [did] not know whether his personal

information was compromised in the alleged breach [and] there has been no publication of any information allegedly wrongfully obtained, nor any fraudulent or otherwise harmful use of such information.").

### F. CERNER CAUSED PLAINTIFFS' INJURIES.

Cerner's conduct also proximately caused Plaintiffs' injuries. "The general test of proximate cause is whether an injury is the natural and probable consequence of the defendant's negligence." *Robinson v. Mo. State Highway & Transp. Comm'n*, 24 S.W.3d 67, 78 (Mo. Ct. App. 2000) (internal quotation marks omitted). Plaintiffs allege, on information and belief,[10] that the Data Breach (and resulting theft of their Private Information) would not have occurred but for, among other failures, Cerner's failure to encrypt Plaintiffs' Private Information, failure to delete Private Information that was no longer needed, failure to comply with HIPAA and FTC guidance, failure to use an intrusion detection system, failure to sufficiently train employees regarding the proper handling of Private Information, and failure to implement a number of other standard data security practices. ¶¶ 366-68, 405, 408-21. As a result, Plaintiffs have suffered lost time remedying and mitigating the effects of the Data Breach, actual misuse of their Private Information in the form of unauthorized charges, fraudulent withdrawals, and fraudulent accounts opened in their names, lost value of unauthorized access to their Private Information, and all Plaintiffs now face a substantial, imminent, immediate, and continuing increased risk of medical fraud and identity theft. ¶¶ 45, 73, 101, 129, 143, 171, 213, 241, 443-58.

Under Missouri law, these allegations are plainly sufficient to allege proximate cause. *See Clay-Platte*, 2025 WL 3143638, at *6 ("Plaintiffs allege injuries—including lost time—from the

[10] Here, Cerner and the hospitals failed to disclose to their victims (in notice letters or elsewhere) how the hackers infiltrated Cerner's systems and what vulnerabilities the hacker exploited to gain access. ¶¶ 385-86.

data breach. It is reasonable to infer that the data breach was a probable consequence of Defendants' alleged failure to protect Plaintiffs' Private Information. The Court finds that Plaintiffs plausibly allege proximate causation.").

### G. PLAINTIFFS ADEQUATELY PLEAD A CLAIM FOR NEGLIGENCE *PER SE*.

To establish a claim of negligence *per se*, the plaintiff must establish that: (1) the defendant violated a statute; (2) the injured plaintiff was a member of the class of persons intended to be protected by the statute; (3) the injury complained of was of the kind the statute was designed to prevent; and (4) the violation of the statute was the proximate cause of the injury. *J.J.'s Bar & Grill, Inc. v. Time Warner Cable Midwest, LLC*, 539 S.W.3d 849, 868-69 (Mo. Ct. App. 2017). Cerner does not dispute Plaintiffs satisfy these factors, instead arguing erroneously that negligence *per se* only lies when a statute creates a private cause of action.

Under Missouri law, a statutory violation may constitute negligence *per se* where the legislature (or regulatory body) intended for the statute to create a standard of care. *J.J.'s Bar & Grill*, 539 S.W.3d at 869. Therefore, the question is not whether the statute creates a private cause of action, but whether the statute sets forth a standard of care that if violated constitutes negligence *per se*. *Ascension Health*, 2025 WL 2710014, at *10. Applying this standard, Missouri courts have recognized that HIPAA creates a statutory duty of confidentiality that, when violated, gives rise to a common law claim of negligence *per se*. *J.J. ex rel. C.W. v. Poplar Bluff Reg'l Med. Ctr., L.L.C.*, 675 S.W.3d 259, 266 (Mo. Ct. App. 2023) ("If a defendant health care provider does not comply with its duties under HIPAA and HITECH, and the plaintiff is injured as a result of a statutory violation, then the defendant is liable for negligence *per se*."); *Ascension Health*, 2025 WL 2710014, at *10 (sustaining negligence *per se* under HIPAA); *Clay-Platte*, 2025 WL 3143638, at

*6 (similar).[11] Because Plaintiffs allege that Cerner violated HIPAA, they have sufficiently alleged a claim for negligence *per se*.[12]

### H. PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR CONTRACT-BASED CLAIMS

#### 1. Plaintiffs are third-party beneficiaries of the business associate agreements.

Plaintiffs have sufficiently pled third-party beneficiary claims against Cerner, Mosaic, and Tallahassee Memorial under the applicable Business Associate Agreements ("BAAs"). *See* Decl. Alan Schoenfeld, Exs. D & E. As discussed below, these BAAs contemplate the existence of third-party beneficiaries with enforceable rights. Plaintiffs concede the remaining third-party beneficiary claims that are the subject of the pending motion.[13]

Under Missouri law, "[o]nly parties to a contract and any third-party beneficiaries of a contract have standing to enforce that contract." *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. 2007). To qualify as a third-party beneficiary, the contract must clearly express an intent to benefit the third-party or an identifiable class to which the third-party belongs. *See id*. If the contract lacks an express declaration of such intent, there is a strong presumption that the third-party is not a beneficiary. *See Burnett v. Nat'l Ass'n of Realtors*, 75 F.4th 975, 983 (8th Cir. 2023). "Third party beneficiary status depends not so much on a desire or purpose to confer a benefit on

---

[11] While Cerner points to *Howland v. Truman Med. Ctr., Inc.*, 719 S.W.3d 98, 109 (Mo. Ct. App. 2025), *Howland* applied the "incorrect" principle that a lack of a private right of action precludes a negligence *per se* claim. *See Ascension Health*, 2025 WL 2710014, at *10. But as the *Ascension* court recognized, "it would make no sense for a common law claim of negligence *per se* to lie only where a statutory claim already exists." *Id*.

[12] Plaintiffs withdraw their negligence *per se* claim to the extent that it is based on violations of the FTC Act. *See Ascension Health*, 2025 WL 2710014, at *10 ("the Eighth Circuit has concluded that the FTCA does not create a legal duty enforceable through a state negligence action.").

