**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE: CERNER/ORACLE DATA BREACH LITIGATION | Case No. 25-00259-CV-W-BP |
| STEPHANIE SPIKES and CHRISTINE KOEHLI, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CERNER CORPORATION D/B/A ORACLE HEALTH, FLORIDA HEALTH SCIENCES CENTER, INC. D/B/A TAMPA GENERAL HOSPITAL, TAMPA GENERAL MEDICAL GROUP, INC., TAMPA GENERAL HOSPITAL HERNANDO, LLC, TAMPA GENERAL HOSPITAL CITRUS, LLC, and CHS/COMMUNITY HEALTH SYSTEMS, INC.<br><br>Defendants. | This filing relates to lead case No. 4:25-cv-00259-BP, and to member case No. 4:26-cv-00305-BP<br><br>CIVIL ACTION<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>*Electronically Filed* |

**FIRST AMENDED[1] CLASS ACTION COMPLAINT**

Plaintiffs Stephanie Spikes and Christine Koehli, on behalf of themselves and all similarly situated persons, allege the following against Cerner Corporation d/b/a Oracle Health ("Oracle Health" or "Oracle"),[2] Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital, Tampa General Medical Group, Inc., Tampa General Hospital Hernando, LLC, Tampa General Hospital

[1] Plaintiffs file this First Amended Complaint "as a matter of course" under Federal Rule of Civil Procedure 15(a)(1)(B).

[2] Oracle, *Oracle Acquires Cerner to Form Oracle Health: The Future of Healthcare*, https://www.oracle.com/health/acquisition-of-cerner-the-future-of-healthcare/ (last visited July 23, 2026).

Citrus, LLC (collectively, "Tampa General entities" or "Tampa General"), and CHS/Community Health Systems, Inc. ("CHS"), (collectively, "Defendants").[3] Plaintiffs make these allegations based upon personal knowledge of the facts pertaining to Plaintiffs and on information and belief as to all other matters derived from, among other things, investigation by counsel and review of public documents.

## NATURE OF THE ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Oracle Health, formerly Cerner Corporation, is the second-largest electronic health record ("EHR") vendor in the United States, holding about 22% of the U.S. EHR industry in 2025.[4] Oracle Health should have industry-leading data security systems in place. Oracle Health acknowledges that it "has been trusted with some of the world's most sensitive and regulated data" and understands that it has a legal duty to safeguard that data from unauthorized access and disclosure.[5] But Oracle Health failed to meet its duty, leading to a massive data breach in January 2025 that compromised the extremely sensitive financial and medical information entrusted to it by patients and their healthcare providers (the "Data Breach").

---

[3] Dave Muoio, *CHS closes sale of 3 Florida hospitals to Tampa General Hospital for $294M*, FIERCE HEALTHCARE (Dec. 1, 2023) https://www.fiercehealthcare.com/providers/chs-selling-3-florida-hospitals-tampa-general-hospital-290m; *see also* Tampa General Hospital, *Agreement Signed for Tampa General Hospital to Acquire Bravera Health* (July 24, 2023) https://www.tgh.org/news/tgh-press-releases/2023/july/agreement-signed-for-tampa-general-hospital-to-acquire-bravera-health.

[4] Tyler Smith, Who are the largest EHR vendors? (Oct. 31, 2025) https://web.archive.org/web/20260419170222/https://www.ehrinpractice.com/largest-ehr-vendors.html#:~:text=Hospital%20EHRs&text=Based%20on%20data%20from%20the,Meditech:%2013.2%25.

[5] Seema Verma, Oracle Acquires Cerner to Form Oracle Health: The Future of Healthcare, Oracle, https://www.oracle.com/health/acquisition-of-cerner-the-future-of-healthcare/ (last visited July 24, 2026).

3. Defendant Tampa General entities are healthcare providers based in Florida[6] that operate several West-Central Florida-area hospitals.[7] Some of those hospitals were previously known as "Bravera Health."

4. CHS is a hospital operating system that innovates healthcare systems, recruits physicians, and manages hospitals and medical technology systems.[8] CHS operated the Bravera hospitals where Plaintiffs were medical patients before the Bravera hospitals were acquired by the Tampa General entities in 2023.

5. Plaintiffs Stephanie Spikes ("Spikes") and Christine Koehli ("Koehli") are former patients of Bravera, now owned and operated by the Tampa General entities.

6. Defendant Cerner Corporation d/b/a Oracle Health has its principal place of business in Kansas City, Missouri. It contracted with the hospitals previously operating as "Bravera Health," now operating under Tampa General, as their EHR vendor.

7. Cerner, which provides electronic medical record services, informed CHS that "[i]n late February, Cerner learned that an unauthorized third party had gained access to Cerner's electronic systems as early as January 22, 2025. This unauthorized third party had gained access to personal health information in those electronic systems."[9] (the "Data Breach").

8. "Cerner notified Bravera Health – Brooksville, Seven Rivers and Spring Hill about this security incident on October 28, 2025."[10]

---

[6] Tampa General Hospital, *About*, https://www.tghnorth.org/about (last visited July 24, 2026).

[7] Tampa General Hospital, *Our Locations*, https://www.tghnorth.org/locations (last visited July 24, 2026).

[8] Community Health Systems, *Company Overview*, https://www.chs.net/company-overview/ (last visited July 24, 2026).

[9] Exhibit A, CHS Data Breach Notice Letter to Current and Former Patients (Dec. 22, 2025).

[10] *Id.*

9. Defendants store a litany of highly sensitive personally identifiable information ("PII") and protected health information ("PHI")—together "Private Information"—about current and former patients. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in the Data Breach.

10. The types of information exposed in the Data Breach include such Private Information.

11. It is unknown for precisely how long the cybercriminals had access to Defendants' network and information stored before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to current and former patients' Private Information.

12. On information and belief, cybercriminals were able to breach Oracle Health's systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's Private Information. In short, Defendants' failures placed the Class's Private Information in a vulnerable position—rendering them easy targets for cybercriminals.

13. Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

14. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before this Data Breach, Defendants' current and former patients' Private Information was exactly that—private. Now their Private Information is forever exposed and unsecured.

## PARTIES

15. Plaintiff Stephanie Spikes is a natural person and a citizen of Florida. She is domiciled in Florida.

16. Plaintiff Christine Koehli (previously known as Christine Sheerattan) is a natural

person and a citizen of Florida. She is domiciled in Florida

17. Defendant Cerner Corporation d/b/a Oracle Health, is a Delaware corporation with its principal place of business located at 8779 Hillcrest Road, Kansas City, MO 64138.[11]

18. Defendants Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital,[12] Tampa General Hospital Hernando, LLC, and Tampa General Hospital Citrus, LLC are headquartered at Tampa General Hospital, One Tampa General Circle, Tampa, FL 33606.[13] Tampa General Hospital Hernando, LLC and Tampa General Hospital Citrus, LLC are subsidiaries of Florida Health Sciences Center Inc ("Florida Health").[14]

19. Tampa General Hospital Hernando, LLC f/k/a FHSC Newco II, LLC, and Tampa General Hospital Citrus, LLC f/k/a FHSC Newco I, LLC, are subsidiaries formed about one week before the Asset Purchase Agreement ("APA") transferring the Bravera hospitals from CHS to the Tampa General entities. [15] Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital

---

[11] *Oracle Acquires Cerner to Form Oracle Health: The Future of Healthcare*, ORACLE, https://www.oracle.com/health/acquisition-of-cerner-the-future-of-healthcare/ (last visited July 24, 2026).

[12] Fictious Name Detail: Tampa General Hospital, SUNBIZ.ORG, https://dos.sunbiz.org/scripts/ficidet.exe?action=DETREG&docnum=G03321700153&rdocnum=G03321700153 (last visited July 24, 2026).

[13] Tampa General Hospital, *Contact Us*, https://www.tgh.org/about-tgh/contact-us (last visited July 24, 2026); CMS.gov, *Florida Health Sciences Center Inc.*, https://www.cms.gov/medicare/medicare-general-information/medicareapprovedfacilitie/vad-destination-therapy-facilities-aug2007-items/-tampa-general-hospital (last visited July 24, 2026).

[14] Legal Clarity, *Who Owns Tampa General Hospital? A Private Nonprofit*, (June 13, 2026), https://legalclarity.org/who-owns-tampa-general-hospital-a-private-nonprofit/.

[15] SEC.gov, *First Amendment to Asset Purchase Agreement*, available at https://www.sec.gov/Archives/edgar/data/1108109/000095017023067384/cyh-ex2_1.htm (last visited July 24, 2026); Florida Department of State, *Tampa General Hospital Citrus, LLC*, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=TAMPAGENERALHOSPITALCITRUS%20L230003362741&aggregateId=flal-l23000336274-c0e76c6a-5e27-4cc6-b7a1-2f3089c4da20&searchTerm=tampa%20general%20hospital%20citrus&listNameOrder=TAMPAGENERALHOSPITALCITRUS%20L230003362741 (last visited July 24, 2026); Florida

guaranteed the obligations of its subsidiaries and affiliates in the APA. Tampa General Medical Group, Inc., joined the APA as a "Joining Buyer" in November 2023. Based on information and belief, the subsidiaries were created to facilitate the administration of the Bravera hospitals acquired by Tampa General in December 2023.

20. Defendant CHS is a company that operates healthcare locations across the United States, and is headquartered at 4000 Meridian Boulevard, Franklin, TN 37067.[16] CHS guaranteed the obligations of its subsidiaries in the APA conveying the three Bravera hospitals to the Tampa General entities.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the proposed Class is a citizen of a state different from at least one Defendant, the proposed Class consists of more than 100 members, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

22. This Court has personal jurisdiction over Defendant Oracle Health because its principal place of business is in this District.

23. This Court also has jurisdiction over the Tampa General entities and CHS because they contracted with Defendant Oracle Health – a known Kansas City, MO entity – to manage the patients' electronic health records ("EHR") and thus had a legal obligation to oversee the

---

Department of State, *Tampa General Hospital Hernando, LLC*, https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=TAMPAGENERALHOSPITALHERNANDO%20L230003362651&aggregateId=flal-l23000336265-ff6e306c-0723-4306-b425-5e4649c35e0a&searchTerm=tampa%20general%20hospital%20hernando&listNameOrder=TAMPAGENERALHOSPITALHERNANDO%20L230003362651 (last visited July 24, 2026).

[16] CHS Community Health Systems, *Contact Us*, https://www.chs.net/contact-us (last visited July 24, 2026).

management and security of their patient information on Oracle Health's servers in Kansas City, MO.

24. Based on information and belief, CHS contracted with Oracle Health to provide EHR services for the Bravera facilities.

25. In 2023, CHS sold the three Bravera hospitals whose patient data was disclosed to Florida Health Sciences Center, Inc. d/b/a Tampa General Hospitals, and its subsidiaries and affiliates.

26. In the 2023 APA transferring ownership of the Bravera facilities to the Tampa General entities, the transferred assets included "to the extent legally transferrable" financial and patient records, including medical records, and "all rights and interests in the contracts" assigned relating to the three Bravera facilities.[17]

27. At closing, the Seller was to deliver to the Tampa General entities an "Information Technology Transition Services Agreement" and "the Business Associate Agreement."[18]

28. In the November 30, 2023 First Amendment to the Asset Purchase Agreement, the Tampa General entities and CHS agreed to each pay 50% "of the fees incurred by Sellers or their Affiliates to Cerner Corporation ('Cerner') for implementation and transition services in connection with the Information Services Agreement."[19] The Tampa General entities further agreed to reimburse the Sellers for payments made to Cerner for "implementation and transition

[17] Sec. 1.1 of Asset Purchase Agreement (July 24, 2023), available at https://www.sec.gov/Archives/edgar/data/1108109/000095017023067384/cyh-ex2_1.htm.

[18] Sec. 2.2(k) of Asset Purchase Agreement (July 24, 2023), available at https://www.sec.gov/Archives/edgar/data/1108109/000095017023067384/cyh-ex2_1.htm.

[19] First Amendment to Asset Purchase Agreement, available at https://www.sec.gov/Archives/edgar/data/1108109/000095017023067384/cyh-ex2_1.htm (last visited July 24, 2026).

services" as "evidenced by invoices from Cerner and as set forth on the closing statement."[20] Thus, the Tampa General entities and CHS accepted certain responsibilities regarding patient information storage matters.

29. The Tampa General entities continued to store their patients' records on Oracle Health's systems for approximately 12 months after acquiring the Bravera hospitals.[21]

30. The Tampa General entities have sufficient minimum contacts with the State of Missouri because they stored their patients' EHR with Oracle Health and, based on information and belief, assumed applicable contracts and a Business Associate Agreement with Oracle Health. Moreover, jurisdiction is proper under Missouri's long-arm statute. *See* Mo. Rev. Stat. § 506.500.1(1).

31. The Tampa General entities and CHS knowingly and continually sent their patients' Private Information to Oracle Health as the healthcare facilities' EHR vendor.

32. The Tampa General entities and CHS knew or should have known that Oracle Health stored patients' Private Information in Kansas City, Missouri.[22]

33. The Tampa General entities and CHS failed to monitor or oversee the maintenance and security of their patients' Private Information sent to Oracle Health to be stored and maintained in Kansas City, MO. This failure to monitor or oversee patients' Private Information continued as the Tampa General entities stored this data at Oracle Health for at least 12 months following the acquisition of the Bravera facilities.

---

[20] *Id.*

[21] Becker's Health IT, *Tampa General to install Epic at 3 acquired hospitals*, (Dec. 14, 2023), https://www.beckershospitalreview.com/healthcare-information-technology/ehrs/tampa-general-to-install-epic-at-3-acquired-hospitals/? (last visited July 17, 2026).

[22] Elana Gordon, Cerner Fights For Share In Electronic Medical Records Boom, NPR, KCUR, AND KAISER HEALTH NEWS (July 16, 2013) https://www.npr.org/sections/health-shots/2013/07/16/202419168/cerner-fights-for-share-in-electronic-medical-records-boom.

34. Due to the Tampa General entities' and CHS's actions, patients' Private Information was compromised and/or exfiltrated from Oracle Health's legacy systems.[23]

35. Venue is proper as a substantial part of the events or omissions giving rise to the claims occurred in this District and a substantial part of the property that is the subject of this action, Plaintiffs' Private Information, is situated in this District. *See* 28 USC § 1391(b)(2).

## **BACKGROUND**

### ***Defendants Collected and Stored the Personal Information of Plaintiffs and the Class***

36. The Tampa General entities are a healthcare system based in Florida.

37. The Tampa General entities acquired the Bravera hospital network, a group of hospitals, from CHS in December of 2023.[24] Before this acquisition, Bravera used Oracle Health (previously Cerner Corporation) as a third-party EHR vendor along with many other healthcare providers. The Tampa General entities continued to use Oracle Health as their third-party EHR vendor from the time of acquisition in December 2023 until approximately 12 months later.[25]

38. The Tampa General entities' patient data was stored on Oracle Health's Kansas City servers at the time of the January 2025 Data Breach.

39. As part of their business, Defendants receive and maintain the Private Information of thousands of their current and former patients.

40. In collecting and maintaining the Private Information, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law.

---

[23] Exhibit A, Data Breach Notice Letters.

[24] Dave Muoio, *CHS closes sale of 3 Florida hospitals to Tampa General Hospital for $294M*, FIERCE HEALTHCARE, (Dec. 1, 2023) https://www.fiercehealthcare.com/providers/chs-selling-3-florida-hospitals-tampa-general-hospital-290m.

[25]Becker's Health IT, *Tampa General to install Epic at 3 acquired hospitals*, https://www.beckershospitalreview.com/healthcare-information-technology/ehrs/tampa-general-to-install-epic-at-3-acquired-hospitals/? (last visited July 17, 2026).

41. Under state and federal law, businesses like Defendants have duties to protect their current and former patients' Private Information and to notify them about breaches.

***Defendants' Data Breach***

42. According to the letter notifying Plaintiffs of the Data Breach, on October 28, 2025, Oracle informed Bravera[26] that "an unauthorized third party had gained access to Cerner's electronic systems as early as January 22, 2025."[27] This unauthorized third party had gained access to personal health information in those electronic systems. The types of Private Information exposed included "name, Social Security number, and information included within your medical record, such as medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment."[28]

43. Currently, the precise number of persons injured is unclear. But the size of the putative class can be ascertained from information in Defendants' custody and control. And upon information and belief, the putative class has over one hundred members—as it includes Tampa General's current and former patients.

44. And yet, Defendants waited until December 22, 2025, before they began notifying the class—more than 330 days after the Data Breach—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

45. When Defendants did notify Plaintiffs and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering

---

[26] Bravera was acquired by Tampa General in 2023. *See* Tampa General Hospital, *Tampa General Hospital Completes Acquisition of Bravera Health and Introduces "TGH North,"* (Dec. 1, 2023) https://www.tgh.org/news/tgh-press-releases/2023/december/tgh-completes-acquisition-bravera-introduces-tgh-north.

[27] Exhibit A, CHS Data Breach Notice Letters.

[28] *Id.*

identity theft, providing Plaintiffs with additional information about how to protect themselves.

46. Defendants failed in their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing Private Information. And thus, Defendants caused widespread injury and monetary damages.

47. Defendants have done little to remedy their Data Breach. True, Defendants have offered some victims credit monitoring and identity related services. But such services are wholly insufficient to compensate Plaintiffs and Class members for the injuries that Defendants inflicted upon them, including their present and ongoing risk of identity theft and fraud arising from the Data Breach.

48. Because of Defendants' Data Breach, the sensitive Private Information of Plaintiffs and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class members.

49. Plaintiffs Spikes and Koehli were patients of Tampa General. As a result, Defendants obtained and maintained Plaintiffs' Private Information.

50. As a result, Plaintiffs were injured by Defendants' Data Breach.

***Plaintiff Stephanie Spikes, on behalf of the Oracle Health Nationwide Class, the Tampa General Nationwide Subclass, and the Florida State Subclasses***

51. Plaintiff Stephanie Spikes received care from Tampa General, one of Oracle's healthcare provider clients, and received treatment in or around 2020, which is prior to both Bravera's 2023 acquisition by Tampa General and the 2025 Data Breach. As a condition of receiving medical services, Plaintiff was required to provide her Private Information to Defendants, including but not limited to her name, Social Security number and medical information, in connection with Oracle's services contracted by her healthcare provider.

52. Plaintiff typically takes measures to protect her Private Information and is very careful about sharing her Private Information. Plaintiff has never knowingly transmitted unsecured Private Information over the internet or other unsecured sources. She stores any documents containing her Private Information in a safe and secure location, and she chooses unique usernames for her passwords and online accounts.

53. In entrusting her Private Information to Defendants, Plaintiff believed that, as part of the payments for medical treatment and services, Defendants had implemented and maintained reasonable security and practices to protect her Private Information, including only contracting with third party vendors who would adequately protect her Private Information.

54. Had Plaintiff known that Defendants did not utilize reasonable data security measures, she would not have entrusted her Private Information to Defendants.

55. At the time of the Data Breach, Oracle retained Plaintiff's Private Information on its network with inadequate data security and in unencrypted form, causing Plaintiff's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

56. Plaintiff received a Data Breach Notice on or around December 22, 2025, notifying her that her Private Information was improperly accessed by unauthorized third parties, including her name and information included within patient medical records, such as medical record numbers, doctors, treatment, medication, and diagnostic information.

57. As a direct and proximate result of the Data Breach that Defendants caused and allowed to occur, Plaintiff has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

58. Plaintiff has been and will be forced to expend considerable time and effort including to monitor her accounts and credit files, changing her online account passwords, verifying the legitimacy of the Data Breach Notice, and researching the Data Breach, to protect herself from identity theft and fraudulent misuse of her Private Information, disclosed as a result of the Data Breach.

59. Indeed, Plaintiff's Private Information that was compromised in the Data Breach has already been misused, evidenced by the significant increase in spam phone calls that she has received since the Data Breach and false financial alerts telling her to immediately change her bank account. She was also informed that her information is on the "dark web" by CapitalOne and CreditWise.

60. In addition, as a result of the Data Breach, Plaintiff also suffered diminution in the value of her Private Information, a form of intangible property that she entrusted to Defendants for the sole purpose of obtaining medical services.

61. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Private Information in the Data Breach. Plaintiff fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of her Private Information. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

62. As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as her Private Information compromised in the Data Breach includes sensitive data that cannot be changed. She is also worried about the impact on her family's ability to manage her finances in the case that she becomes unable to.

63. Furthermore, Plaintiff's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff to the imminent prospect of additional harm.

***Plaintiff Christine Koehli, on behalf of the Oracle Health Nationwide Class, the Tampa General Provider Nationwide Subclass, and the Florida State Subclasses***

64. Plaintiff Christine Koehli (previously known as Christine Sheerattan) received care from Springhill Regional, one of Oracle's healthcare provider clients and one of several Bravera health care centers later acquired by Tampa General.[29] She received treatment in or around 2021, which is prior to both Bravera's 2023 acquisition by Tampa General and the 2025 Data Breach. As a condition of receiving medical services, Plaintiff was required to provide her Private Information to Defendants, including but not limited to her name, Social Security number and medical information, in connection with Oracle's services contracted by her healthcare provider.

65. Plaintiff typically takes measures to protect her Private Information and is very careful about sharing her Private Information. Plaintiff has never knowingly transmitted unsecured Private Information over the internet or other unsecured source. She stores any documents containing her Private Information in a safe and secure location, and she chooses unique usernames for her passwords and online accounts.

66. In entrusting her Private Information to Defendants, Plaintiff believed that, as part of the payments for medical treatment and services, Defendants had implemented and maintained reasonable security and practices to protect her Private Information, including only contracting with third party vendors who would adequately protect her Private Information.

67. Had Plaintiff known that Defendants did not utilize reasonable data security

---

[29] *Agreement Signed for Tampa General Hospital to Acquire Bravera Health*, TAMPA GENERAL HOSPITAL, July 24, 2023, https://www.tgh.org/news/tgh-press-releases/2023/july/agreement-signed-for-tampa-general-hospital-to-acquire-bravera-health.

measures, she would not have entrusted her Private Information to Defendants.

68. At the time of the Data Breach, Oracle retained Plaintiff's Private Information on its network with inadequate data security and in unencrypted form, causing Plaintiff's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

69. Plaintiff received a Data Breach Notice on or around December 22, 2025, notifying her that her Private Information was improperly accessed by unauthorized third parties, including her name and information included within patient medical records, such as medical record numbers, doctors, treatment, medication, and diagnostic information.

70. As a direct and proximate result of the Data Breach that Defendants caused and allowed to occur, Plaintiff has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

71. Plaintiff has been and will be forced to expend considerable time and effort including to monitor her accounts and credit files, changing her online account passwords, contacting her bank, verifying the legitimacy of the Data Breach Notice, and researching the Data Breach, to protect herself from identity theft and fraudulent misuse of her Private Information, disclosed as a result of the Data Breach. She has spent 15-20 hours addressing the breach weekly since receiving the notice in December of 2025, for a total conservative estimate of 150 hours rectifying the breach as of March 2026.

72. Indeed, Plaintiff's Private Information that was compromised in the Data Breach has already been misused, evidenced by a fraudulent $500 charge on her debit card, her email account being hacked by an unauthorized user, and increased spam calls.

73. In addition, as a result of the Data Breach, Plaintiff also suffered diminution in the value of her Private Information, a form of intangible property that she entrusted to Defendants for the sole purpose of obtaining medical services.

74. Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Private Information in the Data Breach. Plaintiff fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of her Private Information. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

75. As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as her Private Information compromised in the Data Breach includes sensitive data that cannot be changed.

76. Furthermore, Plaintiff's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff to the imminent prospect of additional harm.

***Consumers Prioritize Data Security***

77. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[30] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they

[30] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited July 25, 2026).

won't purchase from an organization they don't trust with their data."[31]

b. 89% of consumers stated that "I care about data privacy."[32]

c. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[33]

d. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[34]

e. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[35]

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

78. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of loss of the opportunity to control how their Private Information is used;

b. diminution in value of their Private Information;

c. compromise and continuing publication of their Private Information;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering

[31] *Id.* at 3.
[32] *Id.* at 9.
[33] *Id.*
[34] *Id.*
[35] *Id.* at 11.

from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen Private Information; and

h. continued risk to their Private Information—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the Private Information.

79. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up thousands depending on the type of information obtained.[36]

80. The value of Plaintiffs' and Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

81. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information far and wide.

82. One way that criminals profit from stolen Private Information is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen Private Information, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

---

[36] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN, June 30, 2025, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/#:~:text=Quick%20Answer,Price%20Index%20by%20Privacy%20Affairs.

83. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

84. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other class members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

85. Defendants disclosed the Private Information of Plaintiffs and Class members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the Private Information of Plaintiffs and Class members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen Private Information.

86. Defendants' failure to promptly and properly notify Plaintiffs and Class members of the Data Breach exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

87. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

88. In 2024, a record 3,158 data breaches occurred—resulting in 1,350,835,988 victim

notices (i.e., 211% increase year-over-year).[37]

89. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[38]

90. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks.[39]

91. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

92. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendants—should use to protect against unlawful data exposure.

93. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices

---

[37] *2024 data breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited July 27, 2026).

[38] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[39] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

businesses must use.[40] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of Private Information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

94. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

95. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

96. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[40] *Protecting Personal Information: A Guide for Business*, FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

97. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former patients' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

98. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

99. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

100. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-02) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

101. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

### ***Defendants Violated HIPAA***

102. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly transactions and code sets to maintain the privacy and security of protected health information.[41]

103. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information and PHI is properly maintained.[42]

104. The Data Breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

---

[41] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[42] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

105. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

## **CLASS ACTION ALLEGATIONS**

106. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Rule 23 of the Federal Rule of Civil Procedure.

107. The classes that Plaintiffs seek to represent are defined as follows:

**Oracle Health Nationwide Class:**
All individuals residing in the United States whose Private Information was compromised in the Oracle Health Data Breach,

which occurred on or around January 22, 2025, including all those individuals who receive notice of the Data Breach.

**<u>Oracle Health Florida Subclass:</u>**
All individuals residing in Florida identified whose Private Information was compromised in the Oracle Health Data Breach, which occurred on or around January 22, 2025, including all those individuals who receive notice of the Data Breach.

**<u>Tampa General/CHS Nationwide Subclass:</u>**
All individuals residing in the United States whose Private Information was compromised in the Oracle Health Data Breach, which occurred on or around January 22, 2025, which information was provided to Oracle Health by Tampa General or CHS, including all those individuals who receive notice of the Data Breach.

**<u>Tampa General/CHS Florida State Subclass:</u>**
All individuals residing in Florida identified in the applicable Count whose Private Information was compromised in the Oracle Health Data Breach, which occurred on or around January 22, 2025, which information was provided to Oracle Health by Tampa General or CHS, including all those individuals who receive notice of the Data Breach.

108. Collectively, the Class and Subclasses are referred to as the "Classes" or "Class members."

109. Excluded from the Classes are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

110. Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

111. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

112. <u>Ascertainability</u>. All Members of the proposed Class are readily ascertainable from

information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them Data Breach notices.

113. Numerosity. The Class members are so numerous that joinder of all members is impracticable. The disposition of the individual claims of the respective Class members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of Class members are ascertainable through Oracle Health's and its customers' records, including but not limited to, the files implicated in the Data Breach.

114. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. When Defendants learned of the Data Breach;

c. Whether Defendants' response to the Data Breach was adequate;

d. Whether Defendants unlawfully lost or disclosed Plaintiffs' and Class members' Private Information;

e. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Defendants owed a duty to Plaintiffs and Class members to safeguard their

Private Information;

i. Whether Defendants breached their duty to Plaintiffs and Class members to safeguard their Private Information;

j. Whether criminals obtained Plaintiffs' and Class members' Private Information via the Data Breach;

k. Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class members;

l. Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

m. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

n. What damages Plaintiffs and Class members suffered as a result of Defendants' misconduct;

o. Whether Defendants' conduct was negligent;

p. Whether Defendants' conduct was per se negligent;

q. Whether either Defendant was unjustly enriched;

r. Whether Plaintiffs and Class members are entitled to actual and/or statutory damages;

s. Whether Plaintiffs and Class members are entitled to additional credit or identity monitoring and monetary relief; and

t. Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

115. Typicality. Plaintiffs' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class members because, *inter alia*, all Class members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to the named Plaintiffs. The claims of the named Plaintiffs and those of Class members arise from the same operative facts and are based on the same legal theories.

116. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class members. Plaintiffs' counsel are competent and experienced in litigating class actions, including data privacy litigation of this kind.

117. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class members, in that Plaintiffs' and Class members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

118. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

119. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class members affected by the Data Breach.

## CLAIMS FOR RELIEF[43]

### Count I – Negligence (On Behalf of Plaintiffs and the Classes)

120. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

121. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

122. Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Private Information from being disclosed,

[43] Plaintiffs do not seek reconsideration of the Court's Order on the Motions to Dismiss in the Consolidated Action but include certain Counts in this complaint to preserve any appellate rights. *See* Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, *In re: Cerner/Oracle Data Breach Litigation*, No. 25-00259-CV-W-BP (W.D. Mo., June 22, 2026), Doc. 394.

compromised, lost, stolen, and misused by unauthorized parties.

123. Defendants knew or should have known of the risks inherent in collecting Plaintiffs' and Class members' Private Information and the importance of adequate security. Defendants were on notice because they knew or should have known that they are attractive targets for cyberattacks seeking healthcare-related data and other Private Information.

124. Defendants owed a non-delegable duty of care to Plaintiffs and Class members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b. To protect their patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d. To employ reasonable security measures and to otherwise protect the Private Information of Plaintiffs and Class members pursuant to federal and state regulations including but not limited to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiffs and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

125. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair…

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

126. Defendants' duty also arose because, as health service providers, Defendants were bound by industry standards to protect their patients' confidential Private Information.

127. Defendants hold themselves out as trusted data collectors, and thereby assume a duty to reasonably protect patients' information. Indeed, Defendants, as data collectors, were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class members as a result of the Data Breach.

128. Plaintiffs and Class members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

129. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class members' Private Information within Defendants' possession.

130. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Plaintiffs' and Class members' Private Information.

131. Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

132. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class members' Private Information;

e. Failing to comply with the FTCA; and

f. Failing to detect in a timely manner that Class members' Private Information had been compromised.

133. Defendants had a special relationship with Plaintiffs and Class members. Plaintiffs' and Class members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions.

134. Defendants' breach of duties owed to Plaintiffs and Class members caused Plaintiffs' and Class members' Private Information to be compromised, exfiltrated, and/or misused, as alleged herein.

135. As a result of Defendants' ongoing failure to notify Plaintiffs and Class members regarding exactly what Private Information has been compromised, Plaintiffs and Class members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

136. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

137. As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class members, Plaintiffs and Class members are in danger of imminent harm in that their

Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

138. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class members have suffered damages as alleged herein and are at imminent risk of further harm.

139. The injury and harm that Plaintiffs and Class members suffered was reasonably foreseeable.

140. Plaintiffs and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

141. In addition to monetary relief, Plaintiffs and Class members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

**Count II – Negligence *per se***
**(On Behalf of Plaintiffs and the Classes)**

142. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

143. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

144. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

145. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the Class members' sensitive Private Information.

146. Defendants breached their respective duties to Plaintiffs and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Private Information.

147. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

148. The harm that has occurred is the type of harm the FTC Act is intended to guard against. The FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class members.

149. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class members from a data breach.

150. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

151. Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

152. But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class members would not have been injured.

153. The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that the breach would cause Plaintiffs and Class members to suffer the foreseeable harms associated with the exposure of their Private Information. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

154. As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**Count III – Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiffs and the Classes)**

155. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the

Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

156. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

157. Upon information and belief, Oracle Health entered into valid contracts with its clients, including the Healthcare Provider Defendants, to provide software products and/or services, including business associate agreements under HIPAA, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to Oracle Health.

158. Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendants agreed to receive and protect through their services.

159. The benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties, and Plaintiffs and the Class members were direct and express beneficiaries of such contracts.

160. Plaintiffs and the Class are also intended third-party beneficiaries of these contracts because recognizing them as such is appropriate to effectuate the intentions of the parties, and the circumstances indicate that Defendants intended to give the beneficiaries the benefit of the promised performance.

161. Defendants knew that if they were to breach these contracts, healthcare patients, including Plaintiffs and the Class, would be harmed by, among other harms, fraudulent transactions and the need to expend time and money to protect themselves from identity theft.

162. Defendants breached their contracts when they failed to use reasonable data security measures and/or business associate monitoring measures and allowed the Data Breach to occur.

163. As foreseen, Plaintiffs and the Classes were harmed by Defendants' failure to use reasonable data security measures to securely store and protect the files in their care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information. Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**Count IV – Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Classes)**

164. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

165. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

166. Defendants provide healthcare-related services to Plaintiffs and Class members. Plaintiffs and Class members formed an implied contract with Defendants regarding the provision of those services through their collective conduct, including by Plaintiffs and Class members paying for services from Defendants (or having their insurance companies pay Defendants on their behalf).

167. Through Defendants' sale of medical services, they knew or should have known that they must protect Plaintiffs' and Class members' confidential Private Information in

accordance with Defendants' policies, practices, and applicable law.

168. As consideration, Plaintiffs and Class members paid money (or money was paid on their behalf) to Defendants and turned over valuable Private Information to Defendants. Accordingly, Plaintiffs and Class members bargained with Defendants to securely maintain and store their Private Information.

169. Defendants solicited, offered, and invited Plaintiffs and Class members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class members accepted Defendants' offers and provided their Private Information to doctors or other healthcare professionals who then provided it to Oracle Health.

170. Defendants accepted possession of Plaintiffs' and Class members' Private Information for the purpose of providing healthcare-related services to Plaintiffs and Class members.

171. In delivering their Private Information to Defendants and paying for healthcare services, Plaintiffs and Class members intended and understood that Defendants would adequately safeguard Private Information as part of that service.

172. Defendants' implied promises to Plaintiffs and Class members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to Private Information also protects the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of their employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that

Plaintiffs' and Class members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

173. Plaintiffs and Class members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

174. Had Defendants disclosed to Plaintiffs and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and the Class members would not have provided their Private Information to Defendants.

175. As providers of healthcare-related services, Defendants recognized (or should have recognized) that Plaintiffs' and Class members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class members.

176. Defendants violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class members' Private Information. Defendants further breached these implied contracts by failing to comply with their promise to abide by HIPAA.

177. Additionally, Defendants breached the implied contracts with Plaintiffs and Class members by failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and transmitted, in violation of 45 CFR § 164.306(a)(1).

178. Defendants also breached the implied contracts with Plaintiffs and Class members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR § 164.312(a)(1).

179. Defendants further breached the implied contracts with Plaintiffs and Class

members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR § 164.308(a)(1).

180. Defendants further breached the implied contracts with Plaintiffs and Class members by failing to identify and respond to suspected or known security incidents and to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR § 164.308(a)(6)(ii).

181. Defendants further breached the implied contracts with Plaintiffs and the Class members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 CFR § 164.306(a)(2).

182. Defendants further breached the implied contracts with Plaintiffs and the Class members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding PII, in violation of 45 CFR § 164.306(a)(3).

183. Defendants further breached the implied contracts with Plaintiffs and the Class members by failing to ensure compliance with the HIPAA security standard rules by their workforce, in violation of 45 CFR § 164.306(a)(4).

184. Defendants further breached the implied contracts with Plaintiffs and the Class members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 CFR § 164.502, *et seq.*

185. Defendants further breached the implied contracts with Plaintiffs and the Class members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard PHI, in violation of 45 CFR § 164.530(c).

186. Defendants further breached the implied contracts with Plaintiffs and the Class members by otherwise failing to safeguard Plaintiffs' and Class members' Private Information.

187. A meeting of the minds occurred, as Plaintiffs and the Class members agreed, *inter alia*, to provide accurate and complete Private Information and to pay Defendants in exchange for Defendants' agreement to, *inter alia*, protect their Private Information.

188. Plaintiffs and the Class members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**<u>Count V – Unjust Enrichment</u>**
**(On Behalf of Plaintiffs and the Classes)**

189. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

190. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

191. Plaintiffs and the Class members conferred a benefit on Defendants by turning over their Private Information to Defendants and by paying for medical services (or having their insurance companies pay for medical services) that should have included cybersecurity protection to protect their Private Information. Plaintiffs and the Class members did not receive such protection.

192. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from payments made to it by Plaintiffs and the Class

members (or on their behalf).

193. As such, a portion of the payments made by Plaintiffs and the Class members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

194. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received from Plaintiffs and the Class members that should have been used for adequate cybersecurity practices that they failed to provide.

195. Defendants knew that Plaintiffs and the Class members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and the Class members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and the Class members' Private Information and prevented the Data Breach.

196. If Plaintiffs and the Class members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendants.

197. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

198. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered and are at a continual, substantial, imminent risk of injury, as alleged herein.

199. Plaintiffs and the Class members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other

compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class members may seek restitution or compensation.

200. Plaintiffs and Class members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**Count VI – Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Classes)**

201. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

202. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

203. In providing their Private Information to Defendants, Plaintiffs and the Class members justifiably placed a special confidence in Defendants to act in good faith and with due regard for the interests of Plaintiffs and the Class members to safeguard and keep confidential that Private Information.

204. As healthcare service providers, Defendants have a fiduciary relationship to their clients, like Plaintiffs and Class members.

205. Because of that fiduciary relationship, Defendants were provided with and stored valuable and sensitive Private Information belonging to Plaintiffs and Class members, which they were required to maintain in confidence.

206. Defendants accepted the special confidence that Plaintiffs and Class members placed in it.

207. In light of the special relationship between Defendants, and Plaintiffs and Class members, whereby Defendants became guardians of Plaintiffs and Class members' Private Information, Defendants became fiduciaries by their undertaking and guardianship of the Private Information, to act primarily for the benefit of their customers, including Plaintiffs and Class members for the safeguarding of Plaintiffs' and Class members' Private Information.

208. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and the Class members upon matters within the scope of their customer relationships, in particular, to keep secure the Private Information of their customers, exercise utmost care in protecting the Private Information in their possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons, and to timely notify Plaintiffs and the Class members of a data breach and disclosure.

209. Plaintiffs and Class members have a privacy interest in their Private Information.

210. Defendants breached their fiduciary duties to Plaintiffs and Class members by failing to protect the integrity of the systems containing Plaintiffs' and Class members' Private Information.

211. Defendants breached their fiduciary duties to Plaintiffs and Class members by otherwise failing to safeguard Plaintiffs and Class members' Private Information and by failing to timely notify and/or warn Plaintiffs and Class members of the Data Breach.

212. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and the Class members have suffered and will suffer injuries and damages as alleged herein.

213. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and the Class members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

**Count VII – Invasion of Privacy**
**(On Behalf of Plaintiffs and the Classes)**

214. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

215. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

216. Plaintiffs and the Class members had a reasonable expectation of privacy in the Private Information Defendants mishandled.

217. As a result of Defendants' conduct, publicity was given to Plaintiffs' and Class members' Private Information, which necessarily includes matters concerning their private life.

218. A reasonable person of ordinary sensibilities would consider the publication of Plaintiffs' and the Class members' Private Information to be highly offensive.

219. Plaintiffs' and the Class members' Private Information is not of legitimate public concern and should remain private.

220. As a direct and proximate result of Defendants' public disclosure of private facts, Plaintiffs and the Class members are at a current and ongoing risk of identity theft and sustained injuries and damages as alleged herein.

221. Plaintiffs and the Class members are entitled to compensatory, consequential and

nominal damages suffered as a result of the Data Breach.

222. Plaintiffs and the Class members are also entitled to injunctive relief requiring Defendants to, *inter alia*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate identity protection and credit monitoring services to all Class members.

**Count VIII – Declaratory Judgment**
**(On Behalf of Plaintiffs and the Classes)**

223. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the Nationwide Class, or 2) alternatively by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass.

224. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

225. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

226. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs and the Class allege that Defendants' actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and the Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

227. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continue to owe—a legal duty to use reasonable data security to secure the data entrusted to them;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to protect the data entrusted to them; and

d. Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class members.

228. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to them.

229. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

230. And if another breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs' and Class members' injuries.

231. If an injunction is not issued, the resulting hardship to Plaintiffs and the Class members far exceeds the minimal hardship that Defendants could experience if an injunction is issued. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class members, and the public at large.

**Count IX – Violation of Florida Deceptive and Unfair Trade Practices Act**
**F.S.A. § 501.201, et. seq.**
**(On Behalf of Plaintiffs and the Florida Subclasses)**

232. This claim is brought: 1) by Plaintiffs against Oracle Health, on behalf of the

Nationwide Class, or 2) alternatively by Plaintiffs under Florida Law on behalf of the Florida Subclass; 3) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Nationwide Subclass; and 4) by Plaintiffs against Tampa General/CHS, on behalf of the Tampa General/CHS Florida Subclass.

233. Plaintiffs restate the allegations in Paragraphs 1 through 119 above, as if fully set forth herein.

234. Defendants offered or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

235. Plaintiffs and the Florida Subclasses are "consumers" as defined by Fla. Stat. § 501.203(7), and thus intended for protection under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

236. FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Unfair acts or practices that violate the FTC Act also violate FDUTPA.

237. Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts in the conduct of trade or commerce in violation of Fla. Stat. § 501.204(1), including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and the Florida Subclasses' PII and PHI, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Florida Subclasses' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Failing to comply with Florida's Information Protection Act ("FIPA"), Fla. Stat. § 501.171, et. seq., which requires entities to "take reasonable measures to protect and secure data in electronic form containing personal information.";

e. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and the Florida Subclasses' PII, including by implementing and maintaining reasonable security measures;

f. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Florida Subclasses' PII and PHI, including duties imposed by FIPA and the FTC Act, 15 U.S.C. § 45;

g. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and the Florida Subclasses' PII; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Florida Subclasses' PII, including duties imposed by FIPA and the FTC Act, 15 U.S.C. § 45.

238. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

239. Defendants' collection and maintenance of Plaintiffs' and Class Members' PII were

actions central to their businesses and affected commerce.

240. Defendants violated FDUTPA because they violated the FTC Act, as alleged above Class Members would never have allowed Defendants to access, collect, or maintain their PII had they known that Defendants' representations regarding the safety and security of their products and services were false.

241. Had Defendants disclosed to Plaintiffs and the Florida Subclasses that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business, and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiffs and the Florida Subclasses. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiffs and the Florida Subclasses acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

242. As a direct and proximate result of Defendant's violations of FDUTPA, Plaintiffs and Class Members suffered actual damages. Plaintiffs and Florida Subclasses received services that were less valuable than what Defendants were obligated to provide and for which Defendants were paid, either directly or indirectly, by Plaintiffs and Class Members. The services and business offerings that Defendants ultimately provided were less valuable than what should have been delivered and what Defendants promised to deliver given Defendants' failure to fulfill the data security and privacy promises that were central to their service offerings. Moreover, Plaintiffs and the Florida Subclasses have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including, but

not limited to, fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

243. Plaintiffs and the Florida Subclasses seek all monetary and non-monetary relief allowed by law, including actual damages under Fla. Stat. § 501.211; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper, and are accordingly entitled to damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class members request judgment against Defendants and that the Court enter an order:

i. Certifying this action as a class action, defining the Classes as requested herein, appointing the undersigned as class counsel, and finding that Plaintiffs are proper and adequate representatives of the Classes requested herein;

j. Awarding Plaintiffs and Class members appropriate monetary relief, including actual damages, statutory damages, nominal damages, equitable relief, restitution, disgorgement, and statutory costs;

k. Awarding injunctive and other equitable relief as necessary to protect the interests of the Classes as requested herein;

l. Instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members;

m. Requiring Defendants to pay the costs involved in notifying Class members about the judgment and administering the claims process;

n. Requiring Defendants to implement enhanced data security measures in order to better protect the Private Information in their possession and control;

o. Awarding Plaintiffs and Class members prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

p. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class members demand a trial by jury on all triable issues.

Dated: July 27, 2026

Respectfully submitted,

*/s/ Barrett J. Vahle*
Norman E. Siegel – MO #44378
Barrett J. Vahle – MO #56674
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64113
Tel: (816) 714-7112
siegel@stuevesiegel.com
vahle@stuevesiegel.com

Tyler W. Hudson
WAGSTAFF & CARTMELL, LLP
4740 Grand Ave., Suite #300
Kansas City, MO 64112
(816) 701-1100
(816) 531-2372 (facsimile)
thudson@wcllp.com

Lynn A. Toops
Amina A. Thomas
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
(317) 636-2593 (facsimile)
ltoops@cohenmalad.com
athomas@cohenmalad.com

Thomas E. Loeser
COTCHETT, PITRE & McCARTHY LLP

1809 7th Ave., Ste. 1610
Seattle, WA 98101
(206) 802-1272
tloeser@cpmlegal.com

*Attorneys for Plaintiffs and Proposed Classes*