**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| IN RE: CERNER/ORACLE DATA BREACH LITIGATION | Case No.: 25-00259-CV-W-BP<br><br>This Document Relates to:<br>*Naomi McGhee, on behalf of herself and others similarly situated v. Cerner Corp., et al.*, Case Number 4:26-cv-00192-BP |

## DECLARATION OF JENNIFER A. KOZINN

I, Jennifer A. Kozinn, state under oath, as follows:

1. I am the Senior Vice President and Chief Legal Officer for North Kansas City Hospital. I am also an employee of North Kansas City Hospital and the registered agent for Meritas Health Corporation. In this capacity I have personal knowledge of the facts stated in this Declaration.

2. In my position as Senior Vice President and Chief Legal Officer for North Kansas City Hospital, I have access to the records made by the Board of Trustees of North Kansas City Hospital ("**Board of Trustees**") and maintained at North Kansas City Hospital. Each of the documents attached hereto as **Exhibit A** through **Exhibit L** are true and accurate copies of records made or maintained by the Board of Trustees of North Kansas City Hospital at North Kansas City Hospital in the regular course of business.

3. North Kansas City Memorial Hospital began operations in 1958 as an 80-bed city hospital.

4. The name of the hospital was changed from North Kansas City Memorial Hospital to North Kansas City Hospital on June 18, 1985. On February 28, 1994, the Board of Trustees voted to approve the name change to North Kansas City Hospital.

EXHIBIT
2
exhibitsticker.com

5. North Kansas City Hospital is currently licensed to operate a 451-bed facility located across a 69-acre campus.

6. The Board of Trustees currently has eleven members.

7. Pursuant to R.S. Mo. § 96.150 and § 96.160, the Board of Trustees operates, maintains, and manages North Kansas City Hospital and its facilities.

8. Pursuant to R.S. Mo. § 96.190 and § 96.195, a "fund" is established in the city treasury from which the Board of Trustees deposits monies received and pays expenditures.

9. Pursuant to R.S. Mo. § 96.200, the Board of Trustees annually provides a detailed report to the City Council of North Kansas City showing the receipt and expenditure of all funds. *See, e.g.*, **Ex. A** (Minutes from a meeting of The Board of Trustees of North Kansas City Hospital and The City Council of North Kansas City dated November 25, 2019); **Ex. B** (Minutes from a meeting of The Board of Trustees of North Kansas City Hospital and The City Council of North Kansas City dated November 28, 2022); **Ex. C** (Minutes from a meeting of The Board of Trustees of North Kansas City Hospital and The City Council of North Kansas City dated November 24, 2025).

10. Pursuant to R.S. Mo. § 96.190, the Board of Trustees employs the executive leadership officers of North Kansas City Hospital including but not limited to the PresidentCEO; Senior Vice-President of Finance/CFO; and Senior Vice President and Chief Legal Officer.

11. The CEO, CFO and CLO of North Kansas City Hospital are required to complete annual Personal Financial Disclosures to the Missouri Ethics Commission. *See* R.S. Mo. § 105.483.

12. At a Closed Session Meeting of the Board of Trustees on January 9, 1993, the President/CEO of North Kansas City Hospital presented a proposal to the Board of Trustees to

form a not-for-profit organization which would allow the hospital to become an equity owner in a Health Maintenance Organization (HMO) and to work with physicians in other areas. *See* **Ex. D** (Minutes from Closed Session Meeting of the Board of Directors of North Kansas City Hospital dated January 9, 1993).

13. At the Closed Session Meeting of the Board of Trustees on January 9, 1993, the members agreed that another meeting of the Board of Trustees would be held on January 18, 1993, and the proposal to become an equity owner in an HMO and to establish a not-for-profit organization would be voted on at that meeting. ***Id.***

14. A Closed Session Meeting of the Board of Trustees was called on January 18, 1993, to continue discussions on the proposal by the NKCH President/CEO to participate in the HMO which had been discussed at the Closed Session Meeting on January 9, 1993. **Ex. E** (Minutes from Closed Session Meeting of the Board of Directors of North Kansas City Hospital dated January 18, 1993).

15. At the Closed Session Meeting of the Board of Trustees on January 18, 1993, the President/CEO of North Kansas City Hospital emphasized that the Board of Trustees would have complete control of the proposed not-for-profit corporation if its incorporation was approved by the Board of Trustees. ***Id.***

16. At the meeting of the Board of Trustees on January 18, 1993, the Board of Trustees unanimously adopted a resolution ("**Resolution**") approving the formation of the not-for-profit corporation and to participate in the HMO. **Ex. F** (Resolution attached to Minutes from Meeting of the Board of Directors of North Kansas City Hospital dated January 18, 1993).

17. The Board of Trustees approved a loan agreement in the amount of $2,272,445 for participation in the HMO, and that such payment should be made, pursuant to a Loan Agreement,

to the not-for-profit corporation to be formed "for the purpose of supporting and assisting facilities, owned, operated, or managed by the Board of Trustees of North Kansas City Hospital." **Ex. G** (Resolution attached to Minutes from Meeting of the Board of Directors of North Kansas City Hospital dated January 25, 1993).

18. Meritas Health Corporation ("**Meritas**") was incorporated on January 25, 1993, as a R.S.Mo. Ch. 355-member corporation. **Ex. H** (Articles of Incorporation of Meritas Health Corporation).

19. Meritas is a Missouri non-profit member corporation, whose sole members consist "of those persons who from time to time are members of the Board of Trustees of North Kansas City Hospital." **Ex. I** (Amended and Restated Bylaws of Meritas Health Corporation, Article II, Sec. 1).

20. At the direction of the Board of Trustees, pursuant to its Resolution dated January 25, 1993, Meritas was formed for the purpose of holding the interest of North Kansas City Hospital in a joint venture HMO. **Ex. G** (Resolution of the Board of Trustees of North Kansas City Hospital adopted January 25, 1993, attached to the Minutes of the Board of Trustees of North Kansas City Hospital dated January 25, 1993).

21. Meritas is a wholly owned subsidiary of the Board of Trustees.

22. Meritas "shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the Board of Trustees of North Kansas City Hospital, existing under the authority of Sections 96.150 through 96.228, Revised Statutes of Missouri, 1986, as amended." **Ex. H** (Articles of Incorporation of Meritas Health Corporation, Article VIII).

23. In the event of the dissolution of Meritas, all the assets of the corporation shall be distributed to North Kansas City Hospital, or to the City of North Kansas City, Missouri in the

event that North Kansas City Hospital no longer exists. **Ex. H** (Articles of Incorporation of Meritas Health Corporation, Article XIII).

24. Meritas has no authority to issue capital stock. **Ex. H** (Articles of Incorporation of Meritas Health, Article IV).

25. Under its Bylaws, the property, business, and affairs of Meritas are controlled and managed by a Board of Directors, which are dominated and controlled by the Board of Trustees. **Ex. I** (Amended and Restated Bylaws of Meritas Health Corporation, Article III, Section 1).

26. There are nine members on the Meritas Board of Directors. The Meritas nine-member Board of Directors contains the Chairman, Vice Chairman, Secretary and Treasurer of the Board of Trustees, as well as the President of North Kansas City Hospital and the Vice-President of Finance of North Kansas City Hospital. Three more members are elected yearly by the Board of Directors. At present, one of the elected members of the Meritas Board of Directors is also a member of the Board of Trustees of North Kansas City Hospital. **Ex. I** (Amended and Restated Bylaws of Meritas Health Corporation, Article III, Section 1).

27. The only voting members of Meritas are those directors who are members of the Board of Trustees. Only these voting members have the power to alter, amend, or repeal the Bylaws of Meritas or to amend its Articles of Incorporation. **Ex. H** (Articles of Incorporation of Meritas Health Corporation, Article VII) **Ex. I** (Amended and Restated Bylaws of Meritas Health Corporation, Articles II and VIII).

28. The President (Chief Executive Officer) of North Kansas City Hospital, the Vice-President of Finance (Chief Financial Officer) of North Kansas City Hospital, and the Chairperson, Vice-Chairperson, Secretary and Treasurer of the Board of Trustees are not subject

to removal from the Meritas Board of Directors. **Ex. I** (Amended and Restated Bylaws of Meritas Health Corporation, Article III, Section 5).

29. The President of Meritas has always been the President (Chief Executive Officer) of North Kansas City Hospital, and the Treasurer of Meritas has always been the Vice-President of Finance (Chief Financial Officer) of North Kansas City Hospital.

30. The President (Chief Executive Officer) of North Kansas City Hospital, as the President of Meritas, has general supervision of the business and finances of Meritas. **Ex. I** (Amended Restated Bylaws of Meritas Health Corporation, Article VI, Section 1).

31. The Vice-President-Finance (Chief Financial Officer) of North Kansas City Hospital, as the Treasurer of Meritas, has the custody of Meritas' monies. **Ex. I** (Amended Restated Bylaws of Meritas Health Corporation, Article VI, Section 4).

32. The President and Treasurer of Meritas do not receive a salary from Meritas. Rather, their salaries are paid by the Board of Trustees.

33. Rick Green is a North Kansas City Hospital employee paid by the Board of Trustees, and presently is the ranking executive over Meritas. His title is Senior Vice President Meritas Health.

34. The Board of Trustees generally discusses Meritas at its monthly meetings. Additionally, the Board of Trustees holds an annual combined meeting with the Meritas Board of Directors. Generally, an update on the Meritas annual report and strategic plan is presented at these annual combined meetings. *See, e.g.*, **Ex. J** (Minutes of The Board of Trustees of North Kansas City Hospital Closed Session dated February 22, 2021); **Ex. K** (Minutes of The Board of Trustees of North Kansas City Hospital Closed Session dated March 27, 2023).

35. The Board of Trustees is a voting member of Meritas, and its individual members vote on the approval of amendments to the Meritas Bylaws. *See, e.g.*, **Ex. L** (Minutes of Joint Meeting of the Board of Directors of Meritas Health Corporation and the Individual Members of the Board of Trustees of North Kansas City Hospital in Their Capacities as Voting Member of Meritas Health Corporation dated February 26, 1996).

36. Meritas has been discussed at joint meetings between the Board of Directors and the City Council. *See, e.g.*, **Ex. A** (Minutes from a meeting of The Board of Trustees of North Kansas City Hospital and The City Council of North Kansas City dated November 25, 2019); **Ex. J** (Minutes from a meeting of The Board of Trustees of North Kansas City Hospital and The City Council of North Kansas City dated February 22, 2021).

37. Meritas is not an IRC 501 (c)(3) entity. Meritas has Internal Revenue Code Section 457 and 401A deferred compensation and retirement plans, which are only available to state and local governments.

38. Beginning on June 12, 2025, the name "NKC Health" has been used by and registered to both North Kansas City Hospital and Meritas Health Corporation as a "d/b/a" or doing-business-as brand or trade name registered with the Missouri Secretary of State.

39. The registration of the "d/b/a" name to North Kansas City Hospital and Meritas Health Corporation did not create a new organization or change the existing legal structure, under which common management exists and control is exerted by the Board of Trustees over both. The new, single name emphasizes to the public the unified nature of the municipal hospital system being operated and controlled by the Board of Trustees.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of September 2026, at North Kansas City, Missouri.

/s/ [signature]
Jennifer A. Kozinn

THE BOARD OF TRUSTEES OF
NORTH KANSAS CITY HOSPITAL
and
THE CITY COUNCIL OF NORTH KANSAS CITY
Special Open Session
November 25, 2019

The Board of Trustees met in a Special Open Session jointly with the City Council of the City of North Kansas City on Monday, November 25, 2019, in the Skyview Room of North Kansas City Hospital, Rebecca Welbern, Chairperson presiding.

Trustees present:

Rebecca Welbern, Chairperson
Thomas Herrick, M.D., Vice Chairperson
Glynda Jacobson, Secretary
Sheila Lillis, Treasurer
W. Kent Barr, M.D.
Don Bossert
Robert Magee
Mike Schumacher

Trustees not present:

Charles Cash, Jr., Assistant Secretary
Linda Black

City of North Kansas City:

Mayor Don Stielow
Councilmember Zach Clevenger
Councilmember Tom Farr
Councilmember Richard Stewart
Councilmember Rita Pearce
Councilmember Jess Smith
Councilmember Fred Steffen
Eric Berlin, City Administrator
Tom Barzee, City Counsel
Steve Beamer, Police Chief
Dave Hargis, Fire Chief

Others present NKCH:

Peggy Schmitt, President & CEO
Kerri Jenkins, Sr. Vice President & COO
Henry Seybold, Sr. Vice President-Finance & CFO

EXHIBIT
A

Sarah Oakley, Vice President-Nursing
Randee Gannon, Vice President-Marketing & Community Wellness
Amy Gerlt, Executive Assistant

Ms. Welbern called the meeting to order at 6:00 p.m. and thanked all those present for the great working relationship between the Board, City and Hospital.

Annual Report and Hospital Update

Ms. Schmitt opened her presentation by thanking the City for their attendance and said that the City had received a complete copy of the audit report earlier that month. Ms. Schmitt said that the Hospital established its Mission, Vision and Values statements, with the Mission "We provide hope and healing to every life we touch." Ms. Schmitt said that NKCH takes to heart its mission and considers it an integral part of how NKCH does business every day. The Hospital has also established four strategic pillars and aligns all initiatives under those pillars. Those strategic pillars are: Provider of Choice, Employer of Choice, Financial Stability, and Meet the Needs of the Community.

Ms. Schmitt provided information on the following matters:

- NKCH was ranked 3rd best hospital in Kansas City by US News and World Report.
- NKCH achieved Magnet designation last year and celebrated with a Make Your Mark campaign. Only 9% of hospitals across the country have achieved Magnet designation.
- Affiliated entities map which includes all the Meritas Health physician practices, joint ventures in Ambulatory Surgery Centers, and off-site medical imaging locations.
- NKCH's Medical Staff is comprised of 49 specialties, which includes 359 active staff members. Meritas Health has grown substantially and now has approximately 150 physicians and 33 Advanced Practice Professionals.
- NKCH has begun Deep Brain Stimulation (DBS) to assist with those suffering from Parkinson's Disease and Essential Tremor Symptoms.
- NKCH has also implemented ERAS (Enhanced Recovery After Surgery).
- Inpatient and outpatient volume trends, and patient per adjusted occupied bed trends.

Ms. Schmitt introduced Henry Seybold, the Hospital's Sr. Vice President & CFO. Mr. Seybold provided a summary of the Hospital's combined audited financial statements as follows:

Audit completed of the combined financial statement of North Kansas City Hospital and Affiliate and results have been presented to the Audit & Compliance Committee and Board of Trustees. BKD has issued an unmodified opinion or clean opinion of the financial statements and made no adjustments.

- Total Operating Revenue for the year of $597.2 million and an increase of approximately $10.6 million from 2018 to 2019.
- Total Operating Income for fiscal year 2019 of $11.7 million compared to $11.8 million in 2018.

- Total Operating Expenses increased approximately $10.8 million from 2018 to 2019.
- There was an Increase in net position of approximately $17 million from fiscal year 2018 to 2019. Mr. Seybold attributed the increase to the change in regulation to allow the Hospital to invest up to 25% of its reserves in non-governmental backed securities.
- Financial ratios, including days cash on hand, net days in AR, debt service coverage, and operating margin.

Mr. Seybold ended his presentation by noting that NKCH has significantly lower debt as compared to other hospitals and reported a good fiscal year overall.

Ms. Schmitt said that NKCH was started by and supported by the community and each year, the Hospital produces a Community Benefit Report to quantify what NKCH does to give back to the community. Ms. Schmitt introduced Randee Gannon, the Hospital's Vice President – Marketing & Community Wellness, to present the Community Benefit Report directly to the Board and City Council. Ms. Gannon presented the Community Benefit Report for fiscal year 2019 as follows:

- The Community Benefit Report is categorized by Charity Care, Community Health & Wellness, Contributions & Sponsorships, Health Information, Volunteering in the Community, and Community Health Needs Assessment.
- Charity Care is defined as NKCH's waiver of part or all charges for services provided based on established criteria. NKCH provided approximately $31,646,515 in charity care during fiscal year 2019.
- 11,160 people participated in a Community Health and Wellness programs, including Club W Women's Program, Community Enrichment Classes, Health Fairs and Screenings, Lunch and Learns, NKCH Wellness Corners, Community Partnerships and Community Youth Programs.
- Club W was launched in November 2015 and has continued to increase in membership each year, with 1,811 members currently.
- North Kansas City Hospital holds Community Enrichment Classes and provides fitness and wellness events and collaborates with community partners to provide health education classes.
- Community Health and Wellness has increased the number of classes offered and added clinically based classes to support patients and physicians, including the Rock Steady Boxing class.
- Community Health and Wellness holds special events for heart health month including the "Test Your Ticker" heart health fairs.
- NKCH also has a Wellness Corner at the North Kansas City YMCA that includes a community health nurse: blood pressure screenings and counseling; digestive and colon health counseling; medication education; and lipid, glucose and other screenings, including diabetes and nutrition education.
- Additional NKCH Community Programs include Youth Programs including job shadows, internships, North Kansas City School District On-site Academy, and the Northland CAPS program.
- Total donations to the community were $1,573,437.
- NKCH contributed $256,819 to 29 community and 18 charitable organizations.
- NKCH Board of Trustees contributed $1,006,168 to the Northland CAPS program; Kansas City Hospice; Northland Healthcare Access; Kansas City Area Treatment, Triage

and Assessment Center; YMCA of Greater Kansas City; and Samuel U. Rodgers Health Center.

- The Chip In For Charity Golf Tournament raised $142,062 benefiting three northland organizations.
- A variety of Electronic Health Information is available and NKCH has established an Electronic Health Information Library which had 14,909 visits. There were 175,145 physician profile views and the 221-HEAL line received 9,623 calls.
- NKCH's website, nkch.org, had 1,217,971 views. Facebook has 10,646 fans and NKCH has the highest number of fans of all adult acute hospitals in the metro area.
- NKCH has established a volunteer portal that allows organizations to request volunteers and allows employees an opportunity to volunteer in the community.
- The Community Health Needs Assessment Team identified the three initiatives for Cycle 3 and those initiatives began July of 2019. Initiatives are: 1) Increase exercise and healthy eating resources and programs to help reduce obesity in the northland. 2) Improve access to care and implement services to reduce opioid drug overdoses in Clay and Platte counties. 3) Improve and increase services to better meet the health needs of our aging northland population.
- NKCH is participating in the Missouri Hospital Association's "A Better Missouri" campaign to focus on volunteers and jobs.

Ms. Schmitt said that there have been many changes to the Administrative Team due to retirements and talked about the team members currently in place. Ms. Schmitt talked about her pending retirement and said it has been her privilege to be North Kansas City Hospital's President & CEO for over seven years.

Ms. Schmitt talked about the great physicians, employees, management, community and Board members who all work together as a team to make NKCH such a great hospital. Ms. Schmitt thanked the City and Board for their collaboration and support and said she believes that NKCH has a bright future and has been honored to be a part of the NKCH family for over 26 years.

There were questions and answers regarding physician recruitment, new treatments for sleep apnea, and collaborative relationships with other providers.

Ms. Welbern recognized Ms. Schmitt for her excellent work and leadership at NKCH and those present recognized Ms. Schmitt with applause.

<u>Adjournment</u>

On motion of Ms. Jacobson, seconded by Ms. Lillis, the Board unanimously voted to adjourn at 6:50 p.m.

THE BOARD OF TRUSTEES OF
NORTH KANSAS CITY HOSPITAL
and
THE CITY COUNCIL OF NORTH KANSAS CITY
Special Open Session
November 28, 2022

The Board of Trustees met in a Special Open Session jointly with the City Council of the City of North Kansas City on Monday, November 28, 2022, in the Skyview Room of North Kansas City Hospital, W. Kent Barr, M.D., Chairperson presiding.

Trustees present:
W. Kent Barr, M.D., Chairperson
Thomas Herrick, M.D., Vice Chairperson
Sheila Lillis, Treasurer
Glynda Jacobson, Secretary
Zachary Clevenger
Craig Leonard
Robert Magee
Mitchell Plyler
Mike Schumacher
Rebecca Welbern

Trustees not present:
Johnathan Barnes, Assistant Secretary

City of North Kansas City:
Ana Pellumbi, Council Member
Anthony Saper, Council Member
Jesse Smith, Council Member
Lisa Tull, Council Member
Tom Barzee, City Counselor
Crystal Doss, City Clerk
Kim Nakahodo, Deputy City Administrator
Mike Nichols, City Administrator

Others present:
Stephen Reintjes, Sr., M.D., President & CEO
Kerri Jenkins, Sr. Vice President & COO
Austin Jones, Sr. Vice President & CFO
Sarah Oakley, Vice President-Nursing
Keenan Berghoff, M.D., President-Elect, Medical Staff
Joe Hiersteiner, Seigfreid Bingham
Lisa Crutchfield, Executive Assistant

EXHIBIT
B
exhibitsticker.com

Dr. Barr called the meeting to order at 6:00 p.m., thanked all those present for attending, and asked each attendee to introduce themselves. Following introductions, Dr. Barr said the Hospital values the annual meeting with the City of NKC and appreciates the support. Dr. Barr said although the Hospital has grown over the years, there is still a small community feeling.

Annual Report and Hospital Update
Dr. Reintjes opened his presentation by thanking the city representatives for their attendance.

Dr. Reintjes highlighted the mission, vision, and values of the Hospital. The mission statement is to provide hope and healing to every life we touch, which includes all patients, employees, and community members. The strategic pillars include Employer of Choice, Provider of Choice, Financial Stability, and Community Needs.

Dr. Reintjes introduced Austin Jones, the Hospital's Sr. Vice President & CFO.

Mr. Jones said the last few years have been challenging through the pandemic, and many people don't realize that hospitals lost money while caring for patients, due to the cost of caring for patients being higher than the amount insurance pays.

Mr. Jones explained the purpose of the audit report is to summarize various matters related to the following services provided to North Kansas City Hospital (NKCH) as of June 30, 2022: Audit of the financial statements of NKCH; Audit of the employee benefit plan; Single audit report; and Management letter. The audit report was shared with the City of NKC earlier in the month.

Mr. Jones provided a summary of the Hospital's combined audited financial statements as follows:

- The 2021 audit was restated to be in conformity with GASB87 to be consistent with current year reporting. The 2022 audit will be restated as well for similar reason.
- Net patient revenue for 2022 was approximately $676M compared to $633M in 2021. Other revenue was similar for both years. Total operating revenue in 2022 was approximately $698M compared to $655M in 2021. Many hospitals' revenue has declined, so this increase is attributable to how NKCH responded to the pandemic.
- The current industry impact of agency expenses and the retirement of nurses and physicians has impacted the cost in care. Inflation and labor costs have contributed to financial strains as well.
- Operating expenses for 2022 were approximately $700M compared to $600M in 2021.
- Operating loss was approximately -$11.1M in 2022 compared to -$6.2M in 2021. Mr. Jones explained the CARES Act Provider Relief Fund (PRF) was listed as non-operating revenue as required for auditing purposes, which accounts for approximately $11.3M in revenue.
- Nonoperating revenue for 2022 was -$17.5M, with a significant loss in the investment portfolio.
- Mr. Jones highlighted the financial ratios.

Dr. Reintjes provided a hospital update as follows:

- NKCH was recognized by U.S. News & World Report as the third best hospital in the metro area; the stroke and heart failure programs received five awards and honors from the American Heart Association/American Stroke Association, and NKCH and Meritas Health earned Most Wired recognition.
- The Kansas City Medical Society honored Todd Beardman, M.D., and Denny Fugate, PharmD, for Operation Safe; Forbes named NKCH best midsize employer in the Kansas City area; and wound healing earned prestigious certification by The Joint Commission.

- NKCH developed a 5-year Diversity, Equity, and Inclusion plan; Cath Lab was renovated with upgraded technology and improved workflows; and the Chip In golf tournament raised over $170K for three Northland charities.
- Patient encounters for 2022 include 18,953 admissions (excluding newborns), 280,351 outpatient visits, 70,916 emergency visits, and 399,059 Meritas Health clinic visits. There are 570 physicians and 207 advance practice providers on the medical staff. Dr. Reintjes reiterated what Dr. Barr previously said about the growth of NKCH, and what was once the little hospital on the hill has become the big hospital on the hill. NKCH's service area now includes several counties and is a system.
- On November 1st NKCH launched a Philanthropy Department. Many community members have shown interest in supporting the Hospital. Dr. Reintjes announced that through the efforts of the Philanthropy Department, the Patterson Family Foundation recently awarded NKCH $769,438 for a telehealth partnership with Harrison County Community Hospital.
- NKCH gave nearly $27M back to the community in financial assistance to those in need. A 5-year charity care trend was presented.
- The Board of Trustees provided support to local recipients including Kansas City Hospice & Palliative Care; Kansas City Assessment and Triage Center; Northland Health Care Access; Samuel U. Rodgers Health Center; City of Fountains Foundation; and LevelUp Kids, Inc.
- NKCH supported 24 community organizations and 10 charitable organizations and employee contributions were made to Donate Life and American Heart Association.
- NKCH partnerships include Magnet® Designation; Northland CAPS Program participation; support for NorthCare Hospice; and support for Samuel U. Rodgers Health Center for prenatal care.
- Wellness has been promoted to the community through fitness & health education classes; Club W; free lunch & learn virtual series; free wellness corners; community health fairs; CPR classes; fulfilling community volunteer needs; and starting a capable program through a grant that helps people needing adaptive measures for their home to remain in their home.
- NKCH has a strong presence on several social media outlets.
- The 221-HEAL line utilized to refer the community to the help they need triaged 3,106 phone calls.
- Following the recent Community Health Needs Assessment completed by Northland Health Alliance, NKCH selected three areas to focus on for Cycle Four which include, Access to Care; Cardiac Disease; and Mental and Behavioral Health.

Dr. Reintjes concluded his presentation by expressing the importance of the Hospital and City of NKC working together to meet the needs of our community. Dr. Reintjes thanked the City of NKC for their support and the great relationship. Dr. Reintjes asked if anyone had questions or would like further discussion on the topics he covered.

Ms. Tull mentioned the Aging in Place program of NKCH and said the City of NKC has provided financial support to similar programs. Ms. Oakley explained that residents are referred to the program through the Hospital's Home Health department. Ms. Oakley said she will reach out to Ms. Tull to discuss further.

Mr. Barzee thanked Dr. Reintjes for the weekly reports sent to the City of NKC during the pandemic with the number of Covid patients and said that was instrumental in helping the City Council determine masking guidelines.

Dr. Barr said when the first Covid vaccines were distributed in Clay and Platte County, NKCH did not receive any. Dr. Barr commended Dr. Reintjes for reaching out to an area hospital CEO to secure vaccines for our community, and NKCH participated in Operation Safe by contributing time and resources to vaccinate our community.

There was discussion regarding the CHNA initiative for mental and behavioral health. Both the Hospital and City representatives agreed mental and behavioral health continue to be a growing concern.

There was discussion regarding the rising number of homeless people in the community.

Mr. Smith asked if there was anything the City of NKC can do for the Hospital to support programs. Dr. Reintjes responded that anything the city can do to help promote philanthropic efforts would be great, and explained that fundamentally, to retain the current culture and remain an independent hospital, NCKH must continue to grow.

Dr. Barr and Dr. Reintjes again thanked everyone for coming to the joint meeting.

Adjournment
On motion of Ms. Lillis seconded by Ms. Welbern, the Board unanimously voted to adjourn at 6:58 p.m.

NKC Health™

The Board of Trustees of
North Kansas City Hospital d/b/a NKC Health
and
The City Council of North Kansas City
Special Open Session
November 24, 2025

**NKC Health Trustees present:**
Thomas Herrick, M.D., Vice Chairperson
Sheila Lillis, Treasurer
Glynda Jacobson, Secretary
Craig Leonard, Assistant Secretary
Zachary Clevenger
Vicki Landers
Robert Magee
Jolene Shaw
Rebecca Welbern

**City of North Kansas City:**
Mayor Jesse Smith
Linda Alvarez, Council Member
Amie Clarke, Council Member
Connor Fitzgerald, Council Member
Lyndsey Magrone, Council Member
Anthony Saper, Council Member
Kim Nakahodo, Deputy City Administrator
Mike Nichols, City Administrator
Tom Barzee, City Counselor

**Others present:**
Stephen Reintjes Sr., M.D., President & CEO
Kerri Jenkins, Sr. Vice President & COO
Austin Jones, Sr. Vice President & CFO
Jennifer Kozinn, Sr. Vice President & CLO
Sarah Oakley, Vice President-Nursing
Ian Rosbrugh, M.D., President, Medical Staff
Scott Chapman, M.D., President-Elect, Medical Staff
Kristen Guillaume, Vice President, Chief Digital & Information Officer
Jean Paul Bradshaw II, Lathrop GPM
Lisa Crutchfield, Executive Assistant

Dinner was served prior to the meeting, and Dr. Herrick called the meeting to order at 6:05 p.m. Dr. Herrick welcomed attendees and asked everyone to introduce themselves. Following introductions, Dr. Reintjes expressed appreciation to the city officials for

EXHIBIT
C
exhibitsticker.com

attending and introduced Austin Jones, who serves as the Hospital's Senior Vice President and Chief Financial Officer.

**Audit Report:**
Mr. Jones reported that Forvis Mazars provided the audit as of June 30, 2025, which was shared with the City of NKC. The report includes a comparative analysis between FY 2024 and FY 2025. He presented a summary of the Hospital's combined audited financial statements:

- Emergency Room visits remained steady at 81,692.
- Inpatient admissions increased by approximately 2,000.
- Outpatient encounters totaled 271,000.
- Primary care visits amounted to 273,000.
- Total lives served reached 1,480,940, representing an 8% year-over-year increase.
- Net patient service revenue increased by 7-8%.
- Total operating revenue was $813M, while total operating expenses were $848M, resulting in an operating loss of -$35M.
- Investment returns totaled $23M, designated for reinvestment purposes.
- A non-capital FEMA grant was received, directly supporting patient care.
- Noncapital gifts and grants from philanthropic efforts generated $6.7M, earmarked for reinvestment.
- Total current assets, total assets, and deferred outflows of resources remained comparable to the prior year.
- The current portion of long-term debt included a $14M bond reclassified from long-term to short-term, scheduled for redemption in the coming weeks. After redemption, only one $40M bond will remain.

Mr. Jones concluded by saying that financial performance has been stable. Due to conservative management of debt and expansion initiatives, the Hospital is positioned to navigate economic challenges and maintain financial stability.

Mr. Jones introduced Kristen Guillaume, Chief Information and Digital Officer.

**Community Benefit Report:**
Ms. Guillaume provided the following updates:

- Community Partnerships:
  - NKC Health's commitment to the community is demonstrated through collaborative relationships. In the past year, we have partnered with 172 organizations to advance our shared objectives. New partners include Dearborn Senior Collaborative, Bethel Green Castle Assisted Living, St. Therese Parish, Kansas City Public Library, Pleasant Valley Baptist Church, and Phoenix Family Assisted Living Centers.

- We continue to provide in-kind support to organizations such as Samuel Rodgers, Level Up Kids, and KC Hospice & Palliative Care by offering complimentary facility space. This enables our partners to enhance their programs and expand services for the broader community.
- Our campus provides a dynamic environment for more than 100 Northland CAPS Healthcare students from 16 high schools. These students participate in practical experiences, including shadowing, internships, and mentorship of student-led projects. During the past year, we hosted 47 tours, coordinated 167 shadow opportunities, and mentored eight student initiatives.
- Our dedication to workforce development is reflected in strong affiliations with higher education institutions. Over the last year, more than 1,300 students from 26 universities and colleges completed a combined total of over 83,000 clinical hours at our facility. As a community-focused hospital, these partnerships are essential to cultivating local talent and ensuring continued regional growth and service.

- This summer, we began our latest Community Health Needs Assessment (CHNA) to identify top health priorities in our community. Over the next three years, we will focus on cardiovascular care, cancer care, and mental and behavioral health. The following sections summarize our progress and achievements in these areas, showing our commitment to improving community well-being.
    - Cardiovascular Care:
        - We organized nearly 150 cardiac screening events, reaching 14,000 individuals to support heart health.
        - Over 500 fitness and health classes engaged almost 40,000 participants in activities like group exercise and health workshops. Popular programs include Sleep is a Superpower, Intermittent Fasting, Her Heart Matters, and Healthy Habits for Prediabetes.
        - We held 37 CPR classes and partnered with fire departments in six rural Missouri cities to deliver CPR, AED, Stop the Bleed, and Narcan training to 47 first responders and residents, enhancing emergency readiness in underserved areas.
        - Upcoming plans include launching blood pressure kiosks, community A1C screenings, virtual support for rural communities, and a Better Breathers club for chronic heart and lung condition support.
    - Cancer Care:
        - We conducted 13 Dermascan events screening 146 people and held 19 breast health education sessions with 874 participants. Lung cancer screenings increased by 35% in October.

        - Three oncology presentations were delivered in this year's Lunch & Learn series, reaching hundreds both live and on YouTube.
        - The first EmpowerHER event offered women resources on preventive care, mental health, and self-advocacy, with 122 attendees joining sessions on cardiac health, pelvic floor health, menopause, and screenings.
        - Thirteen workplace health presentations were given to major employers, including a breast health talk at JE Dunn led by Michelle Lane.
        - Glow All Out at CPKC Stadium hosted 700 guests, raising nearly $700,000 for a TrueBeam Linear Accelerator. The next event is set for October 9, 2026, benefiting women's health.
        - Upcoming plans include a Mayo Clinic-based smoking cessation program and a Caregiver Support Group launching in January.
- Mental and Behavioral Health:
    - Our "Save a Life" series made a big difference last year, with 52 Narcan education and distribution events and over 2,200 kits handed out. These efforts raised awareness about opioid overdoses and provided crucial resources. Recently, with support from Northland CAPS students and the Platte County School District Superintendent, we're preparing to educate and equip all Northland school district bus drivers with Narcan.
    - Suicide Prevention: We offered 12 Question, Persuade, Refer (QPR) classes to teach crisis intervention skills at various workplaces and for the public. Additionally, 308 participants attended 11 Mental Health First Aid classes, gaining practical tools to support those facing mental health challenges.
    - Impact: Drug-related deaths in Clay, Platte, and Jackson counties fell by 11% in the first half of 2024 compared to the same period in 2023. This improvement reflects the commitment of all participants in these initiatives.
    - Future Initiatives: Building 2900 is being demolished for a new inpatient psychiatric center with 36 adult beds, set to open at the end of 2026. NKC Health received $10M from the state of Missouri to support the project. This initiative aims to improve mental health care in our community.
- Access to Healthy Food:
    - Although not a formal focus area this cycle, access to healthy food emerged as a key community priority in Clay County. We remain dedicated to improving food access in our region.
    - Community Roots Garden: With $20,000 in funding, we created a garden with six raised beds, producing over 1,200 pounds of fresh produce in the

first year. Volunteer support was crucial for both harvest and community involvement.

- In partnership with Northland Shepherd's Center, our Meals on Wheels program delivered more than 30,000 meals last year, ensuring that vulnerable residents have consistent access to nutritious food.
- We plan to expand the community garden to boost yields, engage more volunteers, aid employees in need, and host new events focused on healthy food and community health.

- Bringing Our New Brand to the Community:
  - Photos were shared that showcase key moments from recent events where we launched our new brand. Each gathering underscored our dedication to education, outreach, and support, while strong participation demonstrated how the brand is fostering community connections.

**NKC Health Update:**
Dr. Reintjes provided the following hospital updates:

- NKC Health partnered with the Mayo Clinic Care Network (MCCN) in April of 2025. MCCN collaborates with approximately 45 hospitals around the country. NKC Health has utilized several MCCN resources since the collaboration began.
- The rebrand was announced in June 2025. We have established a single brand and cohesive health system for both hospital and outpatient services. Our logo features a color scheme that intentionally differs from our competitors.
- Strategic Investments – First Quarter Fiscal Year 2026 Growth Compared to Fiscal Year 2025
  - Deliveries: Highest quarter ever, with 663 deliveries, a 31.3% increase over FY 2025.
  - NICU: Average daily census of 9.5, up 28.8% from FY25.
  - GI Lab: 2,960 procedures, marking a 43% increase over FY25.
  - Cardiac Cath Lab: 19% increase in procedures compared to FY25.
  - Oncology:
    - Radiation Oncology - 1,153 treatments, a 54.1% increase.
    - Medical Oncology - 2,352 infusions, a 1,992% increase.
  - Medical Group Visits: 166,832 visits, representing a 9.3% increase.
- Market share for NKC Health is greater than 40% for the hospital, obstetrics, inpatient oncology, and inpatient orthopedic and spine services.
- Medicare Advantage Strategy: Strategy includes Traditional Medicare, Humana Medicare Advantage, and Medicare Supplement Plans. The overarching goal is to provide for our community.

Mayor Smith raised concerns about the One Big Beautiful Bill Act (OBBBA). Dr. Reintjes explained that the OBBBA legislation was signed into law on July 4, 2025, and its greatest

impact will be felt after the midterm elections in November 2026, with both rural hospitals expected to be disproportionately affected. Dr. Reintjes said healthcare leaders are looking for solutions and NKC Health recently hosted a Missouri Hospital Association event that included 30 rural hospitals collaborating to address the challenges.

Mayor Smith inquired about ways the city could advocate to state representatives. Dr. Reintjes suggested prioritizing mitigation of future uninsured individuals to prevent negative impacts on hospitals. Mr. Jones emphasized the importance of supporting behavioral health, and Dr. Reintjes noted NKC Health is partnering with University Health to establish a lower-acuity behavioral health facility.

Ms. Magrone noted the Department of Education's recent announcement regarding the reclassification of nursing degrees from professional to non-professional status, which will reduce the allowable loan amounts for students in these programs. Dr. Reintjes stated that, over the next decade, there is an anticipated shortage of two million nurses and this policy change could have significant adverse consequences for the healthcare system.

Dr. Herrick asked how the hospital will be involved with the 2026 World Cup. Dr. Reintjes mentioned that the Missouri Hospital Association is participating, along with a local coalition of hospitals making plans. According to FIFA, major teams are interested in coming to Kansas City because of the excellent facilities. It's expected that two or three top teams will visit, bringing more visitors for extended stays.

Dr. Herrick thanked everyone for attending the joint meeting.

**Adjournment**
On motion of Ms. Lillis, seconded by Ms. Shaw, the Board unanimously voted to adjourn at 7:10 p.m.

THE BOARD OF TRUSTEES OF
NORTH KANSAS CITY HOSPITAL
Closed Session

January 9, 1993

The Board of Trustees met in Closed Session on Saturday, January 9, 1993 at 8:50 a.m. in the Boardroom. Trustees present were:

Terry Myers, Chairman
Sandra Ferguson, Vice Chairman
Virginia Bowser, Secretary
Cathrine Morris, Temporary Treasurer
Betty Sue Cliff
Donald Fakhoury, M.D.
Frances Foerschler
Jack Goodman

Others present were:

Bruce Kauk, President of the Medical Staff
Larry Hollenbeck, President-Elect, Medical Staff
Bryan Bownik, Chairman, Long Range Planning Committee of Medical Staff
Mike Payne, President of the Hospital
Nettie Agnew, Vice President - Clinical Services
Cheri Wilson, Vice President - Finance
Yvonne Seckington, Director - Public Relations/Marketing
Maudie Higgins, Executive Secretary
Charles Myers, Spencer Fane Britt & Browne
Peggy Schmidt, Spencer Fane Britt & Browne

<u>Sale of Barry Road Property</u>

Mike Payne reported that an offer has been received from a broker who has a client interested in the purchase of the Hospital's property on Barry Road. Mr. Payne advised that an appraisal of the land was done in October of 1992 with a value of $205,000. The offer presented to the Hospital is for $205,000 plus the buyer is willing to pay approximately $16,500 in sales commission. Mr. Payne advised that, if approved, the sales agreement would stipulate that the property can not be used for healthcare purposes.

Following discussion, Ms. Cliff moved, seconded by Ms. Bowser, to accept the offer as presented. On a roll call vote, the motion passed unanimously.

(Dr. Kauk arrived.)

EXHIBIT
D
exhibitsticker.com

Purchase of PBN

Mr. Payne advised that the Hospital has been asked to consider purchasing Professional Building North. Discussion followed regarding the background of PBN and the present condition of the building. Mr. Payne reviewed a list of areas that would need attention if NKCH did purchase the building, based on a walk-through inspection by Ken Williams, Director of Facilities. Additional discussion ensued regarding the asking purchase price of $4.5 million plus an estimated $1 million to upgrade the building. Mr. Payne also discussed the rationale behind purchasing PBN.

(Sandra Ferguson arrived.)

Following discussion, Dr. Fakhoury moved, seconded by Ms. Ferguson to authorize Administration to negotiate for the purchase of Professional Building North up to $4 million. On a roll call vote, the motion passed unanimously.

HMO and Not-for Profit Organization

Mr. Payne presented a proposal for NKCH to become an equity owner in HealthSource, Inc., along with Health Midwest Venture's Corp, Inc., Olathe Health Development Corp, Providence St. Margaret Health Center and Integrated Healthsystems, Inc. The primary asset of HealthSource, Inc. is a closed panel HMO. Mr. Payne reviewed the primary objectives of an HMO which is to hire their own physicians and refer to hospitals based on an "as need" basis. Mr. Payne said another objective of HMOs is to keep the number of admits at a minimum. He said this principle goes against what NKCH's primary mission is, which is to treat inpatients. He then discussed a concern of the Medical Staff that NKCH's participation in this HMO would mean direct competition with the Medical Staff. Mr. Payne added that if NKCH does not participate in this HMO, some other healthcare facility will, which will also have an adverse affect on NKCH admissions.

Mr. Payne said that this proposal is the first of two parts and if the Board does not agree to the second part of the proposal he would prefer to lose the HMO to someone else. Mr. Payne then presented the idea of forming a not-for-profit organization which would allow NKCH to work with physicians in other areas. He said by agreeing to both parts of this proposal, it would make the participation in the HMO more feasible and worth the risk.

(Dr. Hollenbeck arrived.)

Discussion followed regarding the method in which an HMO works and how important it is to work with the family practitioners and internal medicine physicians who support NKCH. Mr. Payne said that a not-for-profit organization would allow us to assist physicians which would ultimately increase patient volume.

(The Board took a 10 minute break.)

Charles Myers discussed the possible formation of a not-for-profit corporation and outlined key points related to HealthSource, Inc. He also presented two methods of structuring such an organization and discussed the advantages and disadvantages of both. Mr. Myers reviewed the overall general issues that must be dealt with before forming a corporation.

Discussion followed regarding the formation of HealthSource, Inc., the investment by NKCH and the makeup of the voting members of the HMO. A proposed "Summary of Shareholders Agreement" was distributed to members of the Board and discussed by Charles Myers.

Following further discussion, it was agreed that another Called Meeting of the Board would be held on January 18, 1993, at 1:00 p.m., and the proposal to become an equity owner in HealthSource, Inc. and to establish a not-for-profit organization would be voted on at that meeting.

On motion of Ms. Bowser, seconded by Ms. Cliff, and on a roll call vote, the Board authorized Charles Myers to prepare all necessary paperwork in relation to NKCH possibly joining the HMO and forming a not-for-profit organization.

Return to Open Session

On motion of Ms. Bowser, seconded by Ms. Cliff, the Board agreed to return to Open Session.

Terry Myers, Chairman     Virginia Bowser, Secretary

Called Meeting
Board of Trustees
January 18, 1993
Closed Session

The Board of Trustees met in Closed Session on Monday, January 18, 1993, in the Boardroom. The meeting was called to order by Chairman Terry Myers at 1:26 p.m. Trustees present were:

Virginia Bowser
Betty Sue Cliff
Donald Fakhoury, M.D.
Sandra Ferguson
Frances Foerschler
Jack Goodman
~~Gus Leimkuhler~~
Cathrine Morris
Terry Myers
Scott Werner, M.D.

Others present were:

Mike Payne, President of Hospital
Cheri Wilson, Vice President - Finance
Yvonne Seckington, Director - Public Relations/Marketing
Maudie Higgins, Executive Secretary
Charles Myers, Spencer Fane Britt & Browne
Peggy Schmitt, Spencer Fane Britt & Browne

Terry Myers said the purpose of the called meeting was to continue discussions on the proposal to participate in the HMO, Blue Advantage and to form a not-for-profit corporation. Mr. Payne added that he wanted to make sure everyone understood that the NKCH Board of Trustees would have complete control of the proposed corporation if approved.

Charles Myers distributed copies of a proposed Resolution and an outline of a loan agreement and reviewed both documents. (Copies of these documents are attached.) Mr. Myers said the proposed resolution would authorize a loan in the amount of $2,272,445 to the Missouri-Not-for-Profit Corporation for participation in the HMO. Discussion followed.

Charles Myers said that if the Resolution is adopted, the structure of the corporation and the Loan Agreement will be presented at the regular Board Meeting on January 25, 1993.

Further discussion ensued.

EXHIBIT
E
exhibitsticker.com

Return to Open Session

On motion of Dr. Werner, seconded by Ms. Cliff, the Board returned to open session.

Terry Myers, Chairman

Virginia Bowser, Secretary

# RESOLUTION

**WHEREAS,** HealthSource, Inc., a Missouri corporation, is currently engaged in the business of a mixed model health maintenance organization ("HMO"); and

**WHEREAS,** the Board of Trustees of North Kansas City Hospital ("NKCH") has been asked to become a participant in said HMO; and

**WHEREAS,** NKCH believes that participation in the HMO will assist NKCH in meeting its obligations to serve the health care needs of the community; is consistent with its goals and objectives; and serves a valid public purpose.

**NOW THEREFORE, BE IT RESOLVED,** that the Board of Trustees of North Kansas City Hospital does hereby approve participation in the HMO;

**RESOLVED,** that the Board does hereby authorize the expenditure of Two Million Two Hundred Seventy-Two Thousand Four Hundred Forty-Five and No/100 Dollars ($2,272,445.00) for participation in such HMO;

**RESOLVED,** that the Board of Trustees does hereby authorize the payment of said funds described above to a Missouri-Not-For-Profit Corporation to be formed to support and assist facilities owned, operated, or managed by the Board of Trustees of North Kansas City Hospital;

**RESOLVED,** that the payment to said Not-For-Profit Corporation shall be made pursuant to a Loan Agreement in a form consistent with the Outline of Loan Agreement presented to the Board at this meeting with

EXHIBIT
F

said final Loan Agreement subject to the approval of the Board of Trustees of North Kansas City Hospital; and

**RESOLVED FURTHER,** that the officers designated above are hereby authorized, empowered, and directed to do all such acts and things and to execute, acknowledge and deliver all such documents and to pay all such fees, taxes, and expenses as may in their discretion be deemed necessary or desirable in order to carry out and comply with the terms and provisions of this Resolution and the Outline of Loan Agreement; and all of the acts and doings of such officers which are in conformity and with the intent and purposes of this Resolution whether heretofore or hereafter taken or done, shall be and the same are hereby in all respects, ratified, confirmed, and approved.

THE BOARD OF TRUSTEES OF
NORTH KANSAS CITY HOSPITAL
Regular Session

January 25, 1993

The Board of Trustees met on Monday, January 25, 1993 at 6:00 p.m. in the Boardroom. Trustees present were:

Terry Myers, Chairman
Sandra Ferguson, Vice Chairman
Virginia Bowser, Secretary
Cathrine Morris, Temporary Treasurer
Betty Sue Cliff
Donald Fakhoury, M.D.
Frances Foerschler
Jack Goodman
Gus Leimkuhler
Scott Werner, M.D.

Others present were:

Mike Payne, President of the Hospital
Nettie Agnew, Vice President - Clinical Services
Cheri Wilson, Vice President - Finance
Yvonne Seckington, Director - Public Relations/Marketing
Maudie Higgins, Executive Secretary
Charles Myers, Spencer Fane Britt & Browne
Peggy Schmitt, Spencer Fane Britt & Browne
John Muller, Muller + Co.
Anita Gorman, Parks Department
Joe Galetti, Kansas City Fire Department

Following dinner the meeting was called to order by Chairman Terry Myers at 6:40 p.m.

Children's Fountain

Anita Gorman presented a proposal asking for support for a children's fountain in North Kansas City. She said a contribution by NKCH would be in the best interest of the Hospital as the fountain would make North Kansas City a more beautiful community. Ms. Gorman reviewed drawings of the proposed fountain and said the cost of the small sculptures will be approximately $25,000 each and $75,000 for the larger sculpture. She asked the Board to consider a contribution of $100,000. Mr. Galetti and Ms. Gorman then answered questions relating to the fountain.

EXHIBIT
G

Terry Myers thanked Ms. Gorman and Mr. Galetti for the presentation and advised them that the Board would discuss the request for a contribution toward the Children's Fountain.

(Ms. Gorman and Mr. Galetti left the meeting at this point.)

Advertising Campaign

John Muller recapped the image campaign and said this campaign will continue to run through October, 1993. Mr. Muller then presented the new OB campaign and discussed what has been most successful for NKCH in the past.

(Mr. Muller left the meeting at this point.)

Approval of Minutes

On motion of Ms. Ferguson, seconded by Mr. Leimkuhler, the minutes of the November 21, 1992, Special Board Orientation were approved.

On motion of Ms. Ferguson, seconded by Dr. Werner, the minutes of the November 23, 1992 Regular Meeting were approved.

Mr. Leimkuhler moved, seconded by Dr. Fakhoury, to approve the minutes of the January 9, 1993, Called Meeting. The motion passed unanimously.

Minutes of the January 18, 1993, Called Meeting were presented, and Mr. Leimkuhler advised that the minutes reflected, in error, that he was present at that meeting. On motion of Ms. Bowser, seconded by Dr. Werner, the minutes of the January 18, 1993, were approved as amended.

Auxiliary Bylaws

The attached changes to the Auxiliary Bylaws were accepted on motion of Dr. Fakhoury, seconded by Ms. Cliff.

Finance Committee

On motion of Ms. Morris, seconded by Ms. Ferguson, the minutes of the December 21, 1992, Finance Committee meeting were accepted. The minutes of the January 18,

1993, Finance Committee Meeting were accepted on motion of Ms. Ferguson, seconded by Ms. Morris.

Administrative Report

Mr. Payne discussed the attached summary of the Regulatory Inspections conducted at NKCH for 1992. No action was required.

Cheri Wilson discussed the Hospital's accounts receivable policy and went over the procedure on how and when accounts are turned over to a collection agency. Ms. Wilson advised that accounts on Medicare patients are never turned to a collection agency. She then discussed the criteria necessary to be considered bad debt.

Discussion regarding the bill from NKC for services was discussed.

Jack Goodman announced that he would be running for Mayor of North Kansas City.

Motion for Closed Session

On motion of Ms. Ferguson, seconded by Ms. Foerschler, and on a roll call vote, the Board went into closed session relating to sections 610.021 (1) (2) (3) and (13) of the Revised Statutes of Missouri, should Section 610.010 et. seq. of the Revised Statutes of Missouri apply to NKCH.

Return to Open Session

The Board returned to open session at 9:30 p.m.

Adoption of Resolution

On motion of Mr. Leimkuhler, seconded by Dr. Werner, the attached Resolution was adopted by the Board of Trustees.

Treasurer of Board

Ms. Bowser moved, seconded by Ms. Ferguson, to appoint Cathrine Morris as full time Treasurer to complete the present term. The motion passed unanimously.

Adjournment

The meeting adjourned at 9:35 p.m.

Terry Myers, Chairman

Virginia Bowser, Secretary

1992 REGULATORY AGENCY INSPECTIONS
NORTH KANSAS CITY HOSPITAL

| | | |
|---|---|---|
| February 7, 1992 | Allied Health Education & Accreditation<br>(Radiographer Program) | In Compliance |
| March 3, 1992 | Clay County Health Department<br>Food Service Establishment | Corrective Action Completed<br>within 10 days |
| March 20, 1992 | American College of Radiology<br>Certificate of Accreditation (Siemens Mammomat B) | In Compliance |
| June, 1992 | Pace Incorported<br>Waste Water Testing | In Compliance |
| June 9, 1992 | Gas Monitoring, Inc.<br>Waste Anesthetic Gas | In Compliance |
| June 22, 1992 | Clay County Health Department<br>Food Service Establishment | In Compliance |
| July 9, 1992 | North Kansas City Fire Department<br>Fire Safety Survey Record<br>(Mental Health Center) | In Compliance |
| September 1, 1992 | Department of Health & Human Services<br>Laboratory Registration Certificate (CLIA) | In Compliance |
| November 10, 1992 | State Board of Pharmacy<br>State of Missouri | In Compliance |
| November 17, 1992 | Missouri Department of Health<br>Mammography Authorization (2 machines) | In Compliance |

z:\wp\reg.inspec

**North Kansas City Hospital**
**Auxiliary Bylaws Changes**
**11/18/92**

Article III Section Two - Auxiliary Provisions

B. (paragraph 2)

At the February meeting of the Auxiliary Board of Directors, the Treasurer's report shall include an accounting of the total of all fund-raised monies (not dues) accumulated during the current fiscal year. At the annual meeting ~~70%~~ 60% to 90% of fund-raised monies accumulated shall be presented as a pledge to North Kansas City Hospital.

Article VI Section Two - Composition

A. The voting members of the Board of Directors shall consist of ~~nine~~ eight Directors and eight Officers of the corporation elected as provided in Article VII, Section One.

B. The nonvoting members shall consist of the ~~Archives Chairman, Legislation Chairman and Parliamentarian, all of which are appointed,~~ Chairman of the Archives, Circulation, Crafts, Gift Shop, Legislation, Parliamentarian, and Yearbook Committees and representatives of the Hospital Administration.

Article X Section One - Standing Committees

**Items A, D, E, G, I, T are transferred from Article X, Section One to Article X, Section Two.**

Item L. - Personnel Committee

5. study and assess the short- and long-term goals of the Auxiliary.

Item M. - Planning Committee

**Eliminate**

Item O. - Scholarship Fund Committee

2. consist of a Director as Chairman, plus the Assistant Treasurer, three members at large of the Auxiliary, one representative of the hospital, and, if available, one member of the Finch family.

Article X Section Two - Additional Committees

The President shall designate ~~such~~ additional committees such as those listed in this section on as needed basis and shall appoint, with the approval of the Board of Directors, the Chairmen.

**Transferred from Section One, A, D, E, G, I, T**

# RESOLUTION

## BOARD OF TRUSTEES OF NORTH KANSAS CITY HOSPITAL

### January 25, 1993

**RESOLVED,** that the Board of Trustees of North Kansas City Hospital does hereby approve the form of the Loan Agreement by and between the Board of Trustees of North Kansas City Hospital and the Meritas Health Corporation, a copy of which Loan Agreement was presented at this meeting and which is made a part of these minutes;

**RESOLVED FURTHER**, that the Chairman of the Board of North Kansas City Hospital, the President of North Kansas City Hospital, the Vice-Chair of the Board of Trustees of North Kansas City Hospital, and the Secretary of the Board of Trustees of North Kansas City Hospital, or any of them, be and they hereby are authorized and directed to execute on behalf of the Board of Trustees documents substantially in the form thereof now before this Board and hereby approved, with such changes therein as shall be approved by the foregoing officers, and the execution of such document by any of the foregoing officers shall constitute conclusive evidence of the officers' approval and this Board's approval of any departures therein from the form of Loan Agreement thereof now before this Board; and

**RESOLVED FINALLY**, that the foregoing officers are hereby authorized, empowered, and directed to do all such acts and things and to execute, acknowledge, and deliver all such documents and to pay all such fees, taxes, and expenses as may in their discretion be deemed necessary or desirable in order to carry out and comply with the terms and provisions of this Resolution, the document submitted to this meeting in the form of a Loan Agreement; and all of the acts and doings of said officers which are in conformity of the intent and purposes of this Resolution whether heretofore or hereafter taken or done, shall be and the same are hereby in all respects, ratified, confirmed, and approved.

# LOAN AGREEMENT

THIS LOAN AGREEMENT is entered into as of the ____ day of __________________, 1993 by and between the Board of Trustees of North Kansas City Hospital (the "Hospital") and Meritas Health Corporation, a Missouri not for profit corporation (the "Borrower").

WHEREAS, the Board of Trustees of the Hospital has been asked to participate in the Blue-Advantage health maintenance organization ("HMO") operated by HealthSource, Inc., a Missouri corporation ("HealthSource"), and has determined that such participation will assist the Hospital in meeting its obligations to serve the health care needs of the community, is consistent with its goals and objectives, and serves a valid public purpose; and

WHEREAS, Borrower is a not for profit corporation formed for the purpose of supporting and assisting facilities owned, operated, or managed by the Board of Trustees of the Hospital; and

WHEREAS, both Borrower and Hospital will receive benefits as a result of Borrower becoming a participant in the HMO by investing $2,272,445 in HealthSource and both Borrower and Hospital have determined that it is in their best interests for Borrower to invest such funds; and

WHEREAS, Hospital has agreed to loan funds to the Borrower for the purpose of investing in HealthSource; and

WHEREAS, Borrower desires to borrow such funds from Hospital on the terms and conditions set forth below;

NOW, THEREFORE, the parties hereto agree as follows:

1. Subject to the terms and conditions of this Agreement, Hospital agrees to lend to Borrower the aggregate principal amount of $2,272,445 (hereinafter defined as the "Loan"). The Loan shall be without recourse to Borrower, except that Hospital shall have rights to the Collateral (as that term is defined below) in accordance with the terms of this Loan Agreement. Such Loan shall be made in two portions, which portions shall be repaid by Borrower as set forth below:

(a) Borrower promises to pay Hospital the principal sum of One Million Five Hundred Seventy-four Thousand Eight Hundred Forty-five Dollars ($1,574,845), together with interest at a variable rate equal to the "Prime Rate" as effective on the last banking day of May each year as published by The Wall Street Journal (the "Prime Rate"), with any change in the interest rate to be effective on the first day of June each year. Interest at the rate provided above

shall accrue and accumulate on the principal amount outstanding for the period from the date hereof to May 31, 1994, and such accumulated interest shall bear interest. On July 1, 1995, the Borrower shall pay all accrued yet unpaid interest (plus the accrued yet unpaid interest thereon) from the date hereof through and including May 31, 1995. Thereafter, Borrower shall pay interest as it accrues on the first day of each July for the immediately preceding year measured from June 1 to May 31. Notwithstanding the foregoing, the interest payable by Borrower hereunder shall be limited to the amount of interest properly payable by HealthSource to Borrower under the Surplus Note in the principal amount of $1,574,845 dated ________________, 1993 and due on May 31, 2007 (the "Note"). All accrued yet unpaid interest plus the principal sum of $1,574,845 shall be due and payable on June 1, 2007.

(b) Borrower promises to pay to Hospital the principal sum of Six Hundred Ninety Seven Thousand Six Hundred Dollars ($697,600), together with interest at the same rate of interest paid on the HealthSource Subordinated Convertible Surplus Debenture due May 31, 2007, held by Borrower (the "Debenture"); provided, however, that the total amount of interest payable during any twelve-month period ending May 31 ("Annual Period") shall not exceed the sum of (i) the amount which would have been due and payable during such twelve-month period assuming that the rate of interest was the Prime Rate, plus (ii) the excess (if any) of the amount of interest that would have been paid during previous Annual Periods if the interest rate during such periods had been the Prime Rate over the amount of interest already paid during previous Annual Periods. Interest payments shall be due thirty (30) days after the date that interest payments to Borrower under the Debenture are properly due and payable. All accrued yet unpaid interest plus the principal sum of $697,600 shall be due and payable on June 1, 2007.

Borrower shall have the right to prepay the Loan in whole or in part at any time and from time to time without penalty or premiums. Any such prepayment shall be accompanied by notice from Borrower specifying which portion of the Loan such prepayment applies to, or how such prepayment should be allocated between the two portions. The prepayment allocated to either portion of the Loan shall be applied first to the payment of accrued interest and second to reduce the principal balance outstanding.

2. Borrower hereby grants to Hospital a security interest in all right, title and interest of Borrower in the Collateral (as defined below) to secure the performance and payment of all of Borrower's obligations described in this Agreement, including but not limited to, repayment of the Loan described in paragraph 1 hereof, and for all costs and expenses in the collection of the

same, including reasonable attorneys' fees (collectively the "Obligations"). As used herein, the term "Collateral" means (a) the Note, (b) the Debenture, (c) all additions, products, proceeds, or substitutes of or for the Note or the Debenture, and (d) any securities in respect of, or in exchange for, the Debenture, whether upon conversion of the Debenture or subsequently by way of dividends other than cash dividends, stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations, exchanges of shares or otherwise. The security interest granted hereunder shall remain in effect until the performance and payment in full of all the Obligations.

3. Borrower will deliver to Hospital possession of the Note and Debenture, and any other certificate or document evidencing the Collateral, and will execute and deliver any assignment or other document necessary to perfect the Hospital's security interest in the Collateral. Upon request by Hospital and at Borrower's expense, Borrower shall take all such lawful action as Hospital may request to compel or secure the performance or observance by any person of such person's obligations under or in respect of the Collateral in accordance with the applicable terms thereof, and exercise any and all rights, remedies, and privileges lawfully available to Borrower under or in respect of the Collateral to the extent and in the manner directed by Hospital, including without limitation, the transmission of notices of default on the part of any such person thereunder and the institution of legal or administrative proceedings to compel or secure performance by any such person of such person's obligations under or in respect of the Collateral. Borrower shall not, without the prior written consent of Hospital (which consent shall not be withheld unreasonably), exercise any right, remedy or privilege available to Borrower with respect to the Collateral, take any action to compel or secure performance or observance by any person of such person's obligations thereunder, or give any consent, request, notice, direction, approval, extension, or waiver under or in respect of the Collateral not required to be exercised, taken, observed or given by Borrower pursuant to the terms thereof.

4. Borrower will provide Hospital on June 30 of each year, during the term of this Agreement, an accounting of all sums paid or received by Borrower pursuant to the Note or the Debenture or any other obligation or agreement between Borrower and HealthSource. Borrower shall deliver to Hospital, within ninety (90) days after the close of its fiscal year, copies of financial statements of Borrower, as of the close of such period, prepared in accordance with generally accepted accounting principles, and in a form and substance acceptable to Hospital.

5. Borrower shall, upon Hospital's request, make available for inspection, by duly authorized representatives of Hospital, any of its books and financial records and shall furnish Hospital with

any information regarding its business affairs and financial condition as Hospital may from time to time reasonably request.

6. Borrower shall promptly notify Hospital of any condition or event which may constitute a default under this Agreement, and of any events or changes in the operation, properties, or condition, financial or otherwise, of Borrower, which may result in a material adverse change in the financial condition of Borrower.

7. Borrower shall not, without Hospital's consent, liquidate or discontinue its normal operations with the intent to liquidate, merge or consolidate with any corporation, firm, partnership or other entity, or sell, transfer, lease or otherwise dispose of a substantial portion of its assets.

8. Borrower represents, warrants and covenants, that:

(a) Borrower shall use the proceeds of the Loan only for the purpose of loaning funds to HealthSource pursuant to the Note and the Debenture.

(b) Borrower is, shall, and will be, the lawful owner of the Collateral, free from any and all security interests granted by Borrower to secure any of its obligations to any other person, firm or corporation, except for the security interest granted in favor of the Hospital by this Agreement.

(c) Borrower has the right to pledge, sell, assign or transfer the Collateral to Hospital in accordance with the terms of this Agreement.

(d) The Collateral will not be pledged, sold, assigned or transferred to any other person other than Hospital or in any way further encumbered except to Hospital.

(e) Borrower will warrant and defend the Collateral against the lawful claims and demands of all persons.

(f) Borrower will perform all covenants and agreements set forth in this Agreement.

(g) Borrower shall join in executing, or will execute as appropriate, all necessary financing statements in a form satisfactory to Hospital to properly perfect Hospital's security interest in the Collateral. Borrower further warrants that no financing statement covering the Collateral, or any part or proceeds thereof, is presently on file in any public office.

9. The occurrence of any one or more of the following events shall constitute a default by Borrower under this Agreement and thereupon at the option of Hospital, the Loan will become

immediately due and payable without notice (except as expressly set forth herein), presentment or demand of any kind, all of which are hereby expressly waived by Borrower:

(a) Any failure to pay when due, whether by acceleration or otherwise, any principal or interest upon the Loan.

(b) Any breach by Borrower of any provision, warranty or covenant contained herein which breach is not cured within thirty (30) days after written notice to Borrower.

(c) Any representation or warranty made by Borrower, or any written statement, opinion or certificate furnished hereunder, by or for Borrower shall prove untrue in any material respect.

10. When any event of default described above has occurred and is continuing, Hospital may, by notice in writing sent to Borrower, declare the principal of, and any accrued interest on, the Loan to Hospital immediately due and payable, and effective upon the mailing of such notice, all such indebtedness and liability shall become and be immediately due and payable.

11. Upon the occurrence of an event of default, Hospital shall be entitled to receive all payments made under the Collateral and to apply them toward the payment of the Loan until the default is cured. In addition, when any default described above has occurred and is continuing, Hospital shall have the right to have the Collateral transferred to its own name, or to the name of its nominee.

12. The failure of Hospital to exercise any right or remedy, including acceptance by Hospital of partial or delinquent payments, shall not constitute a waiver of any obligation from Borrower or right of Hospital, or constitute a waiver of any other similar default occurring subsequently.

13. All notices, requests and demands to or upon the respective parties hereto shall be in writing and shall be deemed to have been duly given or made when delivered by hand, or when deposited in the mail, or when delivered to an overnight delivery service addressed as follows or to such other address as to which any party may be hereafter notified by the other party:

Borrower:

President
Meritas Health Corporation
2800 Clay Edwards Drive
North Kansas City, Missouri 64116

Hospital:

President
North Kansas City Hospital
2800 Clay Edwards Drive
North Kansas City, Missouri 64116

14. All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement.

15. This Agreement shall be binding upon and inure to the benefit of Borrower, Hospital, and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of Hospital.

16. This Agreement, and any other document executed and delivered in connection with the Loan, and the rights and obligations of the parties hereunder shall be governed by, and construed and interpreted in accordance with, the laws of the State of Missouri without giving effect to any principles of conflicts of laws thereof.

17. This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof and may not be modified orally, but only by an agreement in writing signed by the parties hereto after the date of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

NORTH KANSAS CITY HOSPITAL

By:______________________________

Its:_____________________________

Borrower:

MERITAS HEALTH CORPORATION

By:______________________________

Its:_____________________________

# ARTICLES OF INCORPORATION

# OF

# MERITAS HEALTH CORPORATION

FILED AND CERTIFICATE OF INCORPORATION ISSUED

JAN 25 1993

Judith K. Moriarty

We, the undersigned, being natural persons of the age of eighteen (18) years or more, and citizens of the United States, for the purpose of forming a corporation under "The General Not For Profit Corporation Law" of the State of Missouri, do hereby adopt the following Articles of Incorporation:

## ARTICLE I

The name of the Corporation is Meritas Health Corporation.

## ARTICLE II

The period of duration of the Corporation is perpetual.

## ARTICLE III

The address of its initial Registered Office in the State of Missouri is 1000 Walnut, Suite 1400, in the City of Kansas City, Missouri 64106-2140 and the name of its initial Registered Agent at said address is Spenserv, Inc.

## ARTICLE IV

This Corporation shall have no authority to issue capital stock.

## ARTICLE V

The names and addresses of the incorporators are as follows:

cfm: A:\BLANKAO1.2: 01-25-93

EXHIBIT

H

| Name | Address |
| --- | --- |
| Charles F. Myers | 1000 Walnut, Suite 1400<br>Kansas City, Missouri 64106 |
| Peggy F. Schmitt | 1000 Walnut, Suite 1400<br>Kansas City, Missouri 64106 |
| Gregory C. Lawhon | 1000 Walnut, Suite 1400<br>Kansas City, Missouri 64106 |

## ARTICLE VI

The property, business and affairs of the Corporation shall be controlled and managed by a Board of Directors. The first Board of Directors shall be six (6) in number. The number of Directors (except for the first Board of Directors), and the manner in and terms for which they are elected, shall be as provided in the Bylaws of the Corporation, which provisions may be changed from time to time by appropriate amendment of the Bylaws, but in no event shall the number of Directors be less than three (3).

The names and addresses of the members of the first Board of Directors are as follows:

| Name | Address |
| --- | --- |
| Terry W. Myers | 1911 East 29th Avenue<br>North Kansas City, Missouri 64116 |
| Sandra P. Ferguson | 6502 Melody Lane<br>Parkville, Missouri 64152 |
| Virginia Bowser | 1244 East 25th Avenue<br>North Kansas City, Missouri 64116 |
| Cathrine Morris | 2907 Cheyenne Circle<br>North Kansas City, Missouri 64116 |
| Michael E. Payne | 9823 Juniper Lane<br>Overland Park, Kansas 66207 |
| Cheri A. Wilson | 102 Hackberry<br>Lee's Summit, Missouri 64064 |

## ARTICLE VII

The Corporation shall have voting members who shall consist of those persons who from time to time are members of the Board of Trustees of North Kansas City Hospital, existing under the authority of Sections 96.150 through 96.228, Revised Statutes of Missouri, 1986, as amended (hereinafter sometimes referred to as "Voting Members"); provided, however, that the right of Voting Members to vote shall be limited to voting on any proposed amendments to the Articles of Incorporation of Corporation as provided in Article XIV of these Articles of Incorporation and to voting on amendments to the Bylaws adopted by the Board of Directors of the Corporation as set forth in the Bylaws of the Corporation.

## ARTICLE VIII

The Corporation is organized exclusively for charitable and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the Board of Trustees of North Kansas City Hospital, existing under the authority of Sections 96.150 through 96.228, Revised Statutes of Missouri, 1986, as amended ("North Kansas City Hospital"), and which is exempt from federal income tax under Section 501(c)(3) of the Code.

All references in these Articles of Incorporation to sections of the Code shall be considered references to the Code as amended from time to time, to the corresponding provisions of any similar internal revenue law subsequently enacted, and to all regulations issued under such sections and provisions.

## ARTICLE IX

The Corporation is a not for profit charitable and educational organization and no part of the net earnings or property of the Corporation will inure to the benefit of, or be distributable to its members, directors, officers or other private individuals, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article VIII hereof. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing of or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

## ARTICLE X

The Corporation shall have all of the powers conferred by "The General Not For Profit Corporation Law" of the State of Missouri, except that, any other provision of these Articles to the contrary notwithstanding, the Corporation shall neither have nor exercise any power, nor carry on any other activities not permitted: (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Code; or (b) by a corporation contributions to which are deductible under Section 170 (c)(2) of the Code.

## ARTICLE XI

All directors and officers who are not compensated for their services on a salary or prorated equivalent basis, shall be immune from personal liability for any civil damages arising from acts performed in their official capacity. The immunity shall extend only to such actions for which the director or officer would not otherwise be liable, but for the director's or officer's affiliation with the Corporation. This immunity shall not apply to intentional conduct, wanton or willful conduct, or gross negligence. Nothing herein shall be construed to create or abolish an immunity in favor of the Corporation itself.

## ARTICLE XII

The Corporation shall indemnify to the full extent authorized or permitted by the laws of the State of Missouri, as now in effect or as hereafter amended, any person made or threatened to be made a party to any threatened, pending or completed action, suit or proceeding (whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation) by reason of the fact that the person is or was a director, officer, committee member, employee or agent of the Corporation or serves any other enterprise as such at the request of the Corporation.

The foregoing right of indemnification shall not be deemed exclusive of any other rights to which such persons may be entitled apart from this Article XII. The foregoing right of indemnification shall continue as to a person who has ceased to be a director, officer, committee member, employee or agent and shall inure to the benefit of the heirs, the executors and administrators of such a person.

## ARTICLE XIII

In the event of the dissolution of the Corporation, the Board of Directors shall, after paying or making provision for the payment of all of the liabilities of the Corporation, distribute all the assets of this Corporation to North Kansas City Hospital.

If, however, North Kansas City Hospital does not exist at the time of said dissolution, then the Board of Directors of this Corporation shall distribute all of the assets of this Corporation to the City of North Kansas City, Missouri. If both North Kansas City Hospital and the City of North Kansas City, Missouri do not exist at the time of said dissolution, then the Board of Directors of this Corporation shall dispose of all of the assets of this Corporation exclusively for charitable and educational purposes to one or more organizations which are located in or providing services in Clay, Platte, or Ray Counties of Missouri, and which are organized and operated exclusively for charitable and educational purposes or similar purposes as shall at the time qualify: (a) as an exempt organization under Section 501(c)(3) of the Code; and (b) as an organization contributions to which are deductible under Section 170(c) of the Code, in such manner as the Board of Directors shall determine. Any of such assets not so disposed of shall be disposed of by the district court of the county in the State of Missouri in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine which are organized and operated exclusively for such purposes.

## ARTICLE XIV

The power to alter, amend, or repeal the Bylaws of the Corporation and to propose amendments to these Articles of Incorporation shall be vested in the Board of Directors of the Corporation, subject to the powers of the Voting Members as set forth in the Bylaws. The power to adopt proposed amendments to these Articles of Incorporation shall be vested in the Voting Members.

**IN TESTIMONY WHEREOF**, we have hereunto set our hands this 25th day of January, 1993.

Charles F. Myers

Charles F. Myers, Incorporator

Peggy F. Schmitt

Peggy F. Schmitt, Incorporator

Gregory C. Lawhon

Gregory C. Lawhon, Incorporator

**STATE OF MISSOURI** )
) ss.
**COUNTY OF** Jackson )

I, a Notary Public, do hereby certify that on the 25th day of January, 1993, personally appeared before me Charles F. Myers, Peggy F. Schmitt, and Gregory C. Lawhon, and being first duly sworn by me severally

acknowledged that they signed as their free act and deed the foregoing document in the respective capacities therein set forth and declared that the statements therein contained are true, to their best knowledge and belief.

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal the day and year above written.

Peggy L. Lingo
Notary Public

My Commission Expires:

PEGGY L. LINGO
Notary Public - State of Missouri
Commissioned in Clay County
My Commission Expires March 31, 1993

FILED AND CERTIFICATE OF INCORPORATION ISSUED

JAN 25 1993

Judith K. Moriarty

No. N00047373

# STATE OF MISSOURI

**Judith K. Moriarty**
SECRETARY OF STATE

CORPORATION DIVISION

CERTIFICATE OF INCORPORATION

GENERAL NOT FOR PROFIT

WHEREAS, DUPLICATE ORIGINALS OF ARTICLES OF INCORPORATION OF

MERITAS HEALTH CORPORATION

HAVE BEEN RECEIVED AND FILED IN THE OFFICE OF THE SECRETARY OF STATE, WHICH ARTICLES, IN ALL RESPECTS, COMPLY WITH THE REQUIREMENTS OF GENERAL NOT FOR PROFIT CORPORATION LAW;

NOW, THEREFORE, I, JUDITH K. MORIARTY, SECRETARY OF STATE OF THE STATE OF MISSOURI, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY LAW, DO HEREBY CERTIFY AND DECLARE THIS ENTITY A BODY CORPORATE, DULY ORGANIZED THIS DATE AND THAT IT IS ENTITLED TO ALL RIGHTS AND PRIVILEGES GRANTED CORPORATIONS ORGANIZED UNDER THE GENERAL NOT FOR PROFIT CORPORATION LAW.

IN TESTIMONY WHEREOF, I HAVE SET MY HAND AND IMPRINTED THE GREAT SEAL OF THE STATE OF MISSOURI, ON THIS, THE 25TH DAY OF JANUARY, 1993.

Judith K. Moriarty
*Secretary of State*

$10.00



S.O.S. #30

# AMENDED AND RESTATED
# BYLAWS
# OF
# MERITAS HEALTH CORPORATION

## ARTICLE I

## NAME, ORGANIZATION AND LOCATION

**Section 1.** The name of this Corporation is Meritas Health Corporation.

**Section 2.** The Corporation is organized under "The Missouri Nonprofit Corporation Act."

**Section 3.** The Corporation may have one (1) or more offices within or without the State of Missouri as the Board of Directors may from time to time determine.

## ARTICLE II

## MEMBERSHIP

**Section 1.** Voting Members. There shall be one (1) class of Voting Members. The qualification requirements of the class are as follows: Voting Members who shall consist of those persons who from time to time are members of the Board of Trustees of North Kansas City Hospital, existing under the authority of Sections 96.150 through 96.228, Revised Statutes of Missouri, 1994, as amended.

**Section 2.** Voting Rights. Voting Members shall have voting rights only with respect to voting on whether to adopt any proposed amendments to the Articles of Incorporation of the Corporation and voting on whether to reject any amendments to these Bylaws adopted by the Board of Directors, and each Voting Member shall have one (1) vote with respect thereto.

**Section 3.** Meeting Place. All meetings of the Voting Members shall be held at such place within or without the State of Missouri as may be designated from time to time by resolution or written consent of the Voting Members, or by a resolution of the Board of Directors. In the absence of any such designation of a place for a meeting, the meeting shall be held at North Kansas City Hospital, 2800 Clay Edwards Drive, North Kansas City. Missouri.

**Section 4.** Annual Meeting. Beginning in January 1994, the annual meeting of the Voting Members shall be held at 7:00 p.m. on the fourth Monday of January of each year, or, if such date shall be a legal holiday, then at the same hour on the first business day thereafter. If the annual meeting of Voting Members is not held at such time and place as designated herein, said annual meeting shall be held as soon thereafter as is practicable and may be called by the Board of Directors, by any Voting Member, or by the President of the Corporation. At the annual meeting, the President and the Chief Financial Officer shall report on the activities and financial condition of the Corporation and the Voting Members shall consider and act upon: (i) such other matters as may be raised by any Voting Member giving proper notice to the Corporation; or (ii) any amendment to the Corporation's Bylaws to increase or decrease the vote required for any Voting Member action.

EXHIBIT

I

**Section 5.** Special Meetings. Special meetings of the Voting Members may be called by the President of the Corporation; by the Board of Directors of the Corporation; or by any two Voting Members.

**Section 6.** Quorum. A majority of the Voting Members, whether represented in person or by proxy, shall constitute a quorum at any meeting of Voting Members, but less than such quorum shall have the right successively to adjourn the meeting to a specified date not longer than ninety (90) days after such adjournment, and notice shall be given of such adjournment to Voting Members not present at the meeting. The vote of two-thirds (2/3) of the votes entitled to be cast by Voting Members present at a meeting at which a quorum is present shall be necessary to adopt any proposed amendments to the Articles of Incorporation of this Corporation or to reject any amendments to these Bylaws adopted by the Board of Directors.

**Section 7.** Notice of Meetings of Voting Members. Written or printed notice stating the place, day, and hour of the meeting of Voting Members and, in case of a special meeting of Voting Members, the purpose or purposes for which the meeting is called shall, be delivered not less than ten (10), nor more than sixty (60), days before the date of the meeting, either personally or by first class or registered mail, to each Voting Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Voting Member at his/her address as it appears on the records of the Corporation, with postage thereupon prepaid.

**Section 8.** Proxy. Voting Members may vote either in person or by proxy executed in writing by the said Voting Member or by his/her authorized attorney-in-fact. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.

**Section 9.** Consent Action. Any action required by law or by these Bylaws to be taken at a meeting of the Voting Members, or any other action which may be taken at a meeting of Voting Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by eighty (80%) percent of the Voting Members.

**Section 10.** List of Members. After the record date for a notice of a meeting is fixed, the Corporation shall prepare an alphabetical list of the names of all Voting Members entitled to vote at the annual meeting. The list of Voting Members shall show the address of each Voting Member and shall state that each Voting Member listed is entitled to cast one (1) vote at the annual meeting. The list of Voting Members shall be made available for inspection by any Voting Member for the purpose of communication with other Voting Members concerning the meeting, beginning two (2) business days after notice is given of the meeting for which the list was prepared and continuing through the date of the meeting, at the Corporation's principal office. A Voting Member, a Voting Member's agent or a Voting Member's attorney is entitled on written demand to inspect the list, at a reasonable time, during the time it is available for inspection.

## ARTICLE III

## DIRECTORS

**Section 1.** Number. The property, business, and affairs of the Corporation shall be controlled and managed by a Board of Directors. The Board of Directors shall consist of nine (9) persons. Four (4) members of the Board of Directors shall consist of the following officers of the

Board of Trustees of North Kansas City Hospital: Chairperson, Vice-Chairperson, Secretary, and Treasurer. One (1) Director shall be the President (Chief Executive Officer) of North Kansas City Hospital and one (1) Director shall be the Vice-President of Finance (Chief Financial Officer) of North Kansas City Hospital. The three (3) remaining members of the Board of Directors shall be elected by the Board of Directors. Each member of the Board of Directors shall have one (1) vote. In the event the Chairperson of the Board of Trustees of North Kansas City Hospital is an individual who supplies services to, and receives compensation from the Corporation, then unless otherwise directed by the Board of Trustees of North Kansas City Hospital, the Chairperson shall not serve as a Board member or officer of Meritas, and the position which the Chairperson of the Board of Trustees of North Kansas City Hospital otherwise would fill on the Corporation Board of Directors shall be filled by election by the Board of Directors of the Corporation.

**Section 2.** Election. At each annual meeting of the Board of Directors, the Board of Directors shall elect members of the Board of Directors who are to be elected in accordance with Section 1, Article III of these Bylaws. Notwithstanding the foregoing, the initial three (3) members of the Board of Directors to be elected by the Board of Directors as provided above in Section 1, Article III may be done at any special or regular meeting of the Board of Directors and need not be elected at the same meeting. The President of North Kansas City Hospital shall submit nominations to the Board of Directors, however, members of this Board of Directors may make a nomination. The Directors elected shall hold office until the next annual meeting of the Board of Directors or until their successors shall have been elected and qualified or as otherwise provided in these Bylaws. A Director may be elected to succeed himself/herself in office. Each officer of the Board of Trustees of North Kansas City Hospital who is to serve as a member of the Board of Directors of this Corporation, the President (Chief Executive Officer) of North Kansas City Hospital and the Vice-President of Finance (Chief Financial Officer) of North Kansas City Hospital shall serve as members of the Board of Directors of the Corporation so long as they continue to hold such positions on the Board of Trustees of North Kansas City Hospital or at North Kansas City Hospital, as the case shall be. If they are no longer serving in such positions, they shall be deemed to have resigned as a member of the Board of Directors of this Corporation at the time they are not serving in such capacity. When a new President (Chief Executive Officer) or Vice-President of Finance (Chief Financial Officer) of North Kansas City Hospital or a new Chairperson, Vice-Chairperson, Secretary, or Treasurer of the Board of Trustees of North Kansas City Hospital is selected, such person shall immediately become a member of the Board of Directors of this Corporation.

**Section 3.** Vacancies. Vacancies of the Board of Directors (other than a vacancy in the position(s) of President (Chief Executive Officer) of North Kansas City Hospital, Vice-President of Finance (Chief Financial Officer) of North Kansas City Hospital, Chairperson, Vice-Chairperson, Secretary, or Treasurer of the Board of Trustees of North Kansas City Hospital) may be filled by a majority of the Board of Directors at any special meeting of the Board of Directors called for such purpose or at any regular meeting of the Board. The persons so elected to fill any vacancy shall serve until the next annual meeting of the Board of Directors or until their successors shall have been elected and qualified.

**Section 4.** No Cumulative Voting Rights. Members of the Board of Directors shall not have any cumulative voting rights.

**Section 5.** Removal of Director. At any meeting of the Board of Directors called expressly for such purpose, the Board of Directors may remove one or more Directors (except for the President (Chief Executive Officer) of North Kansas City Hospital, the Vice-President of Finance

(Chief Financial Officer) of North Kansas City Hospital, or Chairperson, Vice-Chairperson, Secretary, or Treasurer of the Board of Trustees of North Kansas City Hospital), with or without cause, by a vote of the majority of the Board of Directors that are entitled to vote at an election of directors.

**Section 6.** Annual Meeting/Place. The annual meeting of the Board of Directors shall be held at the same place as the annual meeting of the Voting Members, except that any adjournment thereof may be held at any place within or without the State of Missouri as designated by the Directors who adjourn the meeting. All regular and special meetings of the Board of Directors shall be held at the principal office of the Corporation or at such other place within or without the State of Missouri as designated by the Board of Directors.

**Section 7.** Annual Meeting/Time. The annual meeting of the Board of Directors shall be held immediately after the annual meeting of the Voting Members, except that if a quorum of the Board of Directors cannot then be assembled, the meeting shall be adjourned until a quorum is present, but in no event more than thirty (30) days after the annual meeting of the Voting Members. Regular meetings of the Board of Directors may be held at such times as determined by the Board of Directors; and special meetings may be called at any time by the President, any Vice-President, the Secretary, or the Treasurer of the Corporation, or any member of the Board of Directors.

**Section 8.** Notice. Regular meetings of the Board of Directors may be held without notice. Any notice of a regular meeting, or any waiver of notice, need not state the purpose of the meeting. Special meetings may be held upon two (2) days' written notice of the time, place, and purpose of the meeting. Any notice of a meeting of the Board of Directors shall be in writing and shall be deemed to have been duly given or delivered if delivered personally, or mailed, with first class postage prepaid, or if sent by facsimile transmission, with receipt of such facsimile transmission acknowledged.

**Section 9.** Waiver of Notice. Any notice of a meeting required by these Bylaws to be given to a Director may be waived if the Director signs a waiver of notice before or after the time of such meeting; and, upon signing such waiver, the Director shall be deemed to have received notice of the meeting. Attendance of a Director at any meeting shall constitute a waiver of notice except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened.

**Section 10.** Quorum. A majority of the full Board of Directors shall constitute a quorum for the transaction of business. The act of the majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless a larger vote is required by the Articles of Incorporation, these Bylaws, or the laws of the United States or the State of Missouri.

**Section 11.** Consent Action. Any action which is required to be or may be taken at a meeting of the Board of Directors, or any committee of the Board of Directors, may be taken without a meeting if consents in writing, setting forth the action so taken, are signed by all the members of the Board of Directors or of the committee as the case may be. Such consents shall have the same force and effect as a unanimous vote of the Directors at a meeting duly held. The Secretary shall file such consents with the minutes of the meetings of the Board of Directors or of the committee as the case may be. Any consent of the Board of Directors may be executed in counterparts. Each counterpart shall constitute an original, and all of the counterparts together shall constitute a single consent of the Board of Directors.

**Section 12.** Meeting by Conference Call. Members of the Board of Directors or of any committee designated by the Board of Directors may participate in a meeting of the Board of Directors or any committee thereof by means of conference telephone or similar communications equipment whereby all persons participating in the meeting can hear each other, and participation in a meeting in this manner shall constitute presence in person at the meeting.

**Section 13.** Resignation. Any Director may resign at any time by giving written notice to the President or to the Secretary of the Corporation. Such resignation, which may or may not be made contingent on formal acceptance, takes effect on the date of receipt or at any later time specified in it.

## ARTICLE IV

## COMMITTEES

**Section 1.** Appointment of Committees. A majority of the whole Board of Directors may designate an Executive Committee or any other committee of the Board of Directors. Each such committee shall consist of two (2) or more Directors elected by the Board of Directors and serving at the pleasure of the Board of Directors. Any vacancy on any committee shall be filled by the Board of Directors.

**Section 2.** Power and Authority of Committee. Subject to The Missouri Nonprofit Corporation Act and other applicable laws, each committee of the Board of Directors shall have and may exercise such powers and authorities as shall be designated by a majority of the whole Board of Directors; but the designation of such committee and the delegation of authority thereto shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed upon the Board of Directors, or any member thereof, by The Missouri Nonprofit Corporation Act. Any action taken by a committee of the Board of Directors shall be reported to the Board of Directors at its meeting next succeeding such action and shall be subject to modification by the Board of Directors; provided, however, that the rights of third parties shall not be adversely affected by any such modifications.

**Section 3.** Rules and Procedures. The rules and procedures relating to the operations of committees shall be designated by a majority of the whole Board of Directors, including without limitation, rules and procedures relating to the time and place of meetings, and notice, quorum and voting requirements.

## ARTICLE V

## OFFICERS

**Section 1.** Officers. The officers of the Corporation shall be a President, a Vice-President, a Secretary, and a Treasurer, and such other additional Vice Presidents or assistant officers as the Board of Directors may from time to time elect. If more than one (1) Vice-President is elected, the Board of Directors shall at the time of said election further determine the seniority of each of said Vice-Presidents. All officers shall be members of the Board of Directors. Any two (2) or more offices may be held by the same individuals, except those of President and Secretary.

**Section 2.** Election of Officers. The officers shall be elected annually by the Board of Directors at its annual meeting. Such officers shall hold office at the pleasure of the Board of Directors and until their successors are chosen and are qualified. A failure to elect annually a President, Treasurer, Secretary, or other officers or agents shall not dissolve the Corporation. Any officer elected by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Directors then in office, whenever in their judgment the best interests of the Corporation will be served thereby.

**Section 3.** Vacancy. In case any office shall become vacant by reason of the death, resignation, removal or otherwise, the Board of Directors, by vote of the majority of the Directors present at a meeting at which a quorum is present, may choose a successor or successors for the unexpired terms.

**Section 4.** Bond. The Board of Directors, by resolution, may require any officer to give bond to the Corporation, with sufficient surety or sureties, conditioned for the faithful performance of the duties of his/her office.

## ARTICLE VI

## DUTIES OF OFFICERS

**Section 1.** Duties of President: The President shall preside at all meetings of the Directors and shall have general supervision of the business and finances of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect, subject, however, to the right of the Directors to delegate any specific powers to any other officer or officers of the Corporation except such as may be by statute exclusively conferred upon the President.

**Section 2.** Duties of Vice-President. The Vice-President(s) shall perform such duties as shall be assigned to them and shall exercise such powers as may be granted to them by the Board of Directors or by the President. In the absence of the President, the Vice-President(s), in order of their seniority, may perform the duties and exercise the powers of the President with the same force and effect as if performed by the President.

**Section 3.** Duties of Secretary. The Secretary shall act as clerk at all meetings of the Board of Directors, and shall record all votes and the minutes of all proceedings in a minute book to be kept for that purpose. The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Directors or the President. The Board of Directors, at any meeting, may designate any of their number to act as Temporary Secretary in the absence of the Secretary.

**Section 4.** Duties of Treasurer. The Treasurer shall have custody of the corporate funds and shall keep accurate accounts of receipts and disbursements in books to be maintained by him/her for such purpose; the Treasurer shall deposit all monies and other valuable effects of the Corporation in the name and to the credit of the Corporation in depositories designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors and shall render to the President and Board of Directors at regular or special meetings thereof, an accounting of all the transactions conducted by the Treasurer and of the financial

condition of the Corporation including, but not limited to, obtaining an annual audit of the Corporation by an independent certified accounting firm.

## ARTICLE VII

## INDEMNIFICATION OF OFFICERS. DIRECTORS AND OTHERS

**Section 1.** Indemnification. The Corporation shall indemnify to the full extent authorized or permitted by the laws of the State of Missouri as now in effect or as hereafter amended any person made or threatened to be made a party to any threatened, pending or completed action, suit or proceeding (whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation) by reason of the fact that he/she is or was a Director, officer, committee member, employee or agent of the Corporation or serves any other enterprise as such at the request of the Corporation. The Corporation shall be authorized to enter into written indemnification agreements with any of such persons.

**Section 2.** Non-Exclusive Indemnification. The foregoing right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled apart from this Article VII. The foregoing right of indemnification shall continue as to a person who has ceased to be a Director, officer, committee member, employee or agent and shall inure to the benefit of the heirs, the executors and administrators of such a person.

## ARTICLE VIII

## AMENDMENTS

**Section 1.** Amendment to Bylaws Not Involving Voting Rights of Voting Members. Except as set forth in Section 2 below, these Bylaws may be amended at any meeting of the Board of Directors at which a quorum is present, by the affirmative vote of two-thirds (2/3) of the Directors present at such meeting; provided, however, that any amendments to these Bylaws adopted by the Board of Directors shall be submitted to the Voting Members and shall become final thirty (30) days after submission unless before the expiration of such period the Voting Members, by a vote of two-thirds (2/3) of the votes entitled to be cast by Voting Members present at a meeting at which a quorum is present, reject the amendments adopted by the Board of Directors.

**Section 2.** Amendments Involving Voting Rights of Voting Members. Amendments to these Bylaws to increase or decrease the vote required for any Voting Member action shall, in addition to being approved by the Board of Directors as set forth in Section 1 above, be approved by a vote of a majority of the votes entitled to be cast by Voting Members present at a meeting at which a quorum is present.

## ARTICLE IX

## CONFLICT OF INTEREST

**Section 1.** Disclosure of Conflict of Interest. Any Director, officer, key employee, or member of any committee of the Board having a substantial personal or private interest in a measure, contract, resolution, or other transaction presented to the Board of Directors or a committee thereof for deliberation, authorization, approval, or ratification, or any such person who reasonably believes such an interest exists in another person, shall make a prompt, full, and frank

disclosure of the interest to the Board or committee prior to its acting on such contract or transaction. The interested party shall disclose the nature and extent of his or her interest and any relevant and material facts, known to him or her about the measure, contract, resolution, or transaction which might reasonably be construed to be adverse to the interests of the Board.

**Section 2.** Body to Determine Voting Rights. The body to which such disclosure is made shall determine, by majority vote, whether the disclosure shows that the non-voting and non-participation provision below must be observed. If so, such person shall not vote on, nor use his or her personal influence on, nor participate (other than to present factual information or to respond to questions) in the discussions or deliberations with respect to, such contract or transaction. Such person may not be counted in determining the existence of a quorum at any meeting where the contract or transaction is under discussion or is being voted upon. The minutes of the meeting shall reflect the disclosure made, the vote thereon and, where applicable, the abstention from voting and participation, and whether a quorum was present.

**Section 3.** Substantial Personal or Private Interest Defined. Substantial personal or private interest is defined as ownership by the individual, his or her spouse, or his or her dependent children, whether singularly or collectively, directly or indirectly of: (1) ten percent (10%) or more of any business entity; or (2) an interest having a value of Ten Thousand Dollars ($10,000.00) or more; or (3) the receipt of a salary, gratuity, or other compensation or remuneration of Five Thousand Dollars ($5,000.00) or more, per year from any individual, partnership, organization, or association within any calendar year.

Corrective Action. Corrective and disciplinary action with respect to transgressions of these policies shall be taken by the Board as the Board deems appropriate and proper.

Date: Approved May 21, 2012

THE BOARD OF TRUSTEES OF
NORTH KANSAS CITY HOSPITAL
Closed Session
February 22, 2021

The Board of Trustees met in Closed Session on Monday, February 22, 2021, at 4:40 p.m. via zoom, Rebecca Welbern, Chairperson presiding.

Trustees present:

Rebecca Welbern, Chairperson
Thomas Herrick, M.D., Vice Chairperson
Glynda Jacobson, Secretary
Sheila Lillis, Treasurer
Johnathan Barnes
W. Kent Barr, M.D.
Linda Black
Don Bossert
Robert Magee
Mike Schumacher

Meritas Board of Directors Present:

Stephen Reintjes, Sr., M.D., President
Rebecca Welbern, Vice President
Glynda Jacobson, Secretary
Henry Seybold, Treasurer
Sheila Lillis, Assistant Secretary
Thomas Herrick, M.D.

Meritas Board of Directors Not Present:

Steve Starr, M.D.

Others present:

Stephen Reintjes, Sr., M.D., President & CEO
Henry Seybold, Senior Vice President - Finance & CFO
Kerri Jenkins, Senior Vice President & COO
Jennifer Kozinn, Vice President & General Counsel
Sarah Oakley, Vice President-Nursing
Joseph Eisenach, M.D., President, Medical Staff
Joseph Hiersteiner, Seigfreid Bingham
Scott Poague, Vice President, Supply Chain
Linda Coventon, Meritas Network Executive
Amy Thompson, Executive Assistant

EXHIBIT
J
exhibitsticker.com

Meritas Health Corporation Annual Report

Dr. Reintjes explained that Meritas Health Corporation is a wholly owned subsidiary of North Kansas City Hospital. Dr. Reintjes provided history on the formation of Meritas Health Corporation and the important role Meritas has played to form strategic alliances and solidify the provision of primary and specialty care physicians in the Northland.

Dr. Reintjes introduced the members of the Meritas Board and said that some of the members of the Meritas Board are on that Board by virtue of their position on the Hospital's Board of Trustees or position with the Hospital. The President & CEO and Sr. Vice President & CFO of NKCH are members of the Meritas Board of Directors, as well as the Chairperson, Vice Chairperson, Secretary and Treasurer of the NKCH Board of Trustees.

Dr. Reintjes welcomed Ms. Coventon to the meeting and said he was pleased to announce that she had been selected to receive the Lifetime Achievement Award by Ingram's Magazine.

Ms. Coventon provided the Meritas Health Corporation annual report and other highlights as follows:

- Meritas now employs 182 physicians, 39 Advanced Practitioners and 36 CRNAs, and is the largest physician organization in the Northland. There are 59 primary care physicians, 119 specialty care physicians and 4 corporate care physicians.
- Ms. Coventon compared the number of physicians by specialty between fiscal year 2020 and fiscal year 2021, and noted that evening Hospitalists had been added.
- Ms. Coventon said the overall average age of the physicians with Meritas has decreased over the last few years. The average age of the Primary care physicians has decreased with 42% being over the age of 60 in fiscal year 2015 and is now at 31% over the age of 60. This excludes the pediatricians.
- Meritas has transitioned to Cerner Ambulatory to streamline workflow and the transition occurred during the pandemic. Ms. Coventon noted that education continues on the system, which has been complicated. Meritas Health Occupational Medicine continues to expand, and the clinic on the NKCH campus has been remodeled. Meritas Health Occupational Medicine has transitioned to Systoc, an occupational medicine electronic medical record. Occupational Medicine continues to add new companies, with 32 current companies representing 15,000 employees.
- Meritas is focused on refining physician quality metrics and is in the last year for participation in CPC+. Ms. Coventon reminded the Board that Comprehensive Primary Care Plus (CPC+) is a CMS innovation project meant to strengthen primary care services. CPC+ is a five-year initiative meant to improve access and continuity, care management, comprehensive and coordinated care, patient and caregiver engagement, and data-driven population health management. Meritas primary care is also participating in Analyze Primary Care First, which is a new program.

- Meritas is expanding urgent care at Meritas Health Vivion and is contracting with the Midwest Emergency Medical Services group for staffing. The expansion was originally planned for February, with service hours during the evening and weekends, but has been delayed until October.
- The Hospital's bariatric program has transitioned to Meritas Health effective March 1st to the Total Weight Loss Center. The Center will be relocated to the Health Services Pavilion May 1st and will be run like a clinic. Previously having the service at the Hospital added cost for the patient.

(Mr. Barnes joined the meeting at this point.)

There were questions and discussion. In response to a question raised about efforts to increase market share, Ms. Coventon noted that Meritas has focused on increasing access to care and is monitoring wait times for patients to be able to get in with a clinic. A Nurse Practitioner has been added to Meritas Health Cardiology to improve wait times for that practice.

Dr. Reintjes commended Ms. Coventon and her team for their willingness to expand, strengthen relationships, and continue to meet the needs of our community.

Motion to Return to Open Session and Adjourn Joint Board Meeting

On motion of Mr. Magee, seconded by Ms. Lillis, and on a roll call vote, the Board unanimously voted to return to Open Session and adjourn the Joint meeting between the Board of Trustees of North Kansas City Hospital and the Board of Directors for Meritas Health Corporation.

The Board of Trustees reconvened in Closed Session at 5:05 p.m.

Board Rounding – Supply Chain Services

Mr. Seybold introduced Scott Poague, the Vice President of Supply Chain Services, and said that Mr. Poague joined NKCH in the midst of COVID and has done an excellent job in managing the Hospital's supply chain and has a long history in healthcare supply chain.

Mr. Poague said that the mission of the Supply Chain Services department is to support the Hospital's overall mission by providing products and services that are safe and reliable, and will enable clinical effectiveness throughout the patient care continuum. Supply Chain Services is divided in two teams: Strategic Sourcing and Procurement Operations. Both the buyers and sourcing specialists are cross trained in order to provide the best possible service. Mr. Poague noted that, not including the Meritas clinics, the Supply Chain Services department supports a $114 million supply budget, and highlighted the core medical supplies.

Mr. Poague talked about the challenges caused by the COVID-19 pandemic in securing needed supplies, and the standard costs for those supplies increasing exponentially. Mr. Poague said it was also difficult to predict the surge/volume and timing of supply needs, and the Hospital is working now to reduce some of the supply levels in certain areas.

Mr. Poague explained that, through the Hospital's group purchasing organization, it had established an annual savings goal as well as an additional savings goal of $3.34 million. Some of those savings were realized from total joint supplies, spine implants and pharmacy. There are approximately 80 saving initiatives that the supply chain has in progress. Mr. Poague said his team is also working on an Operating Room revitalization project to better manage the supplies in the Operation Room. After research, it was learned that the inventory was excessive and products expired prior to usage. Through the Hospital's relationship with Vizient, there has been $8.2 million in administrative fee return. Mr. Poague shared a graph depicting that, as of January 2021, the Hospital ranks 2nd out of 577 hospitals through the automated data submission process. This ranking is based on Vizient's aggregated score based on control of spend, data completeness and accuracy. Mr. Poague shared fun facts including that the Hospital uses 4,221 masks per day and 65,393 gloves per day. There was discussion.

(Mr. Poague left the meeting at this point.)

<u>Strategic and Administrative Initiatives Report</u>

Dr. Reintjes provided an update on the following matters:

<u>Operation Safe</u> – Dr. Reintjes provided a summary that the Missouri Department of Health and Senior Services announced the 16 High Throughput Health Care facilities and the Operation Safe coalition was designated as one of the 16. Dr. Reintjes said that the clinic had anticipated receiving 9,000 vaccine doses; however, with the inclement weather, that delivery had been delayed. As the vaccination plans have evolved, the NKCH team has provided a disproportionate share of personnel, equipment and materials needed to establish the mass vaccination clinic. The State of Missouri is also expecting the Coalition to continue as a high throughput clinic administering vaccine every two weeks for the next three to six months.

Dr. Reintjes said that he had requested that the four principal members of the coalition enter into a Memorandum of Understanding to outline the cost sharing details for the vaccination center. Dr. Reintjes noted that the Hospital was participating in providing a public service and believed it important that the public entities financially support those efforts. Currently, the Coalition is trying to secure funding through CARES act, other Federal and State funding, as well as County and municipalities.

Dr. Reintjes said that Cerner has committed to the coalition through May 1st and it is anticipated that each partner in the Coalition would support 25% of the operating cost which is roughly estimated to be at $450,000 for a total cost to operate February 1st through May 1st of $1.8 million. Dr. Reintjes conveyed that the Coalition was established, resources were expended, the State of Missouri is depending on the Coalition to administer the vaccine, and NKCH and Cerner should not be responsible for the burden of expense associated with the clinic operation. Dr. Reintjes said that the Memorandum of Understanding includes a "stop loss" provision on the financial contribution of each principal member of the coalition. While those provisions are still

being finalized, it is anticipated that the "stop loss" would be equal amongst the principal members and when the "stop loss" is met, Operation Safe would be disbanded.

Mr. Hiersteiner said that he has been involved in preparing and negotiating the Memorandum of Understanding and that there is generally no disagreement related to the framework; however, the principal members have not reached agreement on the cost sharing amount. There is also no leverage to ensure the other principal members contribute financially.

Dr. Reintjes noted that the Coalition was currently utilizing the Notable artificial intelligence software to register and communicate with patients, and it is also the software that is being considered for the Meritas Health Clinics. There was discussion.

Dr. Reintjes said that, while the specific details of the MOU are still being finalized, as well as the total amount related to the stop loss provision, he asked for the Board's approval to proceed with execution of the agreement and stop loss. There was discussion.

On motion of Dr. Barr, seconded by Ms. Lillis, and on a roll call vote, the Board unanimously authorized the completion and execution of the Memorandum of Understanding with the stop loss provisions as presented.

Strategic Planning/Leadership Development – Dr. Reintjes provided an update that work continues to develop a strategic plan and that Kaufman Hall has completed interviews with all Board members, Administrative Staff, and key leaders of the medical staff, and he thanked the members for their participation. The Kick-off meeting has been planned for March 10th, and Kaufman Hall will: 1) provide an overview of the strategic planning process in the concept of the "Near", "Now" and "Far", 2) talk about the healthcare market and trends in general; and, 3) present a summary from the interviews including specific data for North Kansas City Hospital. Breakout sessions will also be held with the participants on specific topics and the facilitators will rotate between the three groups. Each group will be comprised of Board members, Administrative Staff and physician leaders are a way to integrate all three group. A social gathering will be held immediately following the sessions. Dr. Reintjes noted that he is working with Kaufman Hall on leadership development for the entire administrative staff.

Dashboard Report – Dr. Reintjes said ER visits, inpatient volume and outpatient visits continue to be below targeted goals. Case Mix index is well above the targeted goal due to the acuity of the patients seen during the month and average daily census is above target. Supplies as a percent of Net Revenue is below target for the current month, but above on a fiscal year-to-date basis.

Fiscal Year 2021 – Dr. Reintjes brought to the Board's attention the Board Strategic Goals report included in the portal which summarizes the achievement of goals at the Threshold, Target or Stretch levels.

Dr. Reintjes noted that the Hospital currently had 22 active positive COVID patients and, at the beginning of January, active positive COVID patients was in the 90s. There have been 216 COVID related deaths since the start of the pandemic.

On motion of Ms. Black, seconded by Dr. Herrick, and on a roll call vote, the Board unanimously approved the actions, recommendations, and minutes from the following meetings: January 25, 2021, Closed Session Board; February 16, 2021, Closed Session Quality Committee; February 15, 2021, Executive Session NKCH Retirement Plan Investment Committee; and the February 15, 2021, NKCH General Investment Account Committee as presented.

(Mr. Seybold, Ms. Jenkins, Ms. Oakley, Ms. Kozinn, Ms. Thompson, and Dr. Eisenach left the meeting at 6:15 p.m.)

THE BOARD OF TRUSTEES OF
NORTH KANSAS CITY HOSPITAL
Closed Session
March 27, 2023

The Board of Trustees met in Closed Session on Monday, March 27, 2023, at 4:52 p.m. in North Kansas City Hospital's Boardroom, W. Kent Barr, M.D., Chairperson, presiding.

Trustees present:
W. Kent Barr, M.D., Chairperson
Thomas Herrick, M.D., Vice Chairperson
Sheila Lillis, Treasurer
Glynda Jacobson, Secretary
Craig Leonard, Assistant Secretary
Zachary Clevenger (Zoom)
Robert Magee
Mitchell Plyler (Zoom)
Mike Schumacher
Rebecca Welbern (Zoom)

Meritas Board of Directors Present:
Stephen Reintjes, Sr., M.D., President
W. Kent Barr, M.D., Vice President
Glynda Jacobson, Secretary
Austin Jones, Treasurer
Sheila Lillis, Assistant Secretary
Thomas Herrick, M.D.
Craig Leonard
Steven Starr, M.D.

Others present:
Stephen Reintjes, Sr., M.D., President & CEO
Rick Green, Sr. Vice President, Meritas Health Corporation
Kerri Jenkins, Sr. Vice President & COO
Austin Jones, Sr. Vice President & CFO
Sarah Oakley, Vice President-Nursing
Keenan Berghoff, M.D., President-Elect, Medical Staff
Joe Hiersteiner, Seigfreid Bingham
Lisa Crutchfield, Executive Assistant

**Meritas Health Corporation Annual Report and Strategic Plan**
Dr. Reintjes welcomed Rick Green, Senior Vice President of Meritas Health Corporation.

Dr. Reintjes explained that Meritas Health Corporation is a wholly owned subsidiary of North Kansas City Hospital and introduced members of the Meritas Board and said that some of the members of the Meritas Board are on that Board by virtue of their position on the Hospital's Board of Trustees or position with the Hospital. The President & CEO and Sr. Vice President & CFO of NKCH are members of the Meritas Board of Directors, as well as the Chairperson, Vice Chairperson, Secretary and Treasurer of the NKCH Board of Trustees.

EXHIBIT
K

Mr. Green provided the Meritas Health Corporation annual report and strategic plan update as follows:

- Recruitment: A listing of new physicians and ongoing recruitment efforts was presented.
- Notable Statistics: A Notable dashboard was reviewed. There was approximately $29K collected on outstanding balances, including copays. Mr. Green explained the conversion rate is the number of patients completing paperwork prior to their visits, and its currently 68%. There was a decrease in the conversion rate due to implementing text message reminders, and patients thinking their paperwork was complete after confirming their appointment via text message. Wording in the text message has been updated to include more clarity, and the conversion rate has begun to increase. Patient satisfaction for the online registration process was 98%.
- Primary Care Call Center: The Primary Care Call Center went live on November 30, 2022 in three clinic locations, with five employees. There are now six clinic locations, with eight employees. There have been 32,299 calls received through March 16, 2023. Mr. Green explained advantages to having a call center include the number of patients being circulated throughout the system; scheduling for multiple clinics provides more options and convenience; a reduction in calls to the offices; and efficiency and consistency have been enhanced.
- Direct Scheduling Update: A report for direct patient scheduling through Notable was presented. For the month of February, 14.58% of scheduling for Primary Care offices was through direct scheduling, and 4.20% for Specialty offices. Mr. Green explained that this is more challenging in specialty clinics due to the complexity in the cases. Approximately 25% of direct scheduling appointments are scheduled after clinic hours. There continues to be an increase in direct scheduling for patient convenience, which alleviates front desk staff scheduling.
- Network Integrity Information: A chart for referrals was presented. In fiscal year 2022 there were 69.3% referrals by Meritas providers to providers outside of the NKCH system. For fiscal year 2023 year-to-date there have been 59.9% such referrals.

  In fiscal year 2022 there were 64.3% physical therapy referrals to outside providers. For fiscal year 2023 year-to-date there have been 49.6% such referrals.

  In fiscal year 2022 there were 28.3% imaging referrals to outside providers. For fiscal year 2023 year-to-date there have been 24.7% such referrals.

  Mr. Green explained that not all services are provided through Meritas Health, which contributes to a portion of the referrals to outside providers.
- Reputation Score: Mr. Green explained that a reputation score is how the Hospital and Meritas Health score on social media. Included in the score are the volume of referrals, frequency of referrals, and satisfaction scores received. The Health System reputation score is 648, Hospital is 552, and Meritas Health is 655. All scores are well above the industry average. The Reputation.com impact report was presented and the average rating is currently 4.8 out of 5 stars, which has increased substantially. Mr. Green explained this score includes Healthgrades, Vitals, and other online ratings.

Following appointments, patients receive a text message asking them to rate their provider online. Mr. Green said physicians have been given their current rating.

- Meritas Workforce: Meritas Health is working with Park University for a Medical Assistant program. The first cohort of 10 graduated in December 2022; the second cohort of 9 graduated in March 2023; and the third cohort of 10 starts in May 2023. Most of the participants have been Hospital and Meritas Health employees; however, approximately 6 participants have been from the community.

- Mr. Green explained there continues to be evaluations of operations. Implementation of changes and enhancements include charge master fee increase; contract elimination and renegotiation; schedule changes and increased productivity; completion of patient assessment forms for Optum; changes in personnel utilization; and change in vendors.

  Mr. Green said the charge master fee increase included Meritas Health Express because Meritas was not charging what insurance providers pay for the services, and this increase has therefore resulted in a significant increase in cash collections.

  Mr. Green explained that Meritas is now beginning to utilize the same medical supply vendor as the Hospital.

  The completion of assessment forms for Optum will yield a return of nearly $400K.

Dr. Barr thanked Mr. Green for his presentation.

**<u>Motion to Return to Open Session and Adjourn Joint Board Meeting</u>**
On motion of Mr. Magee, seconded by Ms. Lillis, and on a roll call vote, the Board unanimously voted to return to Open Session and adjourn the Joint meeting between the Board of Trustees of North Kansas City Hospital and the Board of Directors for Meritas Health Corporation.

The Board of Trustees of North Kansas City Hospital reconvened in Closed Session at 5:41p.m.

**<u>Strategic and Administrative Initiatives Report</u>**
Dr. Reintjes provided updates on the following matters:

- **Health Equity:**
  Dr. Reintjes explained that there are national discussions about eliminating social health inequities and he discussed involvement of the Hospital related to health equity.

  First, NKCH partners with Kansas City Health Collaborative (KCHC), an organization convened by Health Forward Foundation. KCHC educates healthcare leaders around operationalizing health equities, and the various social determinants of health. This group is working together to identify ways to address health equity.

  Second, Missouri Hospital Association (MHA) has a data institute called HIDI, and they are identifying how each hospital collects information on the population, how readmissions are reviewed, etc.

Lastly, is an initiative led by Greater Kansas City Chamber of Commerce, and they have arranged a Healthcare Anchor Network. This is a community wide effort of several foundations and area hospitals with a focus on concepts of economic and racial equity.

Dr. Reintjes mentioned that NKCH reviews the money spent with minority owned companies, and approximately $1 of every $6 spent is with a minority owned company.

- **Home Health Discussion:**
  Dr. Reintjes explained that NKCH provides home health care for patients in four counties. There has been a financial loss through the Home Health Department for the last several years. Leadership has engaged FORVIS to assist in exploring opportunities for a joint venture with a national home health agency, with a goal to optimize home health and continue to grow this service.

  Dr. Reintjes explained the benefits of utilizing a larger home health firm include operational efficiencies such as capabilities in technology, marketing, etc. All of the firms which submitted in response to the NKCH RFP would brand under the NKCH brand.

  The Hospital has received five responses and invited three of the agencies to provide in-person presentations.

  There was discussion regarding the impact to NKCH Home Health Department employees and NKCH patients. Dr. Reintjes explained that the employees would transition to employment under the selected agency. There will be a shared governance between NKCH and the agency, and a clearly defined exit strategy, should any issues arise.

  Dr. Reintjes said the Leadership team will continue with due diligence and he will report back to the Board in the next month or two. Dr. Reintjes asked the Board to keep this discussion highly confidential.

- **Strategic Plan Scorecard**:
  Dr. Reintjes said there were two versions of the Strategic Plan Scorecard in the portal. The first version is the format it was previously presented as, and the second version is the proposed format. Dr. Reintjes explained that the new format provides more clarity for the status of each goal. It was a consensus of the Board to make the transition to the new format.

- **Fiscal Year 2023 Goals:**
  Dr. Reintjes brought to the Board's attention the Board Strategic Goals report which reflects where the Hospital is on a fiscal year-to-date basis in achievement of those identified quality and strategic goals.

**<u>Legal Counsel</u>**
There was no report.

**<u>Medical Staff Report</u>**

In Dr. Meredith's absence, Dr. Barr presented the slate of officers for the Medical Staff. All officers would assume positions July 1, 2023. The list was included in the portal under the Quality Committee section.

**Approval of Minutes**

Ms. Jenkins provided highlights of the quality scorecard.

On motion of Ms. Lillis, seconded by Mr. Magee, and on a roll call vote, the Board unanimously approved the February 27, 2023, Closed Session Board meeting; and March 21, 2023, Closed Session Quality Committee meeting; actions, recommendations, and minutes as presented.

*Ms. Jenkins, Mr. Jones, Ms. Oakley, and Dr. Berghoff left the meeting at this time.*

# JOINT MEETING OF
# THE BOARD OF DIRECTORS OF MERITAS HEALTH CORPORATION AND THE INDIVIDUAL MEMBERS OF THE BOARD OF TRUSTEES OF NORTH KANSAS CITY HOSPITAL IN THEIR CAPACITIES AS VOTING MEMBER OF MERITAS HEALTH CORPORATION

February 26, 1996
Boardroom of North Kansas City Hospital

North Kansas City Hospital Trustees present:

Jesse Roberts, M.D., Vice Chairperson
Virginia Bowser, Secretary
Cathrine Morris, Treasurer
Frances Foerschler
Mark Baldwin
Betty Sue Cliff
Gus Leimkuhler
Gerald Martin
Bradley Cochennet

Excused:

Terry Myers, Chairperson
Jack Goodman

Meritas Health Corporation Directors present:

Michael Payne, President
Virginia Bowser, Secretary
Cheri Wilson, Treasurer
Cathrine Morris
Jesse Roberts, M.D.
Bryan Bownik, M.D.

Others present:

Nettie Agnew, Senior Vice President
Peggy Schmitt, Vice President & General Counsel
Yvonne Seckington, Vice President - Marketing/Public Relations
Mike Mense, Vice President - Operations, Meritas
Barry Cooper, M.D. - President - Medical Staff
Amy Gerlt, Executive Secretary

Dr. Roberts called the meeting to order at 4:35 p.m.

EXHIBIT

L

exhibitsticker.com

Mr. Payne explained the purpose of the meeting was to review 1) the rationale for the establishment of Meritas Health Corporation; 2) the accomplishments of Meritas; and 3) how Meritas supported the Hospital's strategic plan. Mr. Payne stated that the Meritas Health Corporation was established to assist NKCH in fulfilling its mission.

Ms. Schmitt explained that NKCH needed to form a separate corporation in order to hold an equity ownership interest in TriSource, formerly HealthSource, a corporation which owns an HMO. Meritas Health Corporation was formed in January, 1993, and holds an equity ownership interest in TriSource through debentures. The members of the Board of Trustees of North Kansas City Hospital are the voting members of the Board of Meritas Health Corporation.

Ms. Wilson reviewed the financial reasons for the establishment of Meritas, including the effect on NKCH's Medicare reimbursement.

Mr. Payne presented the mission of Meritas Health Corporation: to assist NKCH in its mission of being the premier provider of healthcare services to Northwest Missouri with a commitment to excellence. The Corporate Purpose/Vision of Meritas Health Corporation is: to operate exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the Board of Trustees of North Kansas City Hospital.

Next Mr. Payne reviewed the Meritas success statements. Mr. Payne explained that the first Meritas purchase, which occurred in May of 1993, was the equity ownership in TriSource. This purchase relates the Meritas success statement concerning the development of a relationship with an insurer.

(Dr. Cooper joined the meeting at 4:45 p.m.)

Related to the success statement concerning building a primary care physician base, Mr. Payne reviewed the CEO's reasons for purchasing physician practices: to recruit and retain more physicians; to increase cooperation in cost containment; to increase cohesiveness among medical staff; to enhance quality of care; and, to contract with managed care plans. Next reviewed were the physicians' reasons for affiliations and mergers. Mr. Payne presented a summary of physician affiliation as a strategy, as depicted in the December 11, 1995, edition of "American Medical News".

Dr. Bownik reviewed the rationale for integrating different physician specialties with Meritas. He explained the increasing rate of technology is impressive, but rather expensive during the time of a shrinking economic environment. Dr. Bownik relayed the challenges physicians are faced with by being fiscally responsible while providing high quality patient care.

Dr. Bownik gave a brief background summary on Mr. Payne, Ms Schmitt, Ms. Wilson and Mr. Myers, and related this information to the formation of Meritas.

Dr. Bownik presented a definition of a physician as "one upon whom we set our hopes when ill and dogs when well." He described the different characteristics and future roles of the specialty physician groups of general family practice, pediatrics and internal medicine. He then described the role of subspecialties such as gastroenterology, radiology, pulmonary, and urology. The future goals of Meritas include expanding the physician base, increasing OB/GYN, breaking the disease cycle, ensuring alternative medical care and creating a healthy population.

Mr. Payne presented a model for Meritas Health Corporation's physician practice acquisition. He next reviewed the community need, quality, system, economic and contract components each practice must possess.

Mr. Payne reviewed the evolution of Meritas Health Corporation noting the dates physician practice acquisitions were made, as well as the individual physicians involved.

Mr. Payne next discussed the success statement concerning the development of services that will support primary care physician base and specialty physicians. Mr. Payne explained that the purchase of an interest in the HMBC limited liability company which provides physician billing services, as well as the purchase of the Antioch Plaza Professional Building, were in furtherance of this success statement.

Mr. Payne next discussed the success statement concerning the development of other health care related services that are not hospital based. Mr. Payne explained that the purchase of an interest in Premier WorkComp and the formation of NKCH Occupational Medicine, L.L.C. were in support of this success statement.

Ms. Wilson explained how Meritas Health Corporation supports the Physician Development core strategy included in the Hospital's strategic business plan. The first strategic initiative is to establish a formalized physician recruiting process, which has been started through the employment of a Physician Marketing Coordinator. The second strategic initiative is to create and implement a physician access plan. Coopers & Lybrand has been contracted with to help establish this plan. The third strategic initiative is to expand the role of Meritas to include development of a comprehensive management service organization that acquires and manages physician practices and provides support services to other physician practices.

Mr. Mense defined a management service organization as an entity established to provide management services to physician offices. Mr. Mense next reviewed the advantages a MSO would provide to physicians, which include providing assistance in contracting with insurance plans, recruitment assistance, and marketing of the physician practice. He then reviewed the disadvantages to a physician of joining a MSO, which include the physician's loss of control of the day to day operations of the clinic, the physician remains at risk for performance, and the division of authority could result in inconsistency with staff. The advantages and disadvantages of an MSO from the hospital perspective were reviewed in detail.

Mr. Mense presented a table depicting the total number of family practice, internal medicine, and pediatric physicians listed by hospital for Clay, Platte and Ray counties. He also presented a table depicting physician practices owned or managed by other entities, including Meritas. There were questions and discussion regarding contract specifics of MSOs.

Bylaws Revision

Ms. Schmitt stated that, in response to revisions to the Missouri not for profit corporation statute, the Meritas Board of Directors had adopted certain amendments to the Bylaws of Meritas Health Corporation and were recommending the amendments to the members of the Board of Trustees in their capacity as voting members of Meritas. On motion of Ms. Cliff, seconded by Mr. Martin, the individual Board members of North Kansas City Hospital unanimously voted to approve the amended Bylaws of Meritas Health Corporation as submitted.

Adjournment

The meeting adjourned at 5:30 p.m.

North Kansas City Hospital Board of Trustees:

Jesse Roberts, M.D.
Vice Chairperson

Virginia Bowser, Secretary

Meritas Health Corporation Board of Directors:

Michael Payne, President

Virginia Bowser, Secretary