[13] Despite Plaintiffs' October 7, 2025, discovery requests for Cerner's business agreements with impacted healthcare providers (Doc. 64), Cerner has yet to provide such agreements beyond those attached to its Motion to Dismiss. Plaintiffs reserve the right to assert third-party beneficiary claims for additional Healthcare Provider Defendants in forthcoming short form complaints.

the third person, but rather on an intent that the promisor assume a direct obligation to him." *See Klenc v. John Beal, Inc.*, 484 S.W.3d 351, 355 (Mo. Ct. App. 2015); *see also Laclede Inv. Corp. v. Kaiser*, 596 S.W.2d 36, 42-43 (Mo. Ct. App. 1980) (an intended beneficiary is one where "performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary"). "A court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract." Restatement (Second) of Contracts § 302 rep.'s n. cmt. a; *see also* 13 Williston on Contracts § 37:10 (4th ed.) ("in most jurisdictions the intent to benefit a third-party can be shown not only by the contract's express language but by the surrounding circumstances").

Covered entities, like the Healthcare Provider Defendants, may only share electronic PHI with an EHR vendor, like Cerner, if the entities enter into a written contract whereby Cerner promises to "appropriately safeguard the information." *See* 45 C.F.R. § 164.308(b); Decl. Alan Schoenfeld, Ex. D § 4(h); Ex. E § 2(i). Therefore, the protection of Plaintiffs' Private Information from unauthorized access is necessarily a duty that the Healthcare Provider Defendants owed to Plaintiffs and an obligation Cerner contractually undertook when it executed the BAAs. *See In re Change Healthcare, Inc.*, __ F. Supp. 3d __, 2025 WL 3687895, at *16 (D. Minn. Dec. 19, 2025) (finding BAAs "are intended to benefit patients, including Individual Plaintiffs"); *Barletti v. Connexin Software, Inc.*, 2023 WL 6065884, at *2 (E.D. Pa. Aug. 17, 2023) (finding plaintiffs stated a third-party beneficiary claim in HIPAA-related data breach based on inference that "contracts were meant to benefit the Plaintiffs by storing, maintaining, and securing their private medical data"). The key provisions of the BAAs focus on protecting patient information against unauthorized uses or disclosures, and the circumstances demonstrate that the parties expected to defend third-party claims for the failure to adequately protect such information. For example, the

BAAs provide an indemnity clause to hold harmless any other party from claims by third-parties because of authorized access, use or disclosure of PHI. *See* Decl. Alan Schoenfeld, Ex. D § 10 (emphasis added); *see also* Ex. E § (2)(h) (agreeing to indemnify for costs "arising out of third party claims or enforcement actions"). The clear purpose of this clause is to obligate each party to compensate the other for losses that result from third-party claims. Considering the indemnification provisions, the contracting parties intended a third party to maintain an action on the contract for the failure to protect their Private Information. *See JTL Consulting, L.L.C. v. Shanahan*, 190 S.W.3d 389, 399 (Mo. Ct. App. 2006) ("The intention of the parties is to be gleaned from the four corners of the contract, and if uncertain or ambiguous, from the circumstances surrounding its execution.").

If the Court determines the BAA's language remains ambiguous as to third-party beneficiaries, it may turn "to other tools of construction in an attempt to determine the intent of the parties." *TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy*, 238 S.W.3d 140, 143 (Mo. 2007). Two interpretative canons suggest that the Mosaic and Tallahassee Memorial BAAs should be interpreted to permit third-party beneficiary claims.

Here, omitting the third-party beneficiary disclaimer in *some* of the BAAs, infers that the contracting parties intended to include such third-party beneficiaries when the BAA is silent. "This brings to mind the old interpretive principle that the expression of one thing is the exclusion of another." *Jerseyville Mall, L.L.C. v. Shop 'N Save Warehouse Foods, Inc.*, 633 S.W.3d 523, 527 (Mo. Ct. App. 2021) (internal quotation marks omitted). This is otherwise known as the canon of "*expressio unius est exclusion alterius*." *Gen. Am. Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 133 (Mo. Ct. App. 1993); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107–11 (2012) ("Scalia & Garner") (describing this as the "Negative-

Implication Canon" of interpretation)). Cerner executed BAAs with every Healthcare Provider Defendant and it included an express third-party disclaimer in many of its BAAs, but not all. This silence illustrates a strong inference the parties intended to include the existence of third-party beneficiaries in these BAAs. *See Jerseyville*, 633 S.W.3d at 527.

The Surplusage Canon is also implicated here. If the Court interprets all BAAs as barring third-party beneficiary claims, then it will render the disclaimers in the six BAAs that have such disclaimers mere surplusage. The Surplusage Canon counsels that courts should avoid such readings. Scalia & Garner at 174 ("If possible, every word and every provision is to be given effect. . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."); *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 51–52 (2025) ("[T]he surplusage canon is primarily a tool of linguistic interpretation, reflecting an assumption applicable to 'all sensible writing: Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable.'" (quoting Scalia & Garner 174)).

Accordingly, Plaintiffs, as third-party beneficiaries of the BAAs with Mosaic, and Tallahassee Memorial, are entitled to enforce the agreements.

**2. Plaintiffs have stated a valid breach of implied contract claim.**

Plaintiffs have pled sufficient facts to satisfy each element of an implied-in-fact contract. Plaintiffs entered an implied contract with Cerner whereby Cerner promised to appropriately safeguard their Private Information. "An implied contract is an agreement implied in fact, founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1031 (8th Cir. 2020) (cleaned up); *Nickel v. Stephens Coll.*, 480 S.W.3d 390, 397 (Mo. Ct. App. 2015) (quoting 17A

Am. Jur. 2d Contracts § 14 (2015)).

First, although Cerner argues there can be no meeting of the minds sufficient for mutual assent, Def. Br. at 40 (citing *In re Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 591 (N.D. Ill. 2022)), patients can identify their EHR vendor by accessing their patient portal, and EHR vendors often white-label their systems so the portal login screen or the mobile application displays the provider's name.[14] Furthermore, healthcare providers often disclose the names of the vendors they use for storing medical records to their patients. Notably, the BAAs include a process for Cerner to follow in the event an individual asks for an accounting of disclosures of their PHI, evidencing that Plaintiffs would have knowledge of Cerner's existence prior to the Data Breach. *See e.g.*, Decl. Alan Schoenfeld, Exs. A § 12; B § 3.7; C § 13; D § 4(i); F § 13. If the Court finds the factual allegations in the Complaint insufficient to support a "meeting of the minds," Plaintiffs respectfully request leave to amend any factual defects with respect to this aspect of their claim.

Second, the conduct of the parties illustrates their understanding. Even if Cerner "made no explicit promises as to the ongoing protection of personal information, it is difficult to imagine how, in our day and age of data and identity theft, the mandatory receipt of Social Security numbers or other sensitive personal information would not imply the recipient's assent to protect the information sufficiently." *Castillo v. Seagate Tech., LLC*, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016). Cerner recognizes the importance of this obligation because "patient privacy and the security of health data, when left unaddressed, threaten what the exchange of health

[14] For example, Arkansas Heart Hospital's patient portal does not appear to have any connection to Cerner in the user interface. *See* Arkansas Heart Hospital Patient Portal, available at https://arheart.consumeridp.us-1.healtheintent.com/saml2/sso/login?authenticationRequestId=4eb4d040-381f-4162-8c41-6c20eb97f4a9 (last visited Mar. 2, 2026). When a user clicks "Terms" from the patient portal then it links to CernerHealth's Terms of Service. *See* CernerHealth: Terms of Use, available at https://cernerhealth.com/terms (last visited on Mar. 2, 2026).

information is solely meant to protect: patient safety." ¶ 348. Protection of the Plaintiffs' health information fell within the parties' "tacit understanding." *See Farmers Edge*, 970 F.3d at 1031.

Additionally, to plead an implied contract claim, a plaintiff must allege the "defendant promised to protect the *specific* piece of data the plaintiffs assert was accessed." *Harris v. Mercy Health Network, Inc.*, 2024 WL 5055556, *11 (S.D. Iowa June 26, 2024); *see also Carlsen*, 833 F.3d at 911 (rejecting breach of contract claim where the personal information exposed in data breach was not included in the list of information the defendant promised not to disclose). Here, Cerner's privacy policy contained such a promise. ¶ 349. Cerner promised to use technical and organizational measures designed to protect "Services Personal Information" from unauthorized disclosure or unauthorized access. ¶ 349. "Services Personal Information is personal information that is provided by [Plaintiffs], resides on [Cerner], customer or third-party systems and environments, and is processed by [Cerner], on [Plaintiffs'] behalf in order to perform the Services." ¶ 349, n.14. Therefore, Plaintiffs have alleged sufficient facts to demonstrate their implied understanding with Cerner. *See In re Gallagher Data Breach Litig.*, 631 F. Supp. 3d at 591 (a privacy policy represents a "document, expression, or action" of the defendant that supports a finding of an implicit promise to protect personal information).

To successfully bring a breach of implied contract claim in a data breach case, plaintiffs must also "identify the actions (*e.g.*, security measures or procedures) the defendant could have employed to prevent the breach." *Harris v. Mercy Health Network, Inc.*, 2024 WL 5055556, at *11 (S.D. Iowa June 26, 2024). Here, Plaintiffs allege that Cerner breached the implied contract by failing to properly maintain and safeguard its computer systems, servers, and data and by storing unencrypted Private Information on its network. *See* ¶¶ 419-420, 517. Furthermore, Cerner breached the contract by failing to understand its network's vulnerabilities, failing to limit access

to sensitive data, and by failing to implement multilayer security. *See* ¶¶ 408-417, 517. Each of these are technical or organizational measures that would have protected Plaintiffs' information from unauthorized access or disclosure. Therefore, Plaintiffs' allegations are sufficient to support a claim for breach of the implied contract.

### I. PLAINTIFFS ADEQUATELY ALLEGED THEIR UNJUST ENRICHMENT CLAIM

Under Missouri law, a defendant is unjustly enriched where: (1) "[the plaintiff] conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. 2011) (citation omitted).

Here, Plaintiffs allege that they conferred their Private Information and payments to Cerner as a condition of receiving Cerner's services. ¶ 543. Contrary to Defendant's argument, "the defendant must have benefited, but the benefit need not be conferred upon them directly by the plaintiff." *In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, 2025 WL 3693201, at *16 (D. Minn. Dec. 19, 2025). Thus, even if the benefit of Private Information and payment was initially conferred directly from Plaintiffs to their healthcare providers, Defendant still received and accepted these benefits from Plaintiffs' third-party agents.

Cerner profited from these benefits, and Plaintiffs reasonably expected that a portion of their payments and Defendant's profits would be allotted to fund adequate data security. ¶¶ 543-545. Instead, Defendant failed to provide an adequate level of security and unjustly retained the full amounts of Plaintiffs' benefits. ¶¶ 546-549. Courts around the country find these allegations sufficient to establish an unjust enrichment claim at the pleadings stage.[15]

---

[15] *See, e.g.*, *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 715 (D. Minn. 2023) (holding that plaintiffs sufficiently alleged they conferred a benefit to defendant in the form of PII); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 198 F. Supp. 3d 1183, 1200-01 (D. Or. 2016) (denying motion to dismiss unjust enrichment claim); *In re: Cmty. Health Sys., Inc.*, 2016

### J. PLAINTIFFS PLAUSIBLY PLEAD BREACH OF FIDUCIARY DUTY.

"To establish a claim for breach of fiduciary duty, a plaintiff must prove: (1) the existence of a fiduciary duty between the plaintiff and the defending party [which Plaintiffs have already done]; (2) that the defending party breached the duty; and (3) that the breach caused the [plaintiff] to suffer harm." *Henry v. Farmers Ins. Co.*, 444 S.W.3d 471, 480 (Mo. Ct. App. 2014).

In support of its argument that it owes no fiduciary duty to the Plaintiffs, Cerner invokes a five-factor test from a nearly 40-year-old case, *Emerick v. Mut. Benefit Life Ins. Co.,* 756 S.W. 2d 513 (Mo. 1988). *See* Def. Br. at 42-43. Cerner's reliance on the *Emerick* test falls flat given recent data breach case law holding that a fiduciary duty exists here. In *Ascension Health*, the court held that "[i]n the context of a systemwide data breach," a fiduciary duty extends beyond a patient's doctor to the "entity maintaining the treatment records." 2025 WL 2710014, at *9 (E.D. Mo. Sept. 23, 2025) (slip op.) ("[T]he level of trust inherent in the patient-provider relationship and corresponding duty of confidentiality codified by HIPAA necessarily extends to regulated providers and warrants fiduciary treatment.").

Like in *Ascension Health*, Cerner was the "entity maintaining the treatment records." The fact that Plaintiffs "do not purport even to have known that Cerner existed before the data breach," *see* Def. Br. at 43, does not absolve Cerner of its fiduciary duty either. Plaintiffs allege that Cerner functioned as a "business associate" under HIPAA, that the Healthcare Provider Defendants were "covered entities," and that all Defendants were therefore subject to HIPAA's security rule and breach notification requirements. ¶ 400. Thus, Plaintiffs satisfy the first element under *Henry.*

Next, Plaintiffs plausibly allege Cerner breached its duty when it "failed to implement, or

---

WL 4732630, at *24 (N.D. Ala. Sept. 12, 2016) (denying motion to dismiss unjust enrichment claim in data breach case); *see also Mohsen v Veridian Credit Union*, 733 F. Supp. 3d 754, 769 (N.D. Iowa 2024) (holding that providing PII in addition to payment for services satisfies the requirement of defendant being enriched by the receipt of a benefit).

inadequately implemented, information security policies or procedures to protect Plaintiffs and Class members' Private Information," which lead to the "massive data breach in January 2025 that compromised the extremely sensitive financial and medical information entrusted to it by patients and their healthcare providers." ¶¶ 401, 1. Cerner breached its fiduciary duty when it failed to protect Plaintiffs' Private Information from foreseeable criminal activity.

Lastly, Cerner's breach of its fiduciary duty harmed Plaintiffs and Class members. "As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and Class members have been harmed and are at an imminent, immediate, and continuing increased risk of harm," in a variety of ways. ¶ 443. Plaintiffs will, for example, now be targets of fraudulent schemes, have lost control and possession of their Private Information to cybercriminals, will incur present and ongoing out-of-pocket costs to mitigate the harm due to the Data Breach, and have experienced a diminution of value in their Private Information. ¶¶ 443-458. Accordingly, Plaintiffs have alleged that Cerner's breach harmed them.

### K. PLAINTIFFS SUFFICIENTLY STATE A CLAIM FOR INVASION OF PRIVACY.

Missouri law recognizes intrusion upon seclusion and public disclosure of private facts as torts. *Nemani v. St. Louis Univ.*, 33 S.W.3d 184, 185 (Mo. 2000). Cerner's argument that Plaintiffs have failed to allege disclosure because Cerner did not itself post the information ignores that disclosure can occur through third parties where the defendant is substantially certain disclosure will occur without reasonable cybersecurity measures and still fails to make the proper investment in security. *See McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 819 (E.D. Ky. 2019) ("A defendant's actions may be intentional when the Defendant acts with such reckless disregard for the privacy of the plaintiff that the actions rise to the level of being an intentional tort"). Indeed, under the Restatement (Second) of Torts § 8A, the definition of intent includes situations in which the actor is "substantially certain" of the consequences of their actions. *See also id.* cmt. b.

Here, Plaintiffs allege that Cerner was aware of the ubiquitous threat of data breaches targeting patient information. *See* ¶¶ 347-49, 387-98, 422-32. Despite this, Cerner chose to ignore the risk and failed to take appropriate precautions. ¶¶ 399, 401, 403-05, 411-17, 419, 422-28. The invasion, therefore, flows directly from Cerner's knowing failure to protect Private Information entrusted to them—not merely from the consequent criminal act. *See Angus v. Flagstar Bank, FSB*, 2025 WL 937760, at *2 (E.D. Mich. Mar. 27, 2025) (claims of recklessness in securing PII sufficient to meet element of intent at pleading stage).

Cerner's argument also ignores that publication to cybercriminals is sufficient to establish publicity. Under Missouri law, a claim for public disclosure of private facts requires that the defendant give "publicity" to private information—that is, communicate the matter to the public at large or to so many persons that the information is substantially certain to become public knowledge. *Childs v. Williams*, 825 S.W.2d 4, 8 (Mo. Ct. App. 1992) (citing Rest. (Second) of Torts § 652D cmt. a).

Here, Plaintiffs plausibly allege that their Private Information was posted—or imminently will be posted—on the dark web following the Data Breach, where it is accessible to countless users, including identity thieves, and is a concrete and ongoing disclosure. *See e.g.*, ¶¶ 143, 171, 347, 397, 430-42. Indeed, the dark web functions as a black market where criminal actors buy, sell, and exploit exfiltrated personal data. *See* ¶¶ 423, 430. Once posted there, sensitive information is rapidly disseminated among identity thieves and fraudsters, ensuring immediate misuse and long-term harm. ¶¶ 15, 347, 397, 430, 441.

At a minimum, whether publication on the dark web constitutes "publicity" is a fact-bound inquiry unavoidably tied into the reach and scope of the "dark web" and thus inappropriate for resolution on a motion to dismiss. *See Angus*, 2025 WL 937760, at *3 (denying motion to dismiss

where the sufficiency of public disclosure was a factual issue). At the least, Plaintiffs' allegations give rise to genuine issues of material fact that preclude dismissal.

Finally, Cerner asserts the Private Information published is not sufficiently sensitive. But Plaintiffs allege the Private Information exfiltrated is extremely sensitive information, including private medical facts and their Social Security numbers—precisely the type of exposure that brings humiliation and distress to a person of ordinary sensibilities—that patients have a right to divulge only to the people they choose. *See* ¶¶ 1, 348, 369, 392; *see also Barber v. Time, Inc.*, 159 S.W.2d 291, 295 (Mo. 1942) ("Certainly if there is any right of privacy at all, it should include the right to obtain medical treatment . . . without personal publicity."); *Purdy v. Burlington N. & Santa Fe. Ry. Co.*, 2000 WL 34251818, at *4 (D. Minn. 2000) ("There is no question that individuals have a strong privacy interest in social security numbers. . . . As a result, the Court concludes that a reasonable fact-finder is likely to determine that publication of that fact is highly offensive.").

### L. PLAINTIFFS PROPERLY ALLEGE THEIR STATUTORY CONSUMER PROTECTION CLAIMS.

Defendants argue that Plaintiffs' claims under eight States' consumer protection statutes[16] should be dismissed because Plaintiffs were not direct customers of Cerner, and accordingly "were not plausibly exposed to or affected by any alleged representation or omission by Cerner." Def. Br. at 46. Although Cerner is correct that each statute requires a causal relationship between the deceptive and unfair conduct and a plaintiff's injuries, not one provides that the only actionable deceptive or unfair acts are those directly experienced during one-on-one transactions with the defendant. Consumers, like Plaintiffs here, can allege a consumer protection act claim under the

[16] The Arizona Consumer Fraud Act (ACFA), the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), the Indiana Deceptive Consumer Sales Act (IDCSA), the Missouri Merchandising Practices Act (MMPA), the New York General Business Law (GBL), the Montana Consumer Protection Act (MCPA), and the California Unfair Competition Law (UCL). Plaintiffs concede dismissal of their claim under the Arkansas Deceptive Trade Practices Act (ADTPA).

laws of each of these states even if the deceptive or unfair conduct caused them injury indirectly.[17] Here, Plaintiffs were indirectly affected by Cerner's affirmative misrepresentations about its cybersecurity practices because those statements were passed down by the hospitals, who contracted directly with Plaintiffs and relied upon Cerner's representations in making their own assurances about security to Plaintiffs. *See, e.g.*, ¶¶ 349–57, 363.

Cerner is also wrong that the misrepresentations alleged cannot support these statutory claims. First, dismissal would be inappropriate even if this was true because it ignores that the consumer protection claims are predicated not merely on affirmative misrepresentations, but also on omissions and unfair practices—the omissions being Cerner's failure to make accurate

[17] *See, e.g.*, *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016) (holding the AFCA "does not expressly require a direct merchant-consumer transaction"); *In re Snowflake, Inc.*, 2025 WL 3012889, at *11 (D. Mont. Oct. 28, 2025) (in hub-and-spoke data breach litigation, where Snowflake, the hub, raised same argument as Cerner here, holding plaintiffs adequately alleged MCPA claim); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) ("[A] plaintiff asserting a FDUTPA claim 'need not show actual reliance on the representation or omission at issue[.]'"); *Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. 2d DCA 2016) (holding a person does not even need to be a consumer to have a claim for damages under FDUTPA); *In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d 313, 323 (E.D. Penn. 2011) (IDCSA "encompass[es] deceptive acts that cause damages not only to direct consumers, but also to third parties who would lack direct reliance on a supplier's deceptive acts."); *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009) ("Both our case law and the governing regulations make clear that the consumer's reliance on an unlawful practice is not required under the MMPA. . . . a plaintiff's *loss* should be a result of the defendant's unlawful practice, but the statute does not require that the *purchase* be caused by the unlawful practice."); *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667 (Mo. 2007) ("The [MMPA's] plain language does not contemplate a direct contractual relationship between plaintiff and defendant, and Missouri courts have not imposed such a requirement through statutory construction."); *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741 (N.Y. 1995) (Under GBL, Plaintiffs need only allege "that the acts or practices have a broader impact on consumers at large."); *In re Blackbaud, Inc., Customer Data Breach Litig.*, 2021 WL 3568394, at *12-14 (D.S.C. Aug. 12, 2021) (in a data breach case, denying motion to dismiss GBL claim where defendant engaged in "consumer-oriented" acts by making "misrepresentations about its data security practices to its customers[, who were non-profit fundraisers, that] prevented consumers from protecting their data"); *Krueger v. Wyeth, Inc.*, 2019 WL 4785862, at *4 (S.D. Cal. Oct. 1, 2019) ("The UCL plaintiff need only prove that the defendant's business practice was unfair or fraudulent, and that plaintiff suffered harm *as a result of* that practice. . . . No reliance element exists under the UCL.").

disclosures about the state of Cerner's data security practices, *see* ¶¶ 601-604, 674, 677, 687, 690, 696, 714, 722, 742, 745, and the unfair practices being Cerner's failure to adequately protect end-users' most sensitive and valuable health-related and personal data, *see* ¶¶ 368-69, 401, 411, 601, 674-77, 687-88, 714-16, 722, 742.

Second, Cerner claims the representation that it is "'an industry leader in securely storing' data," ¶ 349, is not misleading as a matter of law because some courts have described calling oneself "an industry leader" as puffery. Cerner misses the point though—what makes the statement misleading here is not that it says something about Cerner's relative position in its industry, but that it communicates that Cerner has exceptional data security practices. The two cases on which Cerner relies involved "bald assertions of superiority" relative to competitors that were not specific to a practice or business characteristic. *See Trex Co. v. CPG Int'l LLC*, 2017 WL 3272013, at *6 (W.D. Va. Aug. 1, 2017) ("Although Trex insists the #1 reference must be a reference to sales, *the ads themselves do not state that*, nor do the pages on which they appear reference sales. They are instead 'bald assertions of superiority.'" (emphasis added)); *Spiel Assocs., Inc. v. Gateway Bookbinding Sys., Ltd.*, 2010 WL 546746, at *12 (E.D.N.Y. Feb. 16, 2010) (holding vague statements that defendant "took it a step further" and was "leading the way" could not contain implied falsehoods because it was unclear what about the defendant they were describing). Here, the statement was misleading not because it contained a bald assertion of superiority, but because the superiority assertion clearly referred to data security and used the superiority reference to imply something false about Cerner's data security practices.

Cerner is also wrong regarding the second misrepresentation alleged regarding the standard applied to its data security.[18] Cerner argues Plaintiffs have not sufficiently Cerner misrepresented

[18] Cerner stated that it "has implemented and will maintain technical and organizational measures

its "technical and organizational measures to prevent" unauthorized disclosure with the "mere allegation that a criminal hacker was able to access Cerner's servers." Def. Br. at 48. To start, the allegation that Cerner failed to implement adequate data security practices, systems, and procedures *is itself* a factual allegation, and no law requires a plaintiff to allege evidence to prove alleged facts in order to survive a motion to dismiss. Next, courts have also repeatedly accepted the occurrence of a data breach as a fact that makes it more plausible that the defendant failed to adequately implement data security measures. As held in *Flores-Mendez v. Zoosk, Inc.*:

> [V]irtually all of the details that defendants insist on are in possession of the defendants, and not in possession of plaintiff. It is unreasonable for defendant to insist that the details be laid out in the initial complaint. The common law doctrine of *res ipsa loquitur* has some application here. The consuming public has come to believe that the internet companies, which take in their private information, have taken adequate security steps to protect the security of that information from any and all hackers or interventions. The ordinary consumer, however, has no clue what internet companies' security steps are. There would be no way for users to know what security steps were actually in place. Therefore, when a breach occurs, *the thing speaks for itself.* The breach would not have occurred but for inadequate security measures, or so it can be reasonably inferred at the pleadings stage.

2021 WL 308543, at *4 (N.D. Cal. Jan. 30, 2021); *see also Ramirez v. Paradis Shops, LLC*, 69 F.4th 1213, 1220 (11th Cir. 2023) ("A plaintiff may know only what the company has disclosed in its notice of a data breach. . . . We cannot expect a plaintiff . . . to plead with exacting detail every aspect of [defendant's] security history and procedures that might make a data breach foreseeable . . . ."); *In re Univ. Urology Data Sec. Incident Litig.*, 2025 WL 1002355, at *5 (S.D.N.Y. Mar. 31, 2025).[19] Here, Cerner has failed to disclose to its victims how the hackers

designed to prevent accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Services Private Information. These measures, which are generally aligned with the ISO/IEC 27001:2013 standard, govern all areas of security applicable to the Services, including physical access, system access, data access, transmission, input, security oversight, and enforcement." ¶ 349.

[19] Even under the general pleading standard, Plaintiffs merely need to allege sufficient facts to show that their claim is plausible. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir.



Case 4:25-cv-00259-BP Document 220 Filed 03/03/26 Page 44 of 53

infiltrated and exploited its systems, ¶¶ 385-86, and now attempts to exploit its own disclosure failures to bar its victims from obtaining any relief.

Cerner next argues Plaintiffs have not pled a "viable unfairness-based theory" because "the CAC does not allege that Cerner was more than (at most) negligent" and "it cannot be true that every negligent act (including negligence in ensuring data security) amounts to an unfair trade practice." Def. Br. at 49. On the first point, Cerner contradicts itself because it argues earlier in its motion that the Complaint alleges not merely negligence but intentional conduct. *See* Def. Br. at 46-47 (arguing Rule 9(b) applies because Complaint alleges intentional acts). Cerner's second argument is legally erroneous because the failure to adequately protect data constitutes an unfair act under each of the relevant state consumer protection acts, all of which are analogous to the FTC Act. For each statute other than the California UCL and the Indiana Deceptive Consumer Sales Act, FTC and federal court interpretations of the FTC Act are considered persuasive authority in interpreting the relevant act's provisions.[20] As the Complaint alleges, the Federal

2009). Inferences must also be made in the non-movants' favor. *Id.* Here, Cerner incorrectly asks the Court to draw inferences from the occurrence of the data breach *in its favor* and to fault Plaintiffs for not alleging facts excluding alternative explanations for the breach. *See id.* at 595 (reversing district court's dismissal because it "ignored reasonable inferences supported by the facts alleged. It also drew inferences in appellees' favor, faulting [plaintiff] for failing to plead facts tending to contradict those inferences.").

[20] *See* Ariz. Rev. Stat. § 44-1522 (C); Fla. Stat. § 501.204(2) (similar); 15 Mo. Code of State Regs. § 60-8.020; *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 494 (D. Md. 2020) ("New York courts specifically interpret § 349 'by looking to the definition of deceptive acts and practices under [S]ection 5 of the Federal Trade Commission Act.'" (quoting *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002))); Mont. Code Ann. § 30-14-104(1) (similar). The California UCL relies upon a violation of other law (like the FTC Act) and is thus slightly different from the other state statutes but in a non-material way. The UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 420 (E.D. Va. 2020) (holding plaintiffs satisfied unlawfulness prong of UCL alleging "that Defendants violated, among other statutes, Section 5 of the FTC Act."). Finally, although there is scant caselaw interpreting the unfairness prong of the Indiana Deceptive Consumer Sales Act, one court has entered a consent judgment where the State of

Trade Commission has concluded that the failure to adequately protect data constitutes an unfair trade practice under Section 5 of the FTC Act, 15 U.S.C. § 45. *See* ¶¶ 407-12. Federal courts have also held that "allegedly deficient cybersecurity that failed to protect consumer data against hackers" may constitute unfair trade practices under the FTC Act. *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240-49 (3d Cir. 2015); *see also Ohio Telecom Ass'n v. Fed. Trade Commc'ns Comm'n*, 150 F.4th 694, 718 (6th Cir. 2025).

Finally, Cerner makes a passing reference to Rule 9(b) in arguing against deception-based consumer protection claims. Def. Br. at 46. Cerner, however, makes no argument that Plaintiffs' allegations do not satisfy the Rule. In any event, the allegations comply because Plaintiffs allege the who, what, where, when, and how regarding the intentionally deceptive conduct, omissions, *and* unfair acts upon which the claims are predicated. Plaintiffs allege (1) that Cerner acted unfairly and deceptively and made material omissions in its representations, *see* ¶¶ 1, 3, 349, 358, 370, 373-75, 405, 416, 419, 479, 524, 528, 560; (2) the statements and conduct that were deceptive, ¶¶ 3, 6, 349, 358, 369-71, 373-75, 405, 416, 419, 524, 528, 560; (3) the persons affected by the deceptions and unfair conduct, ¶¶ 8-327, 460; (4) when the misrepresentations, omissions, and unfair conduct occurred, ¶¶ 1-2, 13-14, 21, 369-70, 372-73; (5) and the means that Cerner used to disseminate the misrepresentative statements and the failures that contributed to the lack of adequate data security, ¶¶ 3, 349, 358, 368, 370-72, 374-75, 479, 524, 560.

In addition, Courts apply Rule 9(b) less strictly when the defendant has withheld key details regarding the data breach from its victims and has that information within its own possession (and thus does not need it to be on notice of the claim). *See, e.g.*, *Drobnak v. Andersen Corp.*, 561 F.3d

---

Indiana brought such a claim in the data breach context. *See Indiana ex rel. Rokita v. Jackson Cnty. Schneck Mem'l Hosp.*, 2023 WL 7485516, at *1 (S.D. Ind. Nov. 13, 2023).

778, 783-84 (8th Cir. 2009) ("When the facts constituting the fraud are peculiarly within the opposing party's knowledge, however, such allegations may be pleaded on information and belief."); *Ascension Health*, 2025 WL 2710014, at *15 ("Such granular details in Ascension's possession are unnecessary to place it on notice of Plaintiffs' class claims. Given the nature of this case, the Court finds the pleadings sufficiently specific to provide Ascension notice of the claim."). Here, Cerner has failed to disclose to its victims (in notice letters or elsewhere) how hackers infiltrated its systems and what vulnerabilities they exploited to do so, ¶¶ 385-86, and does not need Plaintiffs to advise it of this information to have notice of Plaintiffs' claims. Finally, Rule 9(b) is also applied less strictly with respect to omissions. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 489 (D. Md. 2020).

### M. CERNER'S STATUTE-SPECIFIC OBJECTIONS[21]

**California Customer Records Act ("CCRA").** Cerner's argument discusses the wrong law. Cerner addresses disclosure exemptions in Cal. Civ. Code § 1798.81. But Plaintiffs' claims arise under § 1798.82, which does not include those exemptions. *Jackson v. Health Ctr. Partners of S. Cal.*, 2024 WL 3708867, at *6 (S.D. Cal. Aug. 7, 2024); ¶¶ 640-43.

**California Confidentiality of Medical Information Act ("CMIA").** Cerner acknowledges that the California Plaintiff alleges that an unauthorized party viewed Plaintiff's data. Such an allegation has been upheld as sufficient. *Jackson*, 2024 WL 3708867, at *4. In addition, Cerner ignores that Plaintiff also alleges that the breach resulted in a flood of third-party usage of data collected, including spam calls and messages, and that Cerner itself has acknowledged that Plaintiff's data was exposed to third parties. *See* ¶¶ 294, 299, 301. Courts have held that allegations like these also suffice to support an allegation of unauthorized viewing. *See*

[21] Plaintiffs concede that their claims under the Montana Uniform Health Care Information Act and California Consumer Privacy Act are properly dismissed.

*Roma v. Prospect Med. Holdings, Inc.*, 2024 WL 3678984, at *14 n.18 (E.D. Pa. Aug. 6, 2024) (citing cases); *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1218-19 (S.D. Fla. 2022). In any event, the CMIA bars not only unauthorized disclosure, but also "the negligent maintenance of medical information, and the negligent 'release' of medical information." *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 908 (S.D. Cal. 2020) (quoting Cal. Civ. Code §§ 56.10(a), 56.101(a), 56.36(b)). Plaintiff's CMIA claim is predicated on all three of these acts. *See* ¶¶ 629-37.

**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").** Cerner argues that Plaintiffs fail to allege that the services they received diminished in value because of Cerner's misrepresentations, omissions, and unfair acts. Cerner misreads the Complaint and ignores that that the Court must view the allegations in the light most favorable to Plaintiffs. Plaintiffs allege that Cerner's conduct caused them to overpay for services received from their healthcare providers because part of the price paid was for, and should have been, for adequate security of the Private Information. ¶¶ 17, 451-56. Plaintiffs do not have to allege actual damages as a direct customer to have a FDUTPA claim. Florida courts have held that the 2001 amendment to Florida Statutes Section 501.211(2) allows even *non*-consumers to bring claims for their actual damages. *See CMR Constr. & Roofing, LLC v. UCMS, LLC*, 2022 WL 3012298, at *3 (11th Cir. July 29, 2022); *Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. 2d DCA 2016) ("We agree that section 501.211(2) evinces a legislative directive that the remedy of damages is not limited to a consumer."); *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015) ("[T]he claimant *does not have to be a consumer* to bring the claim.").

**Montana Data Breach Notification Law ("MDBNL").** Cerner argues that Plaintiffs do not plausibly allege that Cerner owns or licenses the data at issue, but it cites no law in support. If

the allegations of the Complaint are accepted as true, then Cerner had a license to use the data. *See* License, Black's Law Dictionary (12th ed. 2024) (defining a license as "[a] permission, usu. revocable, to commit some act that would otherwise be unlawful . . . ."); *see also* ¶¶ 345-47, 359-65. As to ownership, Montana defines ownership in property as "the right of one or more persons to possess and use it to the exclusion of others." Mont. Code Ann. § 70-1-101. Plaintiffs allege facts that satisfy each element. Cerner had the right to possess and use the data. *See* ¶¶ 345-47, 359-65. Cerner also had the right to possess and use it to the exclusion of others (*i.e.*, the hackers or others not legally entitled to its receipt or use). *See, e.g.*, ¶¶ 364-65 (Cerner was obligated to secure the data from "unauthorized access").[22]

In addition, Cerner ignores an entire section of the Complaint alleging Cerner's unreasonable delay in notifying victims of the data breach. *See* ¶¶ 3-4, 369-386. Plaintiffs allege that Cerner never notified victims, even through the present. ¶¶ 370-71. Cerner mentions paragraph 374, but that allegation is irrelevant. It states that certain hospital defendants delayed sending notifications because Cerner told them to delay because of a purported law enforcement investigation. *See* ¶ 374. It does not state that Cerner's instruction was correct, or that any law enforcement investigation justified the length of any hospitals' delay. *Id.* And it certainly provides no defense to Cerner, whose failure to notify victims is continuing.

**California Unfair Competition Law ("UCL").** Plaintiffs are entitled to equitable remedies under the UCL. The statute states: "Unless otherwise expressly provided, the remedies

[22] Cerner does not need to be the sole person or entity with the right to possess or use the data in question for its possession or use to be to the exclusion of others. The statute provides that the right of possession and use must be to the exclusion of "others," not *all* others. Interpreting the statutory language otherwise would create internal inconsistencies within Montana law, which recognizes concurrent interests and qualified ownership. *See, e.g.*, Montana Code Ann. §§ 70-1-301–70-1-304.

or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state." Cal. Bus. & Prof. Code § 17205. Thus, "[t]he availability of monetary damages does not preclude a claim for equitable relief under the UCL . . . based upon the same conduct." *Luong v. Subaru of Am., Inc.*, 2018 WL 2047646, at *7 (N.D. Cal. May 2, 2018). Cerner's argument is also premature because "[t]his case . . . is at the pleading stage," when courts routinely "allow the pursuit of alternative remedies." *Collyer v. Catalina Snacks Inc.*, 712 F. Supp. 3d 1276, 1289 (N.D. Cal. 2024) (collecting cases).

Finally, Cerner relies on a single federal court decision for the proposition that the UCL does not protect Californians injured by an out-of-state actor.[23] The bulk of authority, including from California state courts and federal courts in California, is to the contrary.[24]

## CONCLUSION

For the reasons stated above, the Court should deny Cerner's Rule 12(b)(1) motion entirely and deny Cerner's Rule 12(b)(6) motion except as to the few claims referenced above in footnote 2 that plaintiffs are dropping. Plaintiffs respectfully request to amend the Complaint to correct for any factual deficiencies for the claims they continue to pursue.

---

[23] The premise of Cerner's argument (that Cerner's conduct occurred entirely in Missouri) is also incorrect insofar as the UCL claim is also premised on omissions (Cerner's failure to make adequate disclosures in California to persons in California). *See* ¶ 652.

[24] *See, e.g., Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, 2017 WL 1436044, at *6 (N.D. Cal. Apr. 24, 2017) ("When a plaintiff resides in California, the UCL may apply to out-of-state conduct, especially when the plaintiff suffered in-state harm."); *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 972 (N.D. Cal. 2015) ("[C]ourts have held that a UCL claim may be brought by a plaintiff who is a resident of California, regardless of where the alleged misconduct occurred."); *Allergan Inc. v. Athena Cosmetics, Inc.*, 2013 WL 12142655, at *4 (C.D. Cal. Mar. 6, 2013) ("[T]he UCL clearly applies to and can regulate out-of-state, domestic conduct that results in injury in California[.]"); *Huntair, Inc. v. Gladstone*, 774 F. Supp. 2d 1035, 1048-49 (N.D. Cal. 2011); *Oracle v. SAP AG*, 734 F. Supp. 2d 956, 968 (N.D. Cal. 2010); *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999); *Yu v. Signet Bank/Virginia*, 69 Cal. App. 4th 1377, 1391-92 (Cal. Ct. App. 1999).

DATE: March 3, 2026

Respectfully submitted,


/s/ Norman E. Siegel
Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64113
Tel: (816) 714-7112
siegel@stuevesiegel.com

Tyler W. Hudson
**WAGSTAFF & CARTMELL**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1177
thudson@wcllp.com

Lynn A. Toops
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenmalad.com

Thomas E. Loeser
**COTCHETT PITRE & MCCARTHY LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272
tloeser@cpmlegal.com

*Co-Lead Interim Class Counsel*

J. Gerard Stranch, IV
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com

*Chair of Plaintiffs' Executive Committee*

Raina Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel: (872) 263-1100
raina@straussborrelli.com

Casondra Turner
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 100
Knoxville, TN 37929
Tel: (771) 772-3086
cturner@milberg.com

Leanna Loginov
**SHAMIS & GENTILE**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
lloginov@shamisgentile.com

Jeff Ostrow
**KOPELOWITZ OSTROW, P.A.**
1 West Las Olas Boulevard, 5th Floor
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Patrick D. Donathen
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
patrick@lcllp.com

Laura Van Note
**COLE & VAN NOTE**
155 12th Street, Suite 2100
Oakland, CA 94607
Tel: (510) 891-9800
lvn@colevannote.com

James Treglio
**POTTER HANDY LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel: (415) 534-1911
jimt@potterhandy.com

Charles E. Schaffer
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (877) 882-1011
cschaffer@lfsblaw.com

Elena Belov
**ALMEIDA LAW GROUP**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (708) 232-3274
elena@almeidalawgroup.com

Anthony Parkhill
**BARNOW AND ASSOCIATES, P.C.**
205 W. Randolph Street, Suite 1630
Chicago, IL 60606
Tel: (312) 621-2000
aparkhill@barnowlaw.com

Paul Doolittle
**POULIN WILLEY ANASTOPOULO LLC**
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
paul.doolittle@poulinwilley.com

*Plaintiffs' Executive Committee